# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

ALASKA INDUSTRIAL
DEVELOPMENT AND EXPORT
AUTHORITY, *et al.*,

        Plaintiffs,

  and

STATE OF ALASKA,

        Intervenor-Plaintiff,

  v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United
States, *et al.*,[1]

        Defendants,

  and

NATIVE VILLAGE OF VENETIE
TRIBAL GOVERNMENT, *et al.*,

        Intervenor-Defendants.

Case No. 3:21-cv-00245-SLG

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT

Before the Court at Docket 60 is the motion for summary judgment filed by

Plaintiffs Alaska Industrial Development and Export Authority ("AIDEA"), North

Slope Borough, Arctic Slope Regional Corporation, and Kaktovik Iñupiat

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the current Alaska State Director for the Bureau of Land Management, Steven Cohn, is automatically substituted in this matter for his predecessor, Defendant Thomas Heinlein.

Corporation; at Docket 59 is Intervenor-Plaintiff State of Alaska's (the "State") motion for summary judgment.[2] Plaintiffs and the State challenge President Joe Biden's Executive Order 13990 ("EO 13990") and actions the U.S. Department of the Interior ("DOI" or "Interior") and the Bureau of Land Management ("BLM") took to implement that order's directive to place a temporary moratorium (the "Moratorium") on the federal government's implementation of an oil and gas leasing program (the "Program") on the Coastal Plain of the Arctic National Wildlife Refuge ("ANWR" or the "Refuge").

The President, DOI, Interior Secretary Deb Haaland, Interior Principal Deputy Assistant Secretary of Land and Minerals Management Laura Daniel-Davis, BLM, BLM Director Tracy Stone-Manning, and BLM Alaska State Director Cohn (collectively, "Federal Defendants")[3] responded in opposition at Docket 63 to Plaintiffs' and the State's motions and request entry of judgment in their favor. Intervenor-Defendants Gwich'in Steering Committee, *et al.*, and the Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council (collectively, "Intervenor-Defendants") responded in opposition to Plaintiffs' and the State's motions at Docket 64 and Docket 65, respectively.[4] Federal

---

[2] Throughout this order, the citations to the parties' filings refer to the page numbers from the docket rather than the page numbers of the parties' briefs.

[3] When appropriate throughout this order, the Court refers to all Federal Defendants except for the President as "Agency Defendants."

[4] The Gwich'in Steering Committee submitted its opposition at Docket 64 on behalf of itself and the Alaska Wilderness League; the Alaska Wildlife Alliance; the Canadian Parks & Wilderness Society – Yukon; Defenders of Wildlife; Environment America, Inc.; Friends of Alaska National

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 2 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 2 of 74

Defendants and Intervenor-Defendants are hereinafter collectively referred to as "Defendants." Plaintiffs replied to the oppositions at Docket 67, and the State replied at Docket 66.

The Court heard oral argument on June 20, 2023. For the reasons set forth below, the Court denies Plaintiffs' and the State's motions and enters judgment in favor of Defendants.

## BACKGROUND

This case is one of several actions involving Agency Defendants' implementation of the Program on ANWR's Coastal Plain. The Court described the Coastal Plain and its cultural, ecological, and economic significance in a January 2021 order issued in *Gwich'in Steering Committee v. Bernhardt*.[5] The Court assumes familiarity here.

As relevant here, in December 2017, Congress authorized an oil and gas leasing program on the Coastal Plain through Section 20001 of the Tax Cuts and Jobs Act of 2017 (the "Tax Act").[6] Section 20001(b)(1) amends the Alaska National Interest Lands Conservation Act ("ANILCA")[7] by lifting the restriction on

Wildlife Refuges; the National Wildlife Federation; the National Wildlife Refuge Association; the Northern Alaska Environmental Center; the Sierra Club; The Wilderness Society; and Wilderness Watch. The remaining Intervenor-Defendants filed their joint opposition at Docket 65.

[5] Case No. 3:20-cv-00204-SLG, 2021 WL 46703, at *1–3 (D. Alaska Jan. 5, 2021).

[6] Pub. L. No. 115-97, 131 Stat. 2054 (2017) [hereinafter Tax Act].

[7] Pub. L. No. 96-487, 94 Stat. 2371 (1980) (codified in relevant part at 16 U.S.C. §§ 3101–3233) [hereinafter ANILCA].

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 3 of 74
Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 3 of 74

oil and gas development on the Coastal Plain that had been included in ANILCA since it was enacted in 1980; it does so by adding an additional purpose for the Refuge: "to provide for an oil and gas program on the Coastal Plain." Section 20001(b)(2)(A) directs the Interior Secretary to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Section 20001(c)(1) requires the Interior Secretary to conduct at least two area-wide lease sales under this program of at least 400,000 acres each; the Interior Secretary "shall offer" the first lease sale not later than December 22, 2021, and the second not later than December 22, 2024. Section 20001(c)(2) directs the Interior Secretary to "issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." Section 20001(c)(3) provides that the Interior Secretary "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section." The Tax Act further instructs the Interior Secretary, "[e]xcept as otherwise provided in this section," to administer this oil and gas program "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 . . . (including regulations)."[8]

---

[8] Tax Act § 20001(b)(3). The regulations governing oil and gas leases under the Naval Petroleum Reserves Production Act of 1976 (the "NPRPA"), 42 U.S.C. § 6501 *et seq.*, are set

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 4 of 74

After Congress passed the Tax Act, BLM initiated the Program's review process pursuant to the National Environmental Policy Act ("NEPA"). In September 2019, BLM released an Environmental Impact Statement (the "EIS") analyzing the environmental impacts of a leasing program on the Coastal Plain.[9] The EIS evaluated three action alternatives and one no-action alternative.[10] BLM identified the alternative that "offers the opportunity to lease the entire program area" and "the fewest acres with no surface occupancy (NSO) stipulations" as its preferred alternative.[11] BLM did not analyze alternatives that allowed fewer than 2,000 acres of surface facilities, reasoning that doing so "would be inconsistent with [the Tax Act] as Congress explicitly established the protective facility acreage limit."[12]

In August 2020, then-Interior Secretary David Bernhardt published a Record of Decision (the "ROD") establishing the Program.[13] The ROD adopted the preferred alternative identified in the EIS with some modifications.[14] Then, on December 7, 2020, BLM published a Notice of 2021 Coastal Plain Alaska Oil and

---

forth at 43 C.F.R. Part 3130.

[9] Administrative Record ("AR") 1–3135. Federal Defendants filed the Administrative Record at Docket 48, Docket 53, and Docket 56.

[10] AR 19–20.

[11] AR 19.

[12] AR 76.

[13] AR 3138–3225.

[14] AR 3145.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 5 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 5 of 74

Gas Lease Sale and Notice of Availability of the Detailed Statement of Sale.[15]  The

lease sale took place on January 6, 2021.[16]  Three bidders participated: AIDEA;

Knik Arm Services, LLC; and Regenerate Alaska, Inc.[17]  AIDEA secured leases for

seven tracts of land, while Knik Arm Services, LLC, and Regenerate Alaska, Inc.,

each secured a lease for one tract of land.[18]

When President Biden took office two weeks later, he issued EO 13990,

which directed DOI to conduct a supplemental environmental review of the

Program and, during the pendency of such review, temporarily halt all activities

related to the Coastal Plain oil and gas leases.[19]  Section 4(a) of EO 13990

provides:

> In light of the alleged legal deficiencies underlying the program,
> including the inadequacy of the environmental review required by the
> National Environmental Policy Act, the Secretary of the Interior shall,
> as appropriate and consistent with applicable law, place a temporary
> moratorium on all activities of the Federal Government relating to the
> implementation of the Coastal Plain Oil and Gas Leasing Program, as
> established by the Record of Decision signed August 17, 2020, in the
> Arctic National Wildlife Refuge. The Secretary shall review the
> program and, as appropriate and consistent with applicable law,
> conduct a new, comprehensive analysis of the potential
> environmental impacts of the oil and gas program.[20]

---

[15] 85 Fed. Reg. 78865–66.

[16] AR 3314–16.

[17] AR 3314–16.

[18] AR 3317–18, 3347, 3689, 3695.

[19] AR 3349–55.

[20] AR 3351.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 6 of 74

Following the President's directive, on June 1, 2021, Interior Secretary Haaland issued Secretarial Order 3401 (the "Secretarial Order"), which instructed DOI and BLM officials to conduct the supplemental environmental review and instituted a "temporary halt on all Department activities related to the Program in the Arctic Refuge" while that supplemental review was being conducted.[21] The temporary halt extended to "any action[s] to authorize any aspect of the Program, including, but not limited to, any leasing, exploration, development, production, or transportation," and the "process[ing of] any pending or future applications for such activities."[22] The Secretarial Order expanded upon the justifications for the temporary moratorium articulated in EO 13990:

> My review of the Coastal Plain Oil and Gas Leasing Program (Program) as directed by EO 13990 has identified multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under the National Environmental Policy Act (NEPA), including failure to adequately analyze a reasonable range of alternatives in the environmental impact statement (EIS); and (2) failure in the August 17, 2020, Record of Decision (ROD) to properly interpret Section 20001 of Public Law 115-97 (Tax Act).[23]

Also on June 1, 2021, DOI issued a Suspension of Operations and Production Letter (the "SOP Letter") to each of the lessees, notifying them it was suspending the leases and associated operations pending the supplemental

---

[21] AR 3362.

[22] AR 3363.

[23] AR 3362.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 7 of 74

NEPA review.[24]   The SOP Letter expanded upon the reasons offered for the temporary moratorium in the Secretarial Order, and a subsequent amendment offered further explanation.[25]

Agency Defendants plan to release a Draft Supplemental EIS for the Program in the third quarter of 2023.[26]   In the meantime, AIDEA, through its contractors, sought authorizations from DOI to begin the initial stages of oil and gas exploration pursuant to its leases, such as conducting archeological investigations and seismic exploration.[27]   Citing the Moratorium, Federal Defendants refused to authorize AIDEA or its contractors to proceed with any activities relating to the leases.[28]   AIDEA then brought this action on November 4, 2021, challenging both the President's issuance of EO 13990 and DOI's implementation of the Moratorium.[29]   The other two lessees have entered into

---

[24] AR 3364–65, 3714–17.

[25] AR 3364–65, 3404–05, 3714–17.

[26] Agency Defendants initially represented to the Court that they planned to release the Draft Supplemental EIS in the second quarter of 2023.  Docket 63 at 16.  However, in a related case, *Gwich'in Steering Committee v. Haaland*, Agency Defendants filed a more recent status report updating that timeframe to the third quarter of 2023.  Defs.' Status Report on Issuance of Draft Suppl. Environmental Impact Statement at 2, *Gwich'in Steering Comm. v. Haaland*, Case No. 3:20-cv-00204-SLG, (D. Alaska Apr. 28, 2023), ECF No. 95.

[27] AR 3370–98.

[28] AR 3399–3400.

[29] Docket 1.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 8 of 74

agreements with BLM in which BLM cancelled and rescinded their leases and refunded their bid and initial rental payments.[30]

In their complaint, Plaintiffs allege that the Moratorium violates the Administrative Procedure Act (the "APA"), 5 U.S.C. § 551 *et seq.*, because it was put in place without an opportunity for the public to comment on it, is contrary to law, unlawfully withholds or unreasonably delays agency action, and is arbitrary and capricious.[31] They also allege that EO 13990 is an *ultra vires* act that exceeds the President's authority.[32] Plaintiffs seek declaratory relief, a permanent injunction vacating Section 4(a) of EO 13990 and the Moratorium, and an order compelling Agency Defendants to implement the leasing and development program.[33]

For the purposes of this order, the Court considers the "Moratorium" to encapsulate Agency Defendants' efforts to implement the directive in EO 13990 by temporarily suspending implementation of the Program and the leases issued pursuant thereto. The Moratorium therefore includes issuance of Secretarial Order 3401, the SOP Letter, the responses to AIDEA and its contractors' attempts to conduct oil-and-gas-related activities on the lands leased pursuant to the Program,

---

[30] AR 3782–92.

[31] Docket 7 at 27–32, ¶¶ 115–48.

[32] Docket 7 at 32–33, ¶¶ 149–51.

[33] Docket 7 at 33–34.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 9 of 74

and the withholding of any further actions to implement the Program pending the ongoing NEPA review.[34] The Court considers Agency Defendants' supplemental environmental review aimed at correcting alleged legal deficiencies to be the Moratorium's primary justification, but this review remains ongoing and did not itself serve as the formal vehicle suspending the Program's implementation.[35]

## JURISDICTION

There is no dispute that the Court has subject matter jurisdiction over Plaintiffs' and the State's claims regarding Agency Defendants' actions taken to implement the Moratorium pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[36]

The parties dispute whether Plaintiffs and the State have standing to assert an *ultra vires* claim against the President with respect to his issuance of EO 13990.[37] To establish standing, a litigant must demonstrate that (1) it suffered an "injury in fact," (2) the injury is "fairly traceable" to the challenged conduct, and (3)

---

[34] AR 3362–65, 3395–96, 3399–3400, 3404–05, 3702–03, 3713–19.

[35] *See* Docket 66 at 15–16 (maintaining that Defendants conflate BLM's supplemental NEPA analysis with the Moratorium itself, noting that Agency Defendants could have conducted the supplemental review without imposing the Moratorium).

[36] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[37] *Compare* Docket 60 at 18–19 (alleging that Plaintiffs have standing), *with* Docket 63 at 21–26 (alleging Plaintiffs do not have standing and therefore the Court lacks subject matter jurisdiction over the claim against the President).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 10 of 74

it is likely that a favorable decision will redress the injury.[38]  To establish an injury in fact, a plaintiff must identify "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical."[39]  Plaintiffs and the State's asserted injuries pass this hurdle.  AIDEA Plaintiffs complain that they have been unable to proceed with the activities critical to developing AIDEA's leases, such as archeological and seismic work, meaning that they cannot reap the revenue, employment opportunities, and information gathering that would result from commencing work on the leases.[40]  The State similarly points to the revenue it has lost in the form of lease payments and taxes due to the Moratorium.[41]

To demonstrate a "fairly traceable" connection between an injury and an action, a plaintiff need only show "no more than de facto causality."[42]  Plaintiffs and the State's alleged injuries are fairly traceable to EO 13990 because that Executive Order directed DOI to suspend the leases and all related activities.[43]  DOI expressly acted at the President's direction when issuing Secretarial Order 3401

---

[38] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations omitted).

[39] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016) (citation omitted).

[40] Docket 60 at 18–19.

[41] Docket 59 at 16–17.

[42] *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (citation omitted).

[43] *See* AR 3351 ("[T]he Secretary of the Interior shall . . . place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program . . . .").

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 11 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 11 of 74

and implementing the other components of the Moratorium.[44]  It is fair to say that without the President's issuance of EO 13990, there likely would not have been a Moratorium, or at least not *this* moratorium implemented at the time and manner in which DOI implemented it.

To evaluate redressability, a court considers the relationship between "the judicial relief requested" and the suffered injury.[45]  The Court has the authority to vacate a President's *ultra vires* action and order Agency Defendants to implement the Program in accordance with the law,[46] which is precisely what Plaintiffs and the State are seeking and what would redress their injuries.[47]

Federal Defendants' arguments to the contrary are unavailing.  They point to two cases in which a district court rejected challenges to an executive order that allegedly "delayed or derailed the promulgation of desired rules."[48]  Each case challenged the same executive order that directed agencies to repeal two regulations for every new regulation issued, offset costs from new regulations by eliminating costs from existing regulations, and comply with an "annual cap" on the

---

[44] *See* AR 3362 ("This Order is taken in furtherance of Section 4(a) of Executive Order (EO) 13990 . . . .").

[45] *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (citation omitted).

[46] *See Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998).

[47] Docket 7 at 33–34; Docket 22 at 12–13.

[48] Docket 63 at 24 (first citing *California v. Trump*, 613 F. Supp. 3d 231 (D.D.C. 2020); and then citing *Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 152 (D.D.C. 2019)); *California*, 613 F. Supp. 3d at 236.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 12 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 12 of 74

total incremental costs allowed from all federal regulations issued in a given year.[49]

Each court found that the plaintiffs lacked standing because they could not show that the challenged executive order caused any material delay to the particular rules about which the plaintiffs complained and the agency defendants presented evidence showing that the delay or rescission of the rules was not connected to the executive order.[50]

Here, there is no genuine dispute that EO 13990 is causally connected to the Moratorium. The Executive Order not only expressly orders the Moratorium,[51] but the Secretarial Order and SOP Letter also expressly state the agency action was taken in furtherance of the Executive Order.[52] Thus, vacatur of EO 13990 would redress Plaintiffs' claimed injuries.

Given the above, the Court finds that Plaintiffs and the State meet the requirements for standing to challenge EO 13990. As a result, the Court has subject matter jurisdiction over the *ultra vires* claim pursuant to 28 U.S.C. § 1331, which vests the Court with jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."

---

[49] *See California*, 613 F. Supp. 3d at 236–37 (describing the nature of the claims at issue in both that case and *Public Citizen*).

[50] *Id.* at 244.

[51] AR 3351.

[52] AR 3362, 3364.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 13 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 13 of 74

## LEGAL STANDARD

Plaintiffs maintain that EO 13990 exceeds the President's statutory and constitutional authority.[53]  While a President's actions are not reviewable under the APA,[54] a court may review an executive order to determine whether it is constitutional and whether the President acted within his statutory authority.[55]

Plaintiffs and the State also seek review of Agency Defendants' implementation of the Moratorium pursuant to the APA.[56]  Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law[,] . . . [or] in excess of statutory jurisdiction, authority, or limitations."[57]

---

[53] Docket 60 at 19–20.

[54] *See Dalton v. Specter*, 511 U.S. 462, 470 (1994) ("The actions of the President, in turn, are not reviewable under the APA because . . . the President is not an 'agency.'" (citation omitted)).

[55] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself."); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (holding President lacked authority to issue executive order directing agencies to withhold funds appropriated by Congress to punish localities that adopted "sanctuary" policies).

[56] Plaintiffs and the State filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, which is an appropriate mechanism to seek review of an agency action.  Docket 59 at 2; Docket 60 at 7, 17–18; *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). *But see* Alaska L. Civ. R. 16.3 (providing procedures for briefing administrative agency appeals). Defendants also request judgment in their favor, effectively making their opposition filings cross-motions for summary judgment pursuant to Rules 56 and 7(b).  Docket 63 at 8 n.1; Docket 64 at 13–14; Docket 65 at 9.

[57] 5 U.S.C. § 706.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 14 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 14 of 74

**DISCUSSION**

Plaintiffs' and the State's challenges to both EO 13990 and Agency Defendants' implementation of the Moratorium allege the lack of statutory authority. Therefore, the Court begins by considering whether any statutory authority exists for the Moratorium. If there is authority for Agency Defendants to implement the Moratorium, then it would stand to reason that the President acted consistent with his presidential powers when issuing EO 13990 since he directed Agency Defendants to act consistent with their authority.[58] After considering the legal authority underpinning the Executive Order and the Moratorium, the Court considers Plaintiffs' and the States' APA claims against Agency Defendants.

**I.    The Tax Act provides authority for both EO 13990 and Agency Defendants' implementation of the Moratorium, authority which no other source of law undermines.**

Plaintiffs and the State maintain that Congress, not the executive branch, has the power to manage federal lands and that the Executive Order and Moratorium violate the mandate of the Tax Act and the amendment to ANILCA to provide for an oil and gas leasing program on the Coastal Plain.[59] Plaintiffs also allege that the Moratorium constitutes "an unlawful withdrawal" of public lands

---

[58] AR 3351.

[59] Docket 60 at 20, 24 (first citing U.S. Const. art IV, § 3 cl. 2; and then citing Tax Act § 20001). The State also alleges that "DOI cannot cancel the Coastal Plain leases because to do so would violate the Tax Act." Docket 59 at 25.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 15 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 15 of 74

because it did not comply with the Federal Land Policy and Management Act of 1976's ("FLPMA") withdrawal requirements.[60]

Federal Defendants respond that the Moratorium does not violate any federal statute and that the President has broad constitutional latitude to formulate policy and implement statutory mandates within the confines of federal law, which they claim the President did here by including within the Executive Order a "savings" clause cabining the Interior Secretary's authority to those actions that are "appropriate and consistent with applicable law."[61] Intervenor-Defendants similarly maintain that DOI's efforts to suspend temporarily the Program leases are "consistent with [DOI's] authority to fix legal problems and manage lands, and no statute imposes other directives or processes with which Interior failed to comply."[62]

## A. The Moratorium's Temporary Duration and Limited Scope

As an initial matter underlying the Moratorium's legality, the Court highlights what are perhaps the Moratorium's most critical elements: its temporary duration and limited scope. Plaintiffs and the State characterize the Moratorium as

---

[60] Docket 60 at 30–31.

[61] Docket 63 at 21–22.

[62] Docket 64 at 13 (citation omitted); *see also* Docket 65 at 8 ("It is well within the Secretary's discretion to order such a [NEPA] supplementation as well as to protect the public resources at issue by issuing a temporary suspension of leases to maintain the status quo ante while the supplemental EIS process is undertaken." (citation omitted)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 16 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 16 of 74

"indefinitely" suspending the ROD prepared in conjunction with the Program.[63] This characterization is inaccurate. EO 13990 expressly directs only a "*temporary moratorium,*" and Secretarial Order 3401 orders a "*temporary* halt on all Department activities related to the Program."[64] The SOP Letter also connotes temporality: "*While this SOP is in place*, no lease operations may transpire on the leases, the terms of the leases are *tolled*, and lease rentals are *suspended*."[65] These documents do not suspend the ROD, EIS, or any other component of the Program's NEPA review or other prerequisites. And they contain no statement or suggestion that the Program, including the ROD, is terminated or that AIDEA's leases are cancelled.[66] Agency Defendants have instead evidenced an intent to continue implementing the Program.[67] The supplemental NEPA review is the current stage of that implementation.[68] Agency Defendants intend to release their Draft Supplemental EIS later this year, and they have outlined the steps that will

---

[63] *See* Docket 59 at 3 ("In effect, DOI and BLM accomplished the President's desired moratorium by suspending and disregarding the ROD indefinitely."); Docket 60 at 39–40 ("By indefinitely suspending all Coastal Plain leases and indefinitely refusing to process any right-of-way applications, . . . Agency Defendants are unlawfully and unreasonably delaying the completion of these discrete, required actions." (footnote omitted)).

[64] AR 3351 (emphasis added); AR 3362 (emphasis added).

[65] AR 3365 (emphasis added).

[66] The SOP Letter notes that DOI eventually *may* determine to "void[]" the leases, but that is not the case now and the validity of such an action is not before the Court. AR 3365.

[67] *See* AR 3369 (establishing timeframe for issuance of a "record of decision selecting a program alternative").

[68] AR 3368–69; Docket 63 at 16.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 17 of 74

follow thereafter as they continue to implement the Program.[69]  As such, the Moratorium has a finite, even if inexact, endpoint, and it is limited to a suspension of lease operations.  Agency Defendants established these fundamental elements at the outset of the process reinitiating the supplemental environmental review, and there is no indication that they have deviated or plan to deviate significantly from their stated plan.[70]

Contrary to Plaintiffs' and the State's assertions,[71] a temporary pause in implementing a program is not a decision to indefinitely cease its implementation. An agency may terminate a moratorium and authorize activities it previously paused.[72]  Additionally, the temporary pause implemented here does not violate any express deadlines in any statute.  The Tax Act mandated only that DOI hold one lease sale within four years of its enactment and another within seven years of its enactment.[73]  The first lease sale was held nearly one year prior to the statutory deadline; the second lease sale must occur before December 22, 2024—

---

[69] *Supra* note 29; *see also* AR 3369 (predicting release of new ROD within approximately nine months following release of Draft Supplemental EIS).

[70] *See* AR 3369 (establishing timeframe and purpose of the supplemental EIS process).

[71] *See* Docket 59 at 3 (characterizing Moratorium as "suspending and disregarding the ROD indefinitely"); Docket 60 at 29 (characterizing Moratorium as "indefinite" suspension of leases and "indefinitely freezing all federal actions necessary to effectuate any development, production, or transportation of oil and gas").

[72] *Cf. Citizens for Clean Energy v. U.S. Dep't of the Interior*, 621 F. Supp. 3d 1165, 1169 (D. Mont. 2022) (describing BLM's termination of its previously issued coal leasing moratorium).

[73] Tax Act § 20001(c)(1)(B)(ii).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 18 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 18 of 74

after the Supplemental EIS is due to be completed.[74]  There are no other deadlines in the Tax Act, such as deadlines to issue rights-of-way or easements or to authorize surface development.[75]

These critical points guide the Court's analysis; yet throughout their briefing, Plaintiffs and the State appear to conflate the statutory mandate to conduct two lease sales by dates certain with a requirement to perform certain post-sale actions without any pause or moratorium.[76]  But the Tax Act contains only the two deadlines by which Interior must hold the lease sales; no other specific deadlines are set out in the Tax Act for the Program.[77]  When Congress imposes an explicit deadline for one agency action in a statute but not for another action, "it seems likely that Congress acted intentionally in omitting the . . . deadline [for a different agency action]."[78]  In the absence of other statutorily mandated timeframes, the

---

[74] *Id*. § 20001(c)(1)(B)(ii).

[75] *See generally id*. § 20001.

[76] *See, e.g.*, Docket 60 at 25 ("[T]he issuance of leases, rights-of-way, and easements necessary to explore for, develop, produce, or transport oil and gas in the Coastal Plain is not a matter of discretion for the Agency Defendants.  Rather, Agency Defendants are bound by statute to issue all such leases, rights-of-way, and easements."); Docket 60 at 28 ("[T]he Tax Act mandates a lease sale by December 2021, followed by the issuance of any rights-of-way or easements . . . .  Agency Defendants have attempted to nullify this congressional deadline by issuing leases before December 2021 only to indefinitely suspend them well beyond that date." (citation omitted)); Docket 66 at 6 ("The Secretary also is not issuing rights-of-way or easements necessary to carry out the Program, a fact that the Federal Defendants do not dispute. . . .  As such, the ROD has been effectively suspended and rescinded." (citation omitted)).

[77] Tax Act § 20001(c).

[78] *See Gen. Motors Corp. v. United States*, 496 U.S. 530, 538 (1990) (holding that statutory requirement that EPA act on a state plan within four months applied only to original state plan, not to revised state plan).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al*.
Order re Motions for Summary Judgment
Page 19 of 74

agency is only required to complete the post-lease-sale components of the Program within a reasonable period of time.[79]

## B.    The Tax Act

The Court next considers whether the Moratorium and EO 13990 are within the executive branch's authority.  Plaintiffs and the State are correct that the executive branch can act only in accordance with its own constitutional powers or the expressed or implied will of Congress.[80]  In many cases, federal statutes are the appropriate starting point to determine whether the executive branch possesses the authority to act.[81]

Here, the parties focus much of their briefing on the Tax Act.  Although Article IV of the Constitution gives Congress the authority to regulate public lands, Congress, through the Tax Act, expressly delegated the authority to "establish and administer" the Program on the Coastal Plain to the Interior Secretary.[82]  This broad grant of authority accords to DOI, under the supervision of the President as

---

[79] *See* 5 U.S.C. § 706(1) (directing a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed"); *cf. Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (holding that the General Mining Act of 1872 "provided no express timetable or deadline for the issuance of the patents" and, "[a]t most, . . . implie[d] that the issuance must be completed within a reasonable time, or . . . 'expeditiously' under the circumstances").

[80] *City & Cnty. of San Francisco*, 897 F.3d at 1233 (citing *Youngstown*, 343 U.S. at 585, 637–38 (Jackson, J., concurring)).

[81] *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018) (reviewing the Immigration and Nationality Act's plain language to determine whether the President has discretion to place entry restrictions on the nationals of eight foreign countries).

[82] Tax Act § 20001(b)(2)(A).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al*.
Order re Motions for Summary Judgment
Page 20 of 74

chief executive,[83] the authority to implement and operate the Program, provided it does so in accordance with all applicable federal laws. By using broad language directing the Interior Secretary to administer the Program with no timetable apart from the two deadlines for the mandated lease sales,[84] Congress left the timetable for the vast majority of the Program's implementation to DOI's discretion.[85] This includes the discretion to temporarily pause the Program while ensuring NEPA compliance.

As Plaintiffs point out, the decision of whether to "establish and administer" the Program is not subject to DOI's or the President's discretion.[86] But this does not mean, as Plaintiffs maintain, that Congress explicitly or implicitly intended to limit the President's authority to direct DOI to pause the Program while conducting a supplemental environmental review. To the contrary, Congress authorized DOI to suspend leases by virtue of the Tax Act's reference to the NPRPA, which expressly allows the Interior Secretary to "direct or assent to the suspension of

---

[83] *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2211 (2020) ("In our constitutional system, the executive power belongs to the President, and that power generally includes the ability to supervise and remove the agents who wield executive power in his stead. . . . The Constitution requires that such officials remain dependent on the President . . . .").

[84] The Tax Act's provisions governing the Program take up just over one page of space in the 186-page statute. *See generally* Tax Act § 20001.

[85] *Cf. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019) (observing that the Census Act leaves much of its implementation to the Secretary of Commerce's discretion given its broad language).

[86] Docket 60 at 10, 24–25.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 21 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 21 of 74

operations and production on any lease or unit."[87]  The actions taken to implement the Moratorium are precisely within this grant of authority: DOI temporarily suspended the leases issued from the 2021 sale.[88]  There simply is no language within the Tax Act that limits the President's authority to order—or DOI's authority to implement—a temporary suspension of the Program leases while the agency undertakes supplemental environmental review.  The cases the State cites for the proposition that "[t]he ROD could have remained in effect while BLM prepared supplemental NEPA analysis"[89] do not suggest that Agency Defendants lack authority to suspend the Program's implementation while supplementing its NEPA analysis.  Those cases instead suggest only that an agency need not always—but still may have authority to—vacate or suspend an underlying action while engaging in supplemental NEPA analysis.[90]

---

[87] 42 U.S.C. § 6506a(k)(2); *see also United States v. Merrell*, 37 F.4th 571, 576 (9th Cir. 2022) ("Congress is . . . presumed to know existing law pertinent to any new legislation it enacts . . . ." (quoting *United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir. 1991))).

[88] *See* AR 3365 ("[T]he Department has concluded it is necessary to suspend the . . . lease(s) . . . . While this [suspension of operations and production] is in place, no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended.").

[89] Docket 66 at 16 (first citing *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1031 (10th Cir. 2023); and then citing *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regul., & Enf't*, 871 F. Supp. 2d 1312, 1339 (S.D. Ala. 2012)).

[90] *See Diné*, 59 F.4th at 1032 (concluding that the NEPA regulations' "silence" on whether an agency must vacate or suspend an action while supplementing a NEPA review "lends support to BLM's argument that vacatur during supplemental analysis is not mandatory"); *Defs. of Wildlife*, 871 F. Supp. 2d at 1334, 1339 (finding that BOEM did not violate NEPA by issuing leases during pendency of supplemental environmental review).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 22 of 74

Plaintiffs nonetheless argue that the NPRPA's suspension provision "pertains to specific leases based on site-specific considerations. It does not provide the Secretary blanket authority to issue a categorical suspension of operations across all leases . . . ."[91] Plaintiffs also allege that the Tax Act's "mandate for oil and gas development" supersedes the NPRPA's suspension provision due to the inclusion in the Tax Act's mandate of the phrase "except as otherwise provided in this section."[92]

Both arguments are unavailing. The NPRPA uses broad language allowing the Interior Secretary to suspend operations "on *any* lease or unit."[93] There is no language within the Tax Act or the NPRPA's suspension provision requiring "site-specific considerations," but even if there were, Agency Defendants may be making "site-specific considerations" as part of the Supplemental EIS process.[94] As for the Tax Act's mandate for oil and gas development, there is nothing in that

_____

[91] Docket 60 at 28 n.8.

[92] Docket 60 at 28 n.8.

[93] 42 U.S.C. § 6506a(k)(2) (emphasis added).

[94] BLM's notice of intent to prepare the Supplemental EIS states that BLM plans to consider whether to "[d]esignate certain areas of the Coastal Plain as open or closed to leasing . . . [and] prohibit surface infrastructure in sensitive areas." AR 3368. BLM's Supplemental EIS also will "evaluate impacts to various surface resources including, but not limited to, caribou, polar bears, birds, vegetation, and surface waters including wetlands." AR 3368–69. By evaluating whether "certain" areas should be open or closed to leasing, considering whether to prohibit impacts to "sensitive" areas, and evaluating impacts to protected species and resources that inherently vary across the Coastal Plain, Agency Defendants may be making "site-specific considerations" as they conduct the supplemental NEPA review that will guide the manner in which they implement the Program and, if and when appropriate, allow operations to proceed on the issued leases.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 23 of 74
Case 3:21-cv-00245-SLG    Document 72    Filed 08/07/23    Page 23 of 74

mandate to suggest that Agency Defendants cannot temporarily pause implementation of the Program to ensure it complies with the law and, upon making that determination, resume the Program's implementation. Notably, Congress included the suspension provision within the NPRPA notwithstanding the NPRPA's mandate to DOI to "conduct an *expeditious* program of competitive leasing of oil and gas."[95] If DOI can suspend lease operations and production notwithstanding the NPRPA's mandate for "expeditious" development, clearly it can do so when implementing the Tax Act, which does *not* expressly call for "expeditious" development but does specifically impose two deadlines for holding lease sales.

Plaintiffs' contention that this interpretation results in "unfettered" discretion or authority for DOI to "indefinitely suspend" the Program again conflates a temporary pause with a permanent pause.[96] DOI's discretion is constrained by the Tax Act's mandate to implement the Program and conduct the two lease sales within the required timeframe and the APA's requirement to act within a reasonable time.[97] As intimated above, Congress could have included additional deadlines requiring Agency Defendants to issue any subsequent approvals by a date certain, but it chose not to do so.[98] Rather, the Tax Act accords to DOI the discretion to

---

[95] 42 U.S.C. § 6506a(a) (emphasis added).

[96] Docket 67 at 16–17.

[97] *See supra* note 86.

[98] *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 24 of 74

implement the Program in a manner consistent with the Tax Act and consistent with ANILCA's purposes, which include environmental conservation along with the newly added purpose of the oil and gas program, and also consistent with other applicable federal laws, including NEPA.[99]

Plaintiffs also read the Tax Act to foreclose application of the NPRPA's suspension authority to "post-sale" activities such as easement or right-of-way applications.[100] Although these activities take place after the issuance of a lease, they are an essential component of the "administration of lease sales."[101] Moreover, the Tax Act itself accords DOI discretion in issuing easements or rights-of-way, as DOI is directed to issue those easements and rights-of-way that it determines are "necessary to carry out" the Program.[102] This includes the discretion, subject to the APA's requirements governing agency action, to decline to issue easements or rights-of-way at a time when they are *not* necessary to the Program's implementation.

---

exclusion." (alteration in original) (citations omitted)).

[99] *See* ANILCA § 303(2)(B) (listing ANWR's purposes); 163 Cong. Rec. S7539–40 (daily ed. Nov. 30, 2017) (Murkowski Floor Statement).

[100] Docket 67 at 16.

[101] Tax Act § 20001(b)(3).

[102] *Id.* § 20001(c)(2); *cf. City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 803 (9th Cir. 2019) (noting the "broad regulatory authority" Congress vests in agencies through the use of statutory language such as "appropriate and necessary" (quoting 42 U.S.C. § 7412(n)(1)(A))).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 25 of 74

Next, Plaintiffs rely on a series of cases that they allege provide support for the proposition that the Tax Act does not confer authority to Agency Defendants to institute the Moratorium.[103]  These cases, which touch on the "major questions doctrine",[104] are inapplicable.  This is not a case involving an agency's assertion of "sweeping authority,"[105] such as a statutory interpretation that would allow an agency to "substantially restructure the American energy market"[106] or "cancel[] roughly $430 billion of federal student loan balances, completely erasing the debts of 20 million borrowers."[107]  The Moratorium affects only a total of nine oil and gas leases held by three lessees over a discrete portion of land in northern Alaska, and it is both temporary and limited in nature.  And while some out-of-circuit courts have held that "a decision to reconsider a rule does not simultaneously convey authority to indefinitely delay the existing rule pending that reconsideration,"[108] Agency Defendants are not indefinitely delaying a rule because the Moratorium is

---

[103] Docket 60 at 29 (first citing Tax Act § 20001(b)(2)(A); then citing *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022); and then citing *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 111 (2d Cir. 2018)); Docket 67 at 11–12 (first citing *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1649 (2022); then citing *West Virginia*, 142 S. Ct. at 2607–08; then citing *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2486 (2021); then citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); and then citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125-26 (2000)).

[104] *See, e.g.*, *West Virginia*, 142 S. Ct. at 2610 ("Under our precedents, this is a major questions case.").

[105] *Ala. Ass'n of Realtors*, 141 S. Ct. at 2486.

[106] *West Virginia*, 142 S. Ct. at 2610.

[107] *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).

[108] *Nat. Res. Def. Council*, 894 F.3d at 111–12 (citing *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 26 of 74

not of indefinite duration, and the actions being delayed—approving requests to begin conducting oil and gas activities or issuing easements or rights-of-way—are adjudicatory actions, not rules.[109]

## C.     Other Authorities

The Court next considers whether ANILCA, FLPMA, or any other federal statute or caselaw precludes Agency Defendants from implementing the Moratorium or strips the President of authority to order the same.

### 1.     ANILCA

Plaintiffs maintain that the Moratorium violates ANILCA because of ANILCA's newly added purpose "to provide for an oil and gas program on the Coastal Plain."[110]   But as discussed above, a temporary moratorium is not evidence that Agency Defendants have abandoned or plan to stop implementing the Program.   And the Tax Act otherwise left ANILCA untouched, including its purposes related to environmental conservation and protection.[111]   The Moratorium is intended to allow Agency Defendants to conduct what they describe as a proper review of the Program's environmental impacts, thereby satisfying ANILCA's other purposes without undermining its newly added purpose to conduct an oil and gas program.   Since the Moratorium furthers ANILCA's purposes and

---

[109] *See* discussion *infra* Section II.A.

[110] Docket 60 at 24 (citing Tax Act § 20001(b)(2)).

[111] ANILCA § 303(2)(B).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 27 of 74

ANILCA contains no provisions limiting Agency Defendants' authority to institute a temporary moratorium on the oil and gas program, the Moratorium does not violate ANILCA.

### 2. FLPMA

Plaintiffs assert that the Moratorium constitutes a "withdrawal" as defined by FLPMA because it precludes oil and gas activities on the Coastal Plain and transfers jurisdiction over the Coastal Plain from BLM to the Interior Secretary.[112] FLPMA defines "withdrawal" as

> withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land, other than "property" governed by the Federal Property and Administrative Services Act, as amended (40 U.S.C. 472) from one department, bureau or agency to another department, bureau or agency.[113]

When withdrawing public lands pursuant to FLPMA, an agency must follow certain procedures, including public notice requirements, and comply with size and temporal limits.[114] "Removing otherwise eligible and available federal land from oil and gas leasing can constitute a 'withdrawal' . . . ."[115] However, "[t]o withdraw . . .

---

[112] Docket 60 at 30.

[113] 43 U.S.C. § 1702(j).

[114] *Yount v. Salazar*, Case No. CV11-8171 PCT-DGC, 2014 WL 4904423, at *18 (D. Ariz. Sept. 30, 2014), *aff'd sub nom. Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845 (9th Cir. 2017).

[115] *W. Energy All. v. Biden*, Case No. 21-CV-13-SWS, 2022 WL 18587039, at *11 (D. Wyo. Sept. 2, 2022).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 28 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 28 of 74

means to withhold the parcel of land from sale entirely" rather than an action such as "cancel[ling] a specific sale to a specific buyer."[116]

The Moratorium does not run afoul of FLPMA. Agency Defendants are not "withholding" the leased land from "settlement, sale, location, or entry" because they have not acted to indefinitely prevent oil and gas activity on the leased land.[117] The Moratorium does not withhold AIDEA's leased land from oil and gas leasing entirely; nor does it reserve any of the leased land for a particular public purpose or program.

At least one district court has found that a temporary action that delays an oil and gas leasing program to allow for a supplemental NEPA review does not constitute a withdrawal subject to FLPMA.[118] Plaintiffs, meanwhile, have failed to identify any authority indicating that a temporary restriction on the use of leased lands while an agency supplements its NEPA review constitutes a "withdrawal" within the meaning of the FLPMA. Their citation to *Mountain States Legal Foundation v. Hodel* is unavailing.[119] The "withdrawal" at issue in that case was

---

[116] *Silver State Land, LLC v. Schneider*, 843 F.3d 982, 991 (D.C. Cir. 2016).

[117] 43 U.S.C. § 1702(j).

[118] *See W. Energy All.*, 2022 WL 18587039, at *4, *12 (finding no withdrawal under or violation of FLPMA when BLM delayed a statutorily mandated lease sale to allow additional consideration of Environmental Assessments in light of federal caselaw (first citing *Columbia Riverkeeper v. U.S. Army Corps of Engrs.*, Case No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020), and then citing *WildEarth Guardians v. Bernhardt*, Case No. 16-1724 (RC), 2020 WL 6701317 (D.D.C. Nov. 13, 2020)).

[119] Docket 67 at 18–19 (citing *Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 29 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 29 of 74

BLM's suspension of mineral leasing in one national forest and its failure to act on lease applications in another national forest that had been pending for up to 12 years.[120]  BLM took these actions at the request of the U.S. Forest Service, which asked BLM to delay further processing of any leases pending completion of a final EIS or until a Forest Plan was completed.[121]  In setting aside the suspension, the U.S. District Court for the District of Wyoming interpreted FLPMA to find that BLM's suspension and unreasonable delay of mineral leasing constituted a withdrawal pursuant to FLPMA.[122]

The Ninth Circuit has expressly rejected the District of Wyoming's FLPMA analysis.[123]  In *Bob Marshall Alliance v. Hodel*, BLM issued 19 oil and gas leases on the 42,000-acre Deep Creek Further Planning Area in the Lewis and Clark National Forest.[124]  BLM did not prepare an EIS prior to issuing the leases; instead, it prepared an Environmental Assessment that "concluded that such leasing would have no significant effect on the quality of the human environment."[125]  The district court enjoined the lease issuances, finding that the federal defendants violated NEPA and the Endangered Species Act by failing to prepare an EIS and address

---

[120] *Mountain States*, 668 F. Supp. at 1469.

[121] *Id.*

[122] *Id.* at 1474.

[123] *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1230 (9th Cir. 1988).

[124] *Id.* at 1224–26.

[125] *Id.* at 1226.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 30 of 74

the effects of the leasing on protected species.[126] The Ninth Circuit affirmed the district court's ruling as to any leases that allowed surface disturbance without further government approval.[127] As an ancillary issue to the issues on appeal, the Ninth Circuit addressed whether denying or deferring action on the lease applications would have violated FLPMA.[128] The Ninth Circuit rejected as unpersuasive the determination in *Mountain States* that deferring action on oil and gas leases can constitute an unlawful administrative withdrawal. Instead, the Ninth Circuit observed that a refusal to issue mineral leases is "far from removing [the land at issue] from the operation of the mineral leasing law" and is "a legitimate exercise of the discretion granted to the Interior Secretary under [the Mineral Leasing Act]."[129]

Plaintiffs maintain that *Bob Marshall* is distinguishable from the instant case because "it involved BLM's discretionary decision not to issue a specific lease."[130] But the Moratorium involves Agency Defendants' discretionary decision pursuant to the Tax Act, and, by incorporation, the NPRPA, to temporarily pause lease

---

[126] *Id.* at 1226–27.

[127] *Id.* at 1227.

[128] *Id.* at 1229–30. Through its NEPA review, the Forest Service had considered a "no action" alternative in which it would have denied or deferred action on the Deep Creek lease applications, but one defendant asserted that choosing this alternative "would have constituted an illegal administrative 'withdrawal' of Deep Creek from mineral leasing" pursuant to FLPMA. *Id.* at 1229. It is in that context that the Ninth Circuit addressed the FLPMA.

[129] *Id.* at 1230.

[130] Docket 67 at 19.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 31 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 31 of 74

operations pertaining to a confined portion of land. Because the Moratorium does not remove the leased land on the Coastal Plain from oil and gas development, it cannot be considered a FLPMA "withdrawal" as the Ninth Circuit has interpreted that term.

Nor has DOI transferred jurisdiction over the Coastal Plain from BLM to the Interior Secretary. Plaintiffs are correct that a "withdrawal" can include "transferring jurisdiction over an area of Federal land . . . from one department, bureau or agency to another department, bureau or agency."[131] Secretarial Order 3401 directs BLM to act; it does not transfer jurisdiction over the Coastal Plain or any other portion of ANWR to the secretarial level at DOI.[132] Indeed, DOI expressly "redelegate[d]" the Interior Secretary's authority to implement the Tax Act to BLM, demonstrating that DOI intended for BLM to maintain its jurisdiction over the Program and land leased pursuant thereto.[133] As such, because Agency Defendants did not withdraw public lands or transfer jurisdiction over public lands between any agencies, there was no requirement for them to follow FLPMA's land withdrawal procedures.[134]

---

[131] 43 U.S.C. § 1702(j).

[132] *See* AR 3363 ("The Assistant Secretary for Land and Minerals Management and the Director of the BLM shall, as appropriate and consistent with applicable law, take appropriate action with respect to existing leases in light of the direction provided herein.").

[133] AR 3363.

[134] *See* 43 U.S.C. § 1714 (establishing procedures to be followed when the Interior Secretary "make[s], modif[ies], extend[s], or revoke[s] withdrawals").

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 32 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 32 of 74

### 3. Caselaw

Plaintiffs' citation to *Louisiana v. Biden*,[135] an out-of-circuit district court decision, is neither controlling nor persuasive. The operative statutes at issue there were not the Tax Act, ANILCA, or FLPMA, but the Outer Continental Shelf Lands Act ("OCSLA") and the Mineral Leasing Act ("MLA").[136] That decision rested on the fact that, when suspending further leasing on the Outer Continental Shelf, the agency had not followed the process set forth in OCSLA for making changes to a previously adopted five-year leasing plan.[137] But the Tax Act contains no such delineated process for the executive branch to follow while administering the Program. Rather, the Tax Act contains a one-sentence directive to DOI to implement the Program.[138] And it instructs DOI to do so in a manner similar to the manner in which it implements the NPRPA oil and gas leasing program, which expressly authorizes DOI to suspend lease operations.[139] Neither the Tax Act nor the NPRPA contain any provisions comparable to OCSLA's provisions that

---

[135] 622 F. Supp. 3d 267 (W.D. La. 2022).

[136] *Id.* at 275.

[137] 43 U.S.C. § 1344(e); *Louisiana*, 622 F. Supp. 3d at 288–89. Notably, the *Louisiana* court omits discussion of the President's authority to withdraw unleased lands pursuant to OCSLA, which could be construed as authority for a nationwide leasing moratorium. *See id.* at 288–90 (evaluating *ultra vires* claim concerning the President's authority to pause leasing nationwide without analysis of 43 U.S.C. § 1341(a), which provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf").

[138] Tax Act § 20001(b)(2)(A).

[139] *Id.* § 20001(b)(3); *see also* 42 U.S.C. § 6506a(k)(2) ("The Secretary may direct or assent to the suspension of operations and production on any lease or unit.").

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 33 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 33 of 74

establish steps DOI must take in order to effectuate a "revision and reapproval" of OCSLA's statutorily mandated program.[140] Nor have Plaintiffs alleged any violation of NPRPA-like procedures applicable to the Program. And even if the "expeditious" portion of the NPRPA's mandate applies to the Tax Act, Congress allowed for the possibility of a lease suspension in the implementation of what it explicitly directed to be an "expeditious" program in the NPRPA.[141]

With respect to Agency Defendants' authority to temporarily pause leasing activities pursuant to the Tax Act, the Court finds *Western Energy Alliance v. Biden*[142] to be more persuasive than *Louisiana*. In *Western Energy Alliance*, the U.S. District Court for the District of Wyoming upheld BLM's decision to postpone lease sales required pursuant to the MLA to ensure that the Environmental Assessments prepared in conjunction with those sales satisfied then-recent federal court decisions governing the proper analysis of greenhouse gas emissions in the NEPA review process.[143] The MLA contains a clear mandate for BLM to

---

[140] *See generally* Tax Act § 20001; 43 U.S.C. § 1344(e).

[141] The State acknowledges Intervenor-Defendants' argument that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions," yet the State maintains that no such authority exists "when Congress has provided a mechanism capable of rectifying mistaken actions." Docket 66 at 8 (quoting *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014)); Docket 64 at 24 (citing *Ivy Sports*, 767 F.3d at 86). Unlike other statutes, the Tax Act's brief provisions governing the Program do not provide a mechanism for correcting legal errors in the Program's implementation, so *Ivy Sports* suggests that Agency Defendants do have inherent authority to revisit the Program's implementation. This inherent authority, coupled with the NPRPA's explicit grant of authority to suspend lease operations, is an adequate statutory backdrop against which Agency Defendants can temporarily pause the Program.

[142] 2022 WL 18587039.

[143] *Id.* at *8–10 (first citing *Rocky Mountain Wild v. Bernhardt*, Case No. 2:19-cv-00929-DBB-

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 34 of 74

hold lease sales on at least a quarterly basis with respect to certain lands deemed available for leasing.[144] BLM postponed lease sales scheduled for the first quarter of 2021 shortly after the President issued an executive order directing a nationwide oil and gas leasing moratorium pending additional NEPA review.[145] *Western Energy Alliance* involved the same executive order at issue in *Louisiana*, but the District of Wyoming determined that the lands at issue were not "available" within the meaning of the MLA since BLM had determined that their underlying Environmental Assessments "needed additional review and possible reworking due to recent caselaw."[146] Here, BLM made a similar determination concerning the EIS and ROD underlying the Program while implementing a statute with a significantly less rigid imperative. The Tax Act specifies only the dates by which two lease sales must take place, whereas the MLA requires quarterly lease sales. If BLM has the authority to postpone a statutorily mandated quarterly lease sale in order to conduct additional environmental review, it has the authority to postpone activities on leases when no statutory source commands it to take any actions beyond the lease sales within a set timeframe.

---

CMR, 2020 WL 7264914 (D. Utah Dec. 10, 2020); then citing *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237 (D.D.C. 2020); and then citing *Columbia Riverkeeper*, 2020 WL 6874871).

[144] 30 U.S.C. § 226(b)(1)(A).

[145] *W. Energy All.*, 2022 WL 18587039, at *3 (citing Exec. Order No. 14008, 86 Fed. Reg. 7619, 7624–25 (Feb. 1, 2021)).

[146] *Id.* at *9; *Louisiana*, 622 F. Supp. 3d at 288–90.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 35 of 74

Intervenor-Defendants' citation to *Boesche v. Udall*[147] provides further support for the Moratorium.[148] There, the Supreme Court interpreted the MLA to grant the Interior Secretary "the power to correct administrative errors . . . by cancellation of leases in proceedings timely instituted by competing applicants for the same land."[149] In *Boesche*, the Supreme Court recognized DOI's "general powers of management over the public lands" and the limited nature of a leasehold interest in such lands: A leasehold interest in public lands "does not give the lessee anything approaching the full ownership of a fee patentee," and so the Interior Secretary "should have the power, in a proper case, to correct his own errors."[150]

*Boesche* involved a different statute and, as the State points out,[151] a different type of agency error. The Supreme Court also cautioned that its holding was limited and "do[es] not open the door to administrative abuses."[152] But there is no indication in the Tax Act that similar authority to correct administrative errors does not exist here. If DOI can cancel a lease to correct its own errors, it can temporarily suspend a lease for the same purpose.[153] *Boesche* also undermines

---

[147] 373 U.S. 472 (1963).

[148] Docket 65 at 17 n.44, 20 n.55.

[149] *Boesche*, 373 U.S. at 485.

[150] *Id.* at 476, 478.

[151] Docket 66 at 11–14.

[152] *Boesche*, 373 U.S. at 485.

[153] In another attempt to distinguish *Boesche*, the State asserts that a violation of a procedural statute such as NEPA is not the type of substantive error that would authorize DOI to cancel a lease. Docket 66 at 12–13. The State alleges that "courts often do not vacate agency decisions

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 36 of 74

Case 3:21-cv-00245-SLG    Document 72    Filed 08/07/23    Page 36 of 74

the State's assertion that the Moratorium's purpose—which the State contends is "to consider cancelling already-issued leases"—is "invalid."[154]

Contrary to another of the State's assertions,[155] the Tax Act does not restrict DOI's broad authority to manage public lands; it simply directs DOI to implement a leasing program, just as the MLA and other federal statutes do. Likewise, ANILCA's purposes, which include environmental conservation,[156] do not restrict DOI's general managerial powers over the Coastal Plain with respect to the imposition of a temporary oil and gas moratorium, especially since DOI completed the first lease sale and currently is supplementing its environmental review and hence is "provid[ing] for an oil and gas program on the Coastal Plain."[157]

*Century Exploration New Orleans, LLC v. United States* also supports the proposition that an agency has authority to pause oil and gas activities after a

_____

and, particularly, do not void oil and gas leases because of deficiencies in NEPA analyses." Docket 66 at 12 (citations omitted). But DOI has not cancelled AIDEA's leases. In any event, in the Ninth Circuit, vacatur is "the presumptive remedy for agency action that violates the NEPA as reviewed through the APA." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (citation omitted), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, No. 22-703, 2023 WL 3801206 (U.S. June 5, 2023).

[154] Docket 59 at 20, 23–26; Docket 66 at 9–14; *see also* discussion *infra* Section II.B.3.b (discussing validity of the Moratorium's purpose). Additionally, it cannot be said that the purpose of the Moratorium is to void AIDEA's leases or even, as the State asserts, "to consider whether to reaffirm or void the leases." Docket 59 at 24. This might be a purpose of the supplemental NEPA analysis, but it is not the purpose of the Moratorium itself. *See* AR 3365 ("The BLM will undertake *this additional NEPA analysis* to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures." (emphasis added)).

[155] Docket 66 at 13–14.

[156] ANILCA § 303(2)(B).

[157] Tax Act § 20001(b)(2)(B)(iii).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 37 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 37 of 74

lease's issuance.[158]   That case involved an oil and gas lessee's challenge to Interior's implementation of two moratoria on deepwater drilling operations in the Gulf of Mexico following the Deepwater Horizon disaster while new and increased substantive requirements were developed for drilling operations.[159]   The Court of Federal Claims held that neither of the moratoria breached the plaintiffs' lease.[160] Rather, the court concluded that the two moratoria, which together resulted in an approximately six-month pause in drilling operations and permitting for such activities, were "well within the government's authority under both the terms of the lease and applicable law."[161]   Similarly, the court observed that the moratoria's "short delay would not have effected a total breach of the lease, particularly in light of the absence of any express deadlines for the review and approval of" applications for drilling permits.[162]

Certainly, the circumstances leading to the Moratorium in the instant case are completely different from the Deepwater Horizon disaster.   Yet the legal framework and analysis outlined in *Century Exploration* are analogous.   Neither AIDEA's leases nor any federal statute or regulation prohibit the Moratorium or provide an express deadline by which Agency Defendants must allow oil and gas

---

[158] 110 Fed. Cl. 148, 168 (2013), *aff'd*, 745 F.3d 1168 (Fed. Cir. 2014).

[159] *Id.* at 157–59.

[160] *Id.* at 168.

[161] *Id.* at 167–68.

[162] *Id.* at 168.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 38 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 38 of 74

activities on the Coastal Plain to proceed after a lease sale is conducted.  And as discussed below, the leases themselves expressly accord to Agency Defendants the right to alter the "timing of operations" conducted pursuant to the leases.  Thus, as in *Century Exploration*, a temporary moratorium on post-sale oil and gas activities on the Coastal Plain is "well within the government's authority."[163]

### 4.    The Lease Provisions

Although not discussed in detail in the parties' briefing,[164] the leases themselves provide support for the Moratorium.  The leases contain a general disclaimer subjecting lessees to "reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision[s] of this lease."[165]  This language covers the instant situation since Secretarial Order 3401 and the SOP Letter are not inconsistent with the lease provisions and provide no additional obligations or burdens on the lessees beyond those associated with delay, which in this context are not "unduly burdensome."  Similarly, Section 6 of the lease—which pertains to "minimiz[ing] adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users"—allows the lessor to

---

[163] *Id.* at 168.

[164] Plaintiffs discuss the lease provisions in one short paragraph of their motion.  Docket 60 at 29.  The State's motion contains one sentence asserting that, upon a lease's cancellation, the lessee and third-party beneficiaries may be able to assert claims for breach of contract.  Docket 59 at 26.

[165] *E.g.*, AR 3320.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 39 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 39 of 74

subject the lessee to "reasonable measures deemed necessary . . . to accomplish the intent of this section."[166]  These measures include the "timing of operations," thereby expressly reserving to Agency Defendants the right to alter the timing of operations conducted pursuant to the leases in an effort to minimize adverse environmental impact, an endeavor with which the supplemental NEPA review may assist.[167]  Though not a statutory provision, the lease has the force of law as a contract between the United States and AIDEA, so these provisions provide further support for the legality of the Moratorium.[168]

In short, Plaintiffs have not identified any provision or source of federal law that precludes a temporary moratorium for the purpose of ensuring that the Program comports with the law.  When viewed in conjunction with the broad discretion that the Tax Act accords DOI, it is clear that the President acted in accordance with his powers by ordering Agency Defendants to implement a temporary moratorium while DOI undertook to correct "alleged legal deficiencies" in its environmental analysis.[169]  Consequently, Agency Defendants themselves

---

[166] *E.g.*, AR 3321.

[167] *E.g.*, AR 3321.

[168] *See Peabody Coal Co. v. Navajo Nation*, 373 F.3d 945, 951 (9th Cir. 2004) (recognizing that oil and gas leases "represent a very specialized subset of contracts" governed by an "extensive federal regulatory scheme" (citation omitted)).

[169] AR 3351, 3362.  Because the Court finds that EO 13990 orders DOI to take actions that are authorized by statute, the Court need not consider whether the Executive Order's savings clause salvages what Plaintiffs assert is an otherwise *ultra vires* order.  Docket 60 at 21–22.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 40 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 40 of 74

also acted in accordance with their powers by implementing the temporary moratorium.

## II.  The Moratorium does not violate the APA.

Plaintiffs and the State allege three categories of APA violations, namely that Agency Defendants (1) failed to follow the APA's notice-and-comment requirements, (2) arbitrarily and capriciously reversed their position regarding the Program's NEPA compliance without adequate factual or legal support or a lawful purpose, and (3) unlawfully and unreasonably withheld or delayed action to implement the Program.[170]  The parties do not dispute that the APA governs these claims against Agency Defendants.[171]  Defendants respond that the Moratorium is not a substantive rule that must follow the APA's notice-and-comment procedures, that Agency Defendants have not unlawfully reversed their position regarding the legality of the NEPA analysis underlying the Program's implementation, and that Plaintiffs cannot bring a viable failure-to-act claim.[172]  The Court addresses these arguments in turn.

---

[170] Docket 59 at 19–34; Docket 60 at 32–40; Docket 66 at 5–14; Docket 67 at 19–25; *see also* discussion of the State's additional arguments *infra* Section II.B.3.

[171] Docket 59 at 18–59; Docket 60 at 22–24; Docket 63 at 29; Docket 64 at 21–22; Docket 65 at 14–15.

[172] Docket 63 at 26–29, 34–42; Docket 64 at 31–39; Docket 65 at 21–28.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 41 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 41 of 74

## A. Notice-and-Comment Procedures

Plaintiffs contend that Agency Defendants' implementation of the Moratorium "constitutes a substantive rule subject to notice and comment given that it leaves agency staff with no discretion to process or approve applications to perform oil and gas activities on the Coastal Plain."[173] Plaintiffs point to several aspects of the Moratorium that they claim make it a substantive rule: its categorical application to all Coastal Plain leases and activities, the suspension of all leases on the same day Secretarial Order 3401 was issued, the virtually identical SOP Letters issued to each of the lessees, and BLM's informing of each contractor that it would not process their applications for work on the leases until the supplemental NEPA review was complete.[174]

Federal Defendants counter that DOI's implementation of the Moratorium is not a substantive rule subject to the APA's notice-and-comment requirements but rather an adjudication.[175] And even if Secretarial Order 3401 is considered a rule, Federal Defendants allege it is at most an interpretative rule or clarification of agency practice rather than a substantive or legislative rule requiring notice and comment.[176] Federal Defendants add that "neither the Program ROD nor its oil

---

[173] Docket 60 at 33; *see also* Docket 59 at 22 ("[T]he agencies did not engage in required notice and comment processes . . . .").

[174] Docket 60 at 34–35.

[175] Docket 63 at 34–37 (quoting *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994)).

[176] Docket 63 at 37–39.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 42 of 74

and gas leases were established through rule making, so it makes little sense to suggest that similar (or lesser) action such as modifying the ROD or suspending the leases would require a rule making."[177]

The APA contemplates two primary forms of agency action: rulemaking and adjudication.[178] Rulemaking is the "agency process for formulating, amending, or repealing a rule."[179] The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."[180] Adjudication "is virtually any agency action that is not rulemaking."[181] As the Ninth Circuit explained,

> Two principal characteristics distinguish rulemaking from adjudication. First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals. Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute). Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.[182]

---

[177] Docket 63 at 36.

[178] 5 U.S.C. § 551(4)–(7). Defendants also suggest that the leases fall under the APA's definition of "licensing," which in their view is further indication that their suspension should not be considered a form of rulemaking. Docket 63 at 36 n.10 (quoting 5 U.S.C. § 551(8), (9)).

[179] 5 U.S.C. § 551(5).

[180] *Id.* § 551(4).

[181] *Yesler*, 37 F.3d at 448 (citing 5 U.S.C. § 551(6)–(7)).

[182] *Id.* (citations omitted).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 43 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 43 of 74

An agency has the discretion to "announce new principles during adjudication" instead of rulemaking.[183]  Two exceptions limit this discretion: "First, agencies may not impose undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy. . . . The second limiting doctrine is that agencies may not use adjudication to circumvent the Administrative Procedure Act's rulemaking procedures."[184]  These procedures include a requirement for an agency to issue a notice of proposed rulemaking in the Federal Register before it proposes a rule and allow public comment on the proposed rule.[185]

Applying these principles, the Court finds that the Moratorium is not a rule subject to the APA's notice-and-comment procedures.  Although the Moratorium reverses Agency Defendants' prior determination—expressed through the NEPA review and their carrying out of the lease sale—that the Program comported with applicable federal laws, the Moratorium does not operate prospectively to affect the rights of unspecified individuals in the future.  Rather, it directly and immediately affected the rights of the identified lessees on the Coastal Plain.[186]

---

[183] *Cities of Anaheim, Riverside, Banning, Colton & Azusa v. FERC*, 723 F.2d 656, 659 (9th Cir. 1984) (citations omitted); *see also Reyes v. Garland*, 11 F.4th 985, 991 (9th Cir. 2021) ("An agency may also exercise its congressionally delegated legislative authority through adjudicatory proceedings, where 'new administrative policy [is] announced and implemented through adjudication.'" (alteration in original) (quoting *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1328 (9th Cir. 1982))).

[184] *Anaheim*, 723 F.2d at 659 (citations omitted).

[185] 5 U.S.C. § 553(b)–(d).

[186] *Cf. Reyes*, 11 F.4th at 991 ("But while rules promulgated through . . . formal rulemaking

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 44 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 44 of 74

Further, neither of the two exceptions that limit an agency's authority to use adjudication apply here. First, the Moratorium does not result in undue hardship to the detriment of those who have relied on a previous agency action. Prior to the Moratorium, the only agency action directly impacting Plaintiffs had been the issuance of the leases; no work on the leases had begun when the Moratorium began.[187] The impact of the Moratorium's suspension of AIDEA's leases was not "excessive or unwarranted" given that the Moratorium is temporary in nature and that AIDEA had—but declined—the opportunity to cancel its leases and receive refunds of its lease payments.[188]

Second, Agency Defendants did not use adjudication to circumvent the APA's rulemaking procedures. A circumvention of the APA's rulemaking procedures occurs when, for example, an agency uses adjudication "to amend a recently amended rule" or "to bypass a pending rulemaking proceeding."[189] Agency Defendants did not circumvent any rulemaking procedure. They chose adjudication as the Moratorium's vehicle to temporarily pause implementation of

---

generally apply prospectively . . . , adjudicatory rules may have a permissible retroactive effect, even without authorization from Congress, in some circumstances." (citation omitted)).

[187] *See* Docket 7 at 20–21, ¶¶ 76–83 (describing AIDEA's efforts to secure its leases, which were effective beginning January 1, 2021, shortly before issuance of EO 13990 on January 20, 2021).

[188] The other two lessees chose to cancel their leases and receive refunds of their lease payments. AR 3785, ¶ 13; AR 3790, ¶ 13.

[189] *Union Flights, Inc. v. Adm'r, FAA*, 957 F.2d 685, 689 (9th Cir. 1992) (citations omitted).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 45 of 74

the Program; they did not amend an existing rule or bypass a pending rulemaking proceeding in so choosing.

In short, Secretarial Order 3401 is not broad or general in scope with the intent to be applied by Agency Defendants to unspecified future leasing. Rather, it is specific and limited to just one EIS for one leasing program. Likewise, BLM's actions to implement Secretarial Order 3401—which, as Plaintiffs put it, "prohibit[] all access for oil and gas activities during the moratorium"[190]—fall squarely within the realm of adjudication rather than rulemaking. These actions took the form of "individual order[s]" issued to the lessees informing each of them of the suspension of their leases[191] and specific responses to AIDEA's contractors' requests to proceed with activities on the leased lands.[192] The Court finds that Agency Defendants operated within their discretionary authority to use adjudication as the means to exercise their statutory authority to address the identified legal deficiencies specific to the Program, which involves a finite, limited number of parties.[193]

---

[190] Docket 7 at 28, ¶ 123. These actions include BLM's issuance of the SOP Letter; refusal to process AIDEA's contractors' applications for rights-of-way, easements, or permits; and alleged "reopening" of the lease sale. Docket 7 at 30, ¶ 133.

[191] *See SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947) (noting agencies may act "by general rule or by individual order"); AR 3364–65, 3714–17.

[192] AR 3395–96, 3399–3400.

[193] *See Montgomery Ward*, 691 F.2d at 1328 ("It is well settled that the decision whether to proceed by adjudication or rule-making 'lies in the first instance within the agency's discretion.'" (alteration omitted) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974))). To the extent Secretarial Order 3401 or the SOP Letter interprets statutes such as the Tax Act or redelegates authority within DOI, they could be considered interpretative rules or rules of

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 46 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 46 of 74

Plaintiffs maintain that the Moratorium is a substantive rule because Secretarial Order 3401 constrains DOI staff's discretion to authorize oil and gas activities on the Coastal Plain and is "binding."[194]  Plaintiffs cite several cases, including one Ninth Circuit case, *Mada-Luna v. Fitzpatrick*, that they maintain support their position.[195]  Agency Defendants respond that *Mada-Luna* is inapposite because it concerned a "general policy constraining implementing official discretion in a multitude of future, distinct cases."[196]

In *Mada-Luna*, the Ninth Circuit held that an internal Immigration and Naturalization Service ("INS") directive issued to agency officials as an operating instruction did not violate the notice-and-comment requirements of the APA.[197]  The instruction listed factors that INS district directors should consider in determining whether to defer immigration action with respect to undocumented persons.[198]  The court held that the instruction was rulemaking but fell within the "general statements of policy" exception to the notice-and-comment requirements

---

agency organization, procedure, or practice.  Neither of these types of rulemaking requires adherence to notice-and-comment procedures.  5 U.S.C. § 553(b)(3)(A).

[194] Docket 60 at 32–35.

[195] Docket 60 at 33 (first citing *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987); then citing *Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 702 (4th Cir. 2019); and then citing *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000)).

[196] Docket 63 at 38.

[197] *Mada-Luna*, 813 F.2d at 1009; *see also* 5 U.S.C. § 553(b)(3)(A) (exempting "general statements of policy" from notice-and-comment requirements).

[198] *Mada-Luna*, 813 F.2d at 1008 n.1.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 47 of 74

because it did not establish a "binding norm" that prohibited agency officials from considering individual facts in individual cases.[199]  *Mada-Luna* is inapposite because Secretarial Order 3401 is not a general statement of policy applicable to all future agency actions on a particular topic; it is instead an agency adjudication limited to one EIS—the Program's EIS.

The other two cases Plaintiffs cite, *Casa De Maryland* and *Appalachian Power Company*, are inapposite for a similar reason: Like *Mada-Luna*, the former differentiated legislative rules subject to notice and comment from general statements of policy,[200] whereas the latter differentiated agency guidance from a legislative rule to be prospectively enforced against unidentified future persons or entities.[201]  Neither case supports the proposition that the agency action in this case—directed solely at the identified lessees on the Coastal Plain—is a substantive rule subject to notice and comment.

Because the Moratorium constitutes an adjudication, and the APA's notice-and-comment procedures do not apply to agency adjudications, Agency

---

[199] *Id.* at 1016–17.

[200] *See Casa De Md.*, 924 F.3d at 701–02 ("Plaintiffs argue that DACA's rescission required notice and comment under the APA because the Rescission Memo is a legislative rule that mandates how Department officials must act and substantively affects DACA recipients. The government rejects this premise, countering that the Memo is a general statement of policy.").

[201] *See Appalachian Power Co.*, 208 F.3d at 1021 ("If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document . . . as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, . . . then the agency's document is . . . 'binding.'" (citation omitted)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 48 of 74

Defendants did not violate the APA's notice-and-comment procedures by implementing the Moratorium.[202]

## B. Reversal of Position

Plaintiffs and the State next allege that Agency Defendants "failed to provide a reasoned explanation" for reversing their prior position, expressed in separate litigation before this Court, that the Program had "satisfied all legal requirements."[203] Federal Defendants respond that "[n]o reversal [of position] has yet occurred" because the ROD remains in place pending the Supplemental EIS process currently underway.[204] In the alternative, Federal Defendants assert that they provided a reasoned explanation for supplementing the Program's environmental analysis,[205] an argument Intervenor-Defendants echo.[206]

---

[202] As a result, the Court need not consider the degree to which Secretarial Order 3401 constrains the discretion of DOI staff.

[203] Docket 60 at 36; *see also* Docket 59 at 30–31 (alleging that Agency Defendants contradicted their prior findings "without acknowledgment or explanation of the contradiction"). That separate litigation is *Gwich'in Steering Comm. v. Haaland*, Case No. 3:20-cv-00204-SLG (D. Alaska filed Aug. 24, 2020), and *Native Vill. of Venetie Tribal Gov't v. Haaland*, Case No. 3:20-cv-00223-SLG (D. Alaska filed Sept. 9, 2020). The Court stayed those cases pending the supplemental NEPA review currently in progress. Text Order, *Gwich'in Steering Comm.*, Case No. 3:20-cv-00204-SLG (D. Alaska Feb. 12, 2021), ECF No. 75; Order Re Defs.' & Pls.' Unopposed Mot. to Stay Proceedings, *Native Vill. of Venetie*, Case No. 3:20-cv-00223-SLG (D. Alaska Sept. 13, 2021), ECF No. 77.

[204] Docket 63 at 39–40.

[205] Docket 63 at 40–41.

[206] Docket 64 at 31–36; Docket 65 at 25–28.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 49 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 49 of 74

### 1.    Whether Agency Defendants Changed Positions

The requirement that an agency explain when it changes its position applies somewhat broadly to a "subsequent agency action undoing or revising" a prior agency action.[207]   This requirement applies to a change in "agency policy," although no precedent specifies what, precisely, constitutes an "agency policy" in this context.[208]  A survey of the caselaw suggests that this requirement applies to any agency practice, interpretation, or position, whether announced through formal means, such as a rescission of a federal regulation published in the Federal Register, or less formal means, such as a change in an interpretation of a statute that arises through an enforcement action or issuance of a ROD.

In *FCC v. Fox Television Stations, Inc.*, the specific change at issue was the Federal Communications Commission's (the "FCC") new interpretation of a federal prohibition on the use of expletives in certain broadcasts.[209]  The FCC's changed position surfaced in orders issued to broadcasters whose broadcasts featured allegedly indecent language that violated the newly revised federal prohibition.[210] The Supreme Court held that the FCC's reversal was not arbitrary or capricious because the FCC "forthrightly acknowledged that its recent actions have broken

---

[207] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[208] *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (discussing *Fox* and its precursor cases).

[209] 556 U.S. at 505–10.

[210] *Id.* at 509–13.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 50 of 74

new ground" and it had provided "rational" reasons for the new policy rooted in a "context-based approach" intended to reduce the widespread use of offensive language.[211]  Other courts have applied the reasoned explanation requirement to myriad settings, including a new statutory interpretation contained in a formal federal rule that was inconsistent with an agency's prior practice,[212] a decision that a species warranted listing as an endangered or threatened species that contradicted a prior listing decision,[213] a finding in a ROD concerning the cost-benefit analysis of a regulation that contradicted the cost-benefit analysis in a prior ROD,[214] and an agency's agreement to transfer land to a Native corporation to build a road after concluding in an earlier ROD that the road's construction would not be in the public interest.[215]

  With this caselaw in mind, the Court considers the two specific reversals Plaintiffs allege: (1) the alleged reversal of the ROD and (2) the alleged reversal of Agency Defendants' position regarding the legality of the Program, namely its NEPA review.  Beginning with the first alleged reversal, the Court finds that Agency Defendants have not yet "undone" or "revised" the ROD because, to date, they

---

[211] *Id.* at 517–19.

[212] *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005).

[213] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1060–62 (9th Cir. 2018).

[214] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966–68 (9th Cir. 2015) (en banc).

[215] *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1133, 1139 (D. Alaska 2019).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 51 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 51 of 74

have not issued a revised ROD or other document that purports to rescind or replace the August 2020 ROD.

As for the second alleged reversal, there is no genuine dispute that Agency Defendants changed their position regarding the legality of the Program's implementation. Agency Defendants promulgated the existing EIS and ROD during the previous presidential administration, defended their legality in litigation before this Court, and relied on the ROD to conduct the Program's first lease sale.[216] Then, following the new administration's issuance of EO 13990, Secretarial Order 3401 identified alleged legal deficiencies in the Program's implementation, such as a failure to adequately analyze a reasonable range of alternatives in the EIS and a failure to properly interpret the Tax Act.[217] The SOP Letter expanded upon these deficiencies and identified other potential deficiencies or concerns warranting additional analysis, such as "compliance with Section 810 of [ANILCA]"[218] and the Ninth Circuit's December 2020 decision in *Center for Biological Diversity v. Bernhardt*.[219]

---

[216] *See generally* AR 1–3226 (EIS, ROD, and associated notices of availability); AR 3227–3316 (lease sale materials); Fed. Defs.' Combined Mem. in Opp'n to Pls.' Mots. for Prelim. Inj., *Gwich'in Steering Comm.*, Case No. 3:20-cv-00204-SLG (D. Alaska Dec. 23, 2020), ECF No. 59.

[217] AR 3362.

[218] AR 3364–65.

[219] 982 F.3d 723 (9th Cir. 2020).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 52 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 52 of 74

The issue is not whether there was a positional change, as there indisputably was, but instead whether the positional change rises to the level of a change that warrants a reasoned explanation. Agency Defendants expressed their initial position regarding the legality of the Program's NEPA review in an EIS and ROD and in litigation defending those documents. Agency Defendants effectuated their positional change through a Secretarial Order, the SOP Letter, and, to some extent, subsequent adjudicatory decisions—e.g., the refusal to process AIDEA's contractors' applications to begin archeological and seismic investigations—but have not done so in a formal instrument such as a ROD. The Court agrees with Plaintiffs and the State that Agency Defendants have changed their position such that the reasoned explanation requirement applies. Defendants have identified no caselaw requiring that the reversal be expressed in "a rule or a formal agency position of general applicability."[220]    Here, Agency Defendants paused implementation of a program that they had been in the process of implementing because they changed their view on the program's legality. Such a reversal constitutes a change in agency policy. As a result, the Court moves to the next step of the analysis, which is to determine if Agency Defendants acknowledged and adequately explained their new position.

---

[220] Docket 63 at 39.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 53 of 74

### 2. Whether Agency Defendants Provided a Reasoned Explanation for the Policy Change

Courts do not provide "heightened review" to an agency action that changes a prior policy.[221] Rather, under *Fox*, a court's review focuses on whether (1) the agency "display[s] awareness that it *is* changing position," (2) "the new policy is permissible under the statute," (3) "there are good reasons for" the new policy, and (4) "the agency *believes* [the new policy] to be better."[222]

Here, the Court finds that each of the *Fox* requirements is met. Agency Defendants acknowledged their change in position from implementing to pausing the Program by stating in Secretarial Order 3401 and the SOP Letter that they were aware of the Program's implementation through the EIS, ROD, and lease sale and were suspending it due to the identification of legal deficiencies in the Program's NEPA review, interpretation of the Tax Act, and compliance with ANILCA.[223] Although Agency Defendants did not expressly state in Secretarial Order 3401 and the SOP Letter that they had previously not identified any legal deficiencies in the Program and had defended that position in litigation, they acknowledged a departure from their previous position by describing the prior

---

[221] *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020) (citing *Fox*, 556 U.S. at 514).

[222] *Fox*, 556 U.S. at 515 (citation omitted) (emphasis in original).

[223] *See* AR 3362 (quoting EO 13990, which references the ROD); AR 3364–65 (acknowledging alleged deficiencies or potential deficiencies with the Program's greenhouse gas analysis, compliance with section 810 of ANILCA, and interpretation of the Tax Act, which were part of the "NEPA documents underlying the competitive lease sale").

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 54 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 54 of 74

NEPA review and explaining the basis for their current position that the prior NEPA review was legally deficient.[224]  The caselaw does not require Agency Defendants to be more explicit, as they simply must "display awareness that [they are] changing position,"[225] which they have done.

As for the remaining factors, Agency Defendants cited multiple statutes in Secretarial Order 3401 and the SOP Letter that they maintain support their decision to implement the Moratorium: the Tax Act, NEPA, and possibly also ANILCA.[226]  As discussed above, the Moratorium "is permissible under the[se] statute[s]."[227]  Further, the Court may presume that Agency Defendants believe that their new position is "better" since they identified legal deficiencies in the Program's implementation that they determined warranted a temporary pause.[228]

Agency Defendants also satisfied the requirement to provide "good reasons" to justify their positional change.  It is not a coincidence that Agency Defendants identified legal errors in the Program promptly after a change in presidential administrations.  A political motivation for a policy change may not necessarily by

---

[224] This is not a case where Agency Defendants failed entirely to discuss the substance of how their new policy diverges from the prior policy.  *See Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir. 2021) (vacating agency's decision that Pacific walrus no longer qualified as threatened species where decision referred to contradictory prior finding only in a discussion of the decision's procedural history).

[225] *Fox*, 556 U.S. at 515 (emphasis omitted).

[226] AR 3362, 3364–65.

[227] *Fox*, 556 U.S. at 515; *see also* discussion *supra* Section I.

[228] *Vill. of Kake*, 795 F.3d at 967 ("[W]e assume the Department 'believes' the new policy is better because it decided to adopt it." (quoting *Fox*, 556 U.S. at 515)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 55 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 55 of 74

itself be a "good reason" for a positional change.[229]  And yet, as the Supreme Court explained, "[a]n initial agency interpretation is not instantly carved in stone.  On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, *or a change in administrations*."[230]  And "a court may not reject an agency's stated reasons . . . simply because the agency might also have had other unstated reasons."[231]  Instead, a court should evaluate only the reasons the agency provided when explaining its new policy.[232]

An agency's reasons for a change can be sufficient even if they simply take the form of a "brief" explanation that the agency's "interpretation is 'more consistent' with statutory language" than an earlier interpretation.[233]  This is precisely what Agency Defendants have done here.  Agency Defendants identified violations of NEPA, and numerous federal courts over the past half-century have

---

[229] *See Coteau Props. Co. v. U.S. Dep't of the Interior*, 53 F.3d 1466, 1478 (8th Cir. 1995) (rejecting withdrawal of agency decision following change in administration when agency made "no pretense of applying . . . the deferential standard of review mandated by [its] own regulations"); *Amalgamated Transit Union, Int'l v. U.S. Dep't of Lab.*, Case No. 2:20-cv-00953-KJM-DB, 2022 WL 17978627, at *24 (E.D. Cal. Dec. 28, 2022) (invalidating agency decisions "motivated by a desire to reach a specific outcome, and . . . not informed by expertise, evidence or careful analysis").

[230] *Brand X Internet Servs.*, 545 U.S. at 981 (emphasis added) (citations and internal quotation marks omitted).

[231] *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) (citation omitted).

[232] *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (observing the "foundational principle of administrative law" that a court's review is limited to "the grounds that the agency invoked when it took the action." (citation omitted)).

[233] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007) (citations omitted).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 56 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 56 of 74

found NEPA violations to be significant enough to warrant the suspension of important federal projects.[234]   Agency Defendants also identified a purported misinterpretation of the Tax Act—the primary substantive law authorizing the Program—concerning the number of surface acres that the Interior Secretary must authorize to be covered by oil and gas production and support facilities.[235]   Further, Agency Defendants noted, albeit without providing additional explanation, that they identified a possible error concerning the other substantive law governing the Program, ANILCA.[236]   For these reasons, Plaintiffs' contention that the Interior Secretary "does not explain how she reached [her] determination" and "makes no attempt to reconcile the Moratorium with Interior's prior position that the environmental review complied 'with all appliable [sic] laws'" is unfounded.[237]

Additionally, the Ninth Circuit has held that conforming an agency's analysis to federal appellate decisions can be a "good reason" to justify a change in position.[238]   In *Center for Biological Diversity v. Bernhardt*, the Ninth Circuit held

---

[234] *See, e.g.*, *Citizens for Responsible Area Growth v. Adams*, 477 F. Supp. 994, 1006 (D.N.H. 1979); *Nat'l Audubon Soc'y v. Hodel*, 606 F. Supp. 825, 846 (D. Alaska 1984); *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407–08 (9th Cir. 1985).

[235] AR 3365 (citing Tax Act § 20001(c)(3)).

[236] *See* AR 3364 ("[T]he Department has identified several areas for which additional analysis may either address a potential legal defect or, at a minimum, serve NEPA's purpose to meaningfully inform the decisionmaker as to the environmental consequences of federal action. These include . . . compliance with section 810 of [ANILCA].").

[237] Docket 60 at 36.

[238] *See Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 682 (9th Cir. 2016) (approving National Marine Fisheries Service's explanation for adopting a new approach to climate analysis during the Endangered Species Act review process based in part on conformance to federal appellate

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 57 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 57 of 74

that a NEPA analysis of a planned offshore oil drilling and production facility was deficient because it failed to include greenhouse gas emissions estimates resulting from foreign oil consumption in its analysis of the no-action alternative.[239]  Here, the EIS prepared in conjunction with the Program similarly fails to consider greenhouse gas emissions estimates resulting from foreign oil consumption.[240]  Although BLM's EIS for the Program attempts to explain why it did not consider the Program's impact on foreign oil consumption and greenhouse gas emissions, the Ninth Circuit rejected those same arguments in *Center for Biological Diversity*.[241]

The Ninth Circuit issued its *Center for Biological Diversity* decision after Agency Defendants completed the EIS, issued the ROD, and provided the public with notice of the lease sale.[242]  Although the lease sale took place shortly after

---

decisions interpreting the Act's "best data available" standard).

[239] 982 F.3d at 736.

[240] *See* AR 84 ("Note that BOEM did not model alternative future carbon policies and foreign energy consumption . . . ."); AR 1019 ("[T]here are currently no reliable methodologies for forecasting foreign energy cross-price elasticities and oil/gas price shock substitution responses to arrive at a global [greenhouse gas] emissions impact from associated domestic changes."); AR 1690 (explaining, in response to a comment, BLM's position that the D.C. Circuit Court of Appeals "has held that agencies are not required to model how their actions will affect global energy markets and how those market changes will, in turn, affect foreign greenhouse gas emissions" (citation omitted)).

[241] *Ctr. for Biological Diversity*, 982 F.3d at 737–740; *see also Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 762–67 (D. Alaska 2021) (vacating BLM's approval of proposed oil and gas development project in part because BLM's greenhouse gas emissions analysis suffered from the same flaws the Ninth Circuit identified in *Center for Biological Diversity*).

[242] *See generally* AR 1–3135 (EIS); AR 3138–3225 (ROD); AR 3227–28 (notice of lease sale).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 58 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 58 of 74

the *Center for Biological Diversity* decision was released, Agency Defendants likely did not have an opportunity to consider the Ninth Circuit's holding when conducting that sale. Because the Ninth Circuit's holding governs the greenhouse gas analysis necessary for an oil and gas program to proceed in accordance with NEPA, it is reasonable for Agency Defendants to pause the Program to reconsider its underlying NEPA analysis in light of the recent holding.[243] It is particularly reasonable to pause the Program at this early stage where "no irreparable and irretrievable commitment of resources has occurred"[244] given the lessees' opportunity to receive refunds of their bid and rental payments and the lack of mobilization to conduct exploration or development activities.[245]

Given the above, the Court finds that Agency Defendants' explanation in Secretarial Order 3401 and the SOP Letter satisfies the requirements for a reasoned explanation articulated in *Fox*. Their explanation is not, as the State puts it, a set of conclusory, "generic statements" concerning the Program's possible legal deficiencies.[246] And where Agency Defendants' explanation contradicts

---

[243] *Cf. Citizens for Clean Energy v. U.S. Dep't of the Interior*, 621 F. Supp. 3d 1165, 1175 (D. Mont. 2022) (reinstating previously issued coal leasing moratorium until BLM performed a sufficient NEPA analysis).

[244] *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 324 F. Supp. 3d 597, 624 (E.D.N.C. 2018) (citing *Nat'l Audubon Soc'y v. U.S. Dep't of Navy*, 422 F.3d 174, 206 (4th Cir. 2005)), *aff'd*, 914 F.3d 213 (4th Cir. 2019).

[245] *See* AR 3782–92 (agreements and notices regarding rescission of leases and refund of payments).

[246] Docket 59 at 28.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 59 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 59 of 74

earlier positions expressed in the ROD, EIS, and prior litigation, they provide reasons that reflect "a rational connection" to their decision to implement the temporary Moratorium.[247]

The cases that Plaintiffs and the State cite in which courts have deemed an agency's explanations to be inadequate are inapposite.[248] Plaintiffs and the State assert that *Village of Kake* involved a similar circumstance to the present case.[249] But *Village of Kake* involved a policy change that rested on changed factual findings.[250] Under the Supreme Court's *Fox* jurisprudence, if an agency's new policy rests upon factual findings that contradict those contained in a prior decision, a "more substantial justification" is required.[251] In *Village of Kake*, the Ninth Circuit affirmed the district court's vacatur of a 2003 ROD and reinstatement of a 2001 ROD because the 2003 ROD "did not simply rebalance old facts to arrive at the

---

[247] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

[248] Docket 59 at 30 (first citing *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022); and then citing *California v. Bernhardt* [sic], 286 F. Supp. 3d 1054, 1065–68 (N.D. Cal. 2020 [sic])); Docket 59 at 33 (citing *Vill. of Kake*, 795 F.3d at 966); Docket 60 at 38 (first citing *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 776 F. Supp. 2d 960, 974 (D. Alaska 2011); and then citing *Vill. of Kake*, 795 F.3d at 966). It appears that the State incorrectly named one of these cases in its briefing. The case located at 286 F. Supp 3d 1054 is *California v. Bureau of Land Management*, not *California v. Bernhardt*, although there is a 2020 decision from the Northern District of California with that name. *California v. Bernhardt*, 472 F. Supp. 3d 573 (N.D. Cal. 2020).

[249] Docket 59 at 33 (citing *Vill. of Kake*, 795 F.3d at 966, 969); Docket 60 at 38 (citing *Vill. of Kake*, 795 F.3d at 966).

[250] *Vill. of Kake*, 795 F.3d at 968.

[251] *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 60 of 74

new policy" but instead "made factual findings directly contrary to the 2001 ROD and expressly relied on those findings to justify the policy change."[252]  *Village of Kake* is inapposite because Agency Defendants did not base the Moratorium on new factual findings that contradict their prior factual findings.  Rather, any contradiction lies in Agency Defendants' position regarding the legality of the Program's NEPA review.

In *Los Padres ForestWatch*, the U.S. Forest Service "fail[ed] to provide evidence of the average or median" diameter of trees that would qualify as "generally small diameter timber" pursuant to federal regulations.[253]  The memorandum approving the project "contain[ed] a bare assertion—with no supporting analysis—that . . . 21-inch [diameter-at-breast-height] trees are 'smaller trees' consistent with the Roadless Area Conservation Rule."[254]  Not only did the Forest Service fail entirely to explain its conclusion regarding the trees at issue, but its conclusion also contradicted other evidence in the record, such as an Environmental Assessment prepared for a nearby project that concluded that "larger diameter" trees have a diameter at breast height exceeding 10 inches.[255]  Here, Agency Defendants did not leave their policy change unexplained, and their

---

[252] *Vill. of Kake*, 795 F.3d at 968.

[253] 25 F.4th at 657.

[254] *Id.*

[255] *Id.* at 658.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 61 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 61 of 74

rationale did not contradict explicit factual findings contained elsewhere in the record.

In *California*, BLM promulgated a rule, referred to by the district court as "the Suspension Rule," that suspended certain provisions of BLM's Waste Prevention Rule, a rule which had sought to "reduce waste of natural gas from venting, flaring, and leaks during oil and natural gas production activities."[256] The court found that the Suspension Rule's reasoning was "untethered to evidence contradicting the reasons for implementing the Waste Prevention Rule" because BLM had initially found that the Waste Prevention Rule imposed "economical, cost-effective, and reasonable measures . . . to minimize gas waste," but in the Suspension Rule found that it had "concerns regarding the statutory authority, cost, complexity, feasibility, and other implications" of the Waste Prevention Rule.[257] Because the Suspension Rule contained factual findings that appeared to "contradict those underlying its prior policy," lacked other factual support, and were "not properly tailored" to address the concerns BLM identified with respect to the prior rule, the court enjoined enforcement of the rule due to BLM's failure to meet the "more detailed justification" standard.[258]

---

[256] 286 F. Supp. 3d at 1058 (citation omitted).

[257] *Id.* at 1058, 1065.

[258] *Id.* at 1065–67 (quoting *Fox*, 556 U.S. at 515).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 62 of 74

Again, *California* is not directly applicable to the case at hand because the reasons Agency Defendants offered for their policy change are not contradictory factual findings about the Program's operation; rather, they are contradictory legal conclusions as to the EIS's compliance with NEPA. For example, the ROD concluded that the Tax Act's provision that the Interior Secretary "shall authorize up to 2,000 surface acres" means that BLM "cannot" consider "[a]n alternative that allowed less than 2,000 acres of surface facilities"; Agency Defendants announced the Moratorium in part because they determined the ROD's interpretation was incorrect, which had a significant impact on the NEPA review since it eliminated from consideration any alternative with lesser surface acreage.[259]

Even though *California* is not directly applicable to the instant case, it still lends support to Agency Defendants' primary justification for the Moratorium—to ensure that the NEPA analysis accounts for subsequently identified legal errors so the Program can proceed in accordance with the law.[260] As the court in *California* observed, a "concern for judicial review may serve to justify a suspension or delay."[261] There, BLM's stated concern for judicial review was insufficient to justify the Suspension Rule because BLM tailored the Suspension Rule "to achieve its

---

[259] AR 76, 3365. The Court expresses no opinion in this order as to this legal issue.

[260] AR 3364–65.

[261] 286 F. Supp. 3d at 1068.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 63 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 63 of 74

goal of relieving operators and the agency of the burden of complying with a rule that may shortly change."[262]

Here, by contrast, BLM's stated concern was that the Program may be based on a "specific legal error" implicated in then-pending court cases.[263] The reasons for the Moratorium expressed in Secretarial Order 3401 and the SOP Letter therefore are tethered to a concern about legality and judicial review and not to some unrelated concern, such as a political motivation or desire to address climate change. Political and climate-inspired motivations may have also been present, but Agency Defendants appropriately tailored the Moratorium to address specifically identified legal concerns that, once addressed, should facilitate Agency Defendants' efforts to implement the Program in accordance with the law.

In sum, the Court finds that Agency Defendants' explanation for the Moratorium satisfies their obligations pursuant to *Fox*.

### 3. The State's Related Arguments

The State raises two related arguments concerning Agency Defendants' policy change, which the Court addresses in turn.

### a. The Moratorium does not rescind the ROD.

The State contends that the Moratorium "functionally rejects, suspends, and even rescinds the ROD . . . without any independent lawful authorization nor with

---

[262] *Id.* (citation omitted).

[263] AR 3362–63 (noting "legal deficiencies"); AR 3365 (describing potential implications to NEPA analysis after the Ninth Circuit issued *Center for Biological Diversity* in December 2020).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 64 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 64 of 74

any process that would otherwise be required for such an action."[264]   The State

characterizes the Moratorium as "simply abandon[ing] an otherwise valid

decision."[265]   But as noted throughout this order, the Moratorium is a *temporary*

pause in Agency Defendants' implementation of the Program.   Nothing in

Secretarial Order 3401 or the SOP Letter "abandons" the ROD.   At some future

time, Agency Defendants may choose to "reject[], suspend[], [or] even rescind[]

the ROD" based on the results of their ongoing supplemental NEPA analysis, but

they have not done so at this time.[266]   Instead, the final agency action properly

challenged in this suit is Agency Defendants' decision to pause the Program's

implementation, not a rejection or rescission of the ROD.

### b.     The Moratorium's purpose is valid.

The State next alleges that the Moratorium is founded on an invalid

purpose.[267]   But the State fundamentally misconstrues the Moratorium's purpose.

The purpose of the Moratorium is not, as the State contends, to "determine

whether to reaffirm or void the Coastal Plain leases."[268]   That may be part of the

purpose of the supplemental NEPA review, but the issues of whether Agency

Defendants have the authority to cancel any leases and under what circumstances

---

[264] Docket 59 at 20.

[265] Docket 59 at 20.

[266] Docket 59 at 20.

[267] Docket 59 at 23.

[268] Docket 59 at 24.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 65 of 74

are not before this Court.[269]  The purpose of the Moratorium—the agency action that is properly challenged and currently before the Court—is to provide time for Agency Defendants to ensure that the Program is implemented in accordance with applicable laws.[270]  It is well within DOI's authority to issue leases pursuant to the Program and to pause lease implementation to address legal errors that could lead a federal court to reject the Program and remand it to Agency Defendants, triggering another years-long NEPA process.[271]

The State acknowledges this authority in its reply but asserts that an agency cannot reconsider a decision "when Congress has provided a mechanism capable of rectifying mistaken actions."[272]  The State asserts that Congress, through NEPA,

---

[269] Regardless, as discussed above, the leases clearly provide authority for Agency Defendants to cancel the leases if, for example, a "lessee fails to comply with any provisions of" the lease. *E.g.*, AR 3312.

[270] *See* AR 3362 ("Based on th[e] identified deficiencies, the Department . . . will conduct a new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies. While that analysis is pending, I direct a temporary halt on all Department activities related to the Program . . . ."); AR 3365 ("[T]he Department has concluded that it is necessary to suspend the above-referenced lease(s) . . . . The BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures.").

[271] *See Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion." (citations omitted)); discussion *supra* Section I.C.3 (citing *Boesche v. Udall*, 373 U.S. 472 (1963)).  Likewise, "notions of administrative autonomy require that [an] agency be given a chance to discover and correct its own errors." *See McKart v. United States*, 395 U.S. 185, 195 (1969) (discussing reasons underlying the administrative exhaustion doctrine).  This includes "giving the agency an opportunity to fix its own mistakes before it is brought to court."  *William Loveland Coll. v. Distance Educ. Accreditation Comm'n*, 347 F. Supp. 3d 1, 13 (D.D.C. 2018), *aff'd sub nom. William Loveland Coll. v. Distance Educ. Accrediting Comm'n*, 788 F. App'x 5 (D.C. Cir. 2019).

[272] Docket 66 at 8 (quoting *Ivy Sports*, 767 F.3d at 86).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 66 of 74

provided "a detailed process that federal agencies can and do use to modify or replace an existing ROD—a process that involves input by the public and other stakeholders."[273]  But this contention again mischaracterizes the Moratorium, which does not modify or replace the Program's formal NEPA review or associated documentation; it instead pauses the Program's implementation so Agency Defendants can conduct additional NEPA analysis and correct the Program's alleged legal deficiencies.  To the extent Agency Defendants develop a new EIS or ROD in an effort to rectify the alleged deficiencies, those efforts would require adherence to the applicable procedures established by Congress in NEPA and any applicable implementing regulations.

In light of the above, the Court concludes that the Moratorium's purpose, and Agency Defendants' authority to pursue that purpose, are each valid.

### C.  Agency Defendants Have Not Unlawfully Delayed or Unreasonably Withheld Agency Action

Plaintiffs' remaining argument is that Agency Defendants "are unlawfully and unreasonably delaying the completion of . . . discrete, required actions" pursuant to the Tax Act.[274]  They focus primarily on the statute's directive that the Interior Secretary "shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out

---

[273] Docket 66 at 8 (first citing 42 U.S.C. § 4332(C); and then citing 40 C.F.R. §§ 1501–06).

[274] Docket 60 at 39–40.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 67 of 74

this section."[275]   Plaintiffs maintain that the Court "shall compel" these actions pursuant to Section 706(1) of the APA.[276]

Agency Defendants counter that they are not unlawfully withholding action because they satisfied the requirement to hold the Program's first lease sale and are "well within the statutory timeline for the second required sale."[277]  With regard to the issuance of easements and rights-of-way, Agency Defendants maintain that a court can only invoke Section 706(1) of the APA when an agency has failed "to perform a ministerial or non-discretionary act," not an action over which the agency is accorded discretion.[278]

The APA provides that a court "shall compel agency action unlawfully withheld or unreasonably delayed," including a failure to act.[279]  Judicial review of an agency's failure to act is limited, however, in order "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."[280]  It follows that a court may not compel agency action

---

[275] Tax Act § 20001(c)(2).

[276] Docket 60 at 39 (citing 5 U.S.C. § 706(1)).

[277] Docket 63 at 28; *see also* Docket 64 at 23 ("Interior did not . . . miss deadlines in the Tax Act.").

[278] Docket 63 at 26–27 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) [hereinafter *SUWA*]).

[279] 5 U.S.C. § 706(1); *see also* 5 U.S.C. § 551(13) (defining "agency action" to "include[] the . . . failure to act").

[280] *SUWA*, 542 U.S. at 66.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 68 of 74

whenever an agency is withholding or delaying *any* action.[281]  Rather, a court's

authority to compel agency action "is carefully circumscribed to situations where

an agency has ignored a specific legislative command."[282]  To prevail on a Section

706(1) claim, a plaintiff must establish "that an agency failed to take a *discrete*

agency action that it is *required to take*."[283]  A court must leave "the manner of its

action . . . to the agency's discretion" since a court "has no power to specify what

the action must be."[284]

In the Ninth Circuit, an action is "unlawfully withheld" if "Congress has

specifically provided a deadline for performance" and the agency has not met that

deadline.[285]  When there is no set deadline by which an agency must act, a court

evaluates whether the agency's delay is unreasonable by applying the six factors

established by the D.C. Circuit in *Telecommunications Research & Action Center*

*v. FCC*[286] and adopted by the Ninth Circuit in *Independence Mining Co. v.*

*Babbitt*:[287]

> (1) the time agencies take to make decisions must be governed by a
> rule of reason; (2) where Congress has provided a timetable or other

---

[281] *Or. Nat. Desert Ass'n v. Bushue*, Case No. 3:19-cv-1550-SI, 2022 WL 17487065, at *2 (D. Or. Dec. 7, 2022).

[282] *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).

[283] *SUWA*, 542 U.S. at 64 (emphasis in original).

[284] *Id.* at 65.

[285] *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).

[286] 750 F.2d 70 (D.C. Cir. 1984) [hereinafter *TRAC*].

[287] 105 F.3d 502, 507 (9th Cir. 1997).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 69 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 69 of 74

indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.[288]

The rule of reason is the most important factor in this analysis because, in determining an "appropriate timeline for agency action, the Ninth Circuit has instructed district courts to follow a standard of reasonableness."[289] Although "there is no *per se* rule as to how long is too long" for agency action,[290] the Ninth Circuit has observed that a delay of more than six years may be "nothing less than egregious."[291] Similarly, the Ninth Circuit held that an eight-year delay with no concrete timeline to reach a final ruling was a "roadmap for further delay" that "stretched the 'rule of reason' beyond its limits."[292]

Plaintiffs rely on one Supreme Court case supporting the proposition that when an agency fails to take a discrete step it is required to take, a court must

---

[288] *TRAC*, 750 F.2d at 80 (internal quotation marks and citations omitted).

[289] *Audubon Soc'y of Portland v. Jewell*, 104 F. Supp. 3d 1099, 1102 (D. Or. 2015) (citations omitted); *see also Or. Nat. Desert Ass'n*, 2022 WL 17487065, at *17 ("Although not dispositive, the first factor in the *TRAC* analysis is the most important." (citing *In re A Community Voice*, 878 F.3d 779, 786 (9th Cir. 2017))).

[290] *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992).

[291] *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020) (citations omitted).

[292] *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 814 (9th Cir. 2015).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 70 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 70 of 74

invoke the APA to compel that action.[293]    However, the operative statutes governing the Program—primarily the Tax Act—do not prescribe any discrete steps that Agency Defendants have yet failed to take.  The Tax Act requires DOI to hold "the initial lease sale under the oil and gas program . . . not later than 4 years after the date of enactment of this Act."[294]    Agency Defendants conducted the Program's first lease sale on January 6, 2021.[295]    Congress enacted the Tax Act on December 22, 2017, so Agency Defendants handily met this deadline.[296]    Agency Defendants have not cancelled, rescinded, nullified, or otherwise undone the first lease sale.[297]    And the second lease sale deadline of December 22, 2024, has not yet passed.[298]

As for the Tax Act's mandate to the Secretary to "issue any rights-of-way or easements . . . necessary to carry out this section," this provision does not specify a timeframe by which Agency Defendants must act, and the Tax Act provides them

---

[293] Docket 60 at 39–40 (citing *SUWA*, 542 U.S. at 64).  In *SUWA*, the Supreme Court held that statements in a land use plan reflecting BLM's intention to conduct supervision and monitoring activities were "not a legally binding commitment enforceable under § 706(1)," and, as such, the Supreme Court did not decide whether the statements were "sufficiently discrete to be amenable to compulsion under the APA."  *SUWA*, 542 U.S. at 72.

[294] Tax Act § 20001(c)(1)(B)(ii)(I).

[295] AR 3227–28 (Notice of Lease Sale).

[296] *See generally* Tax Act.

[297] To the extent Plaintiffs suggest that the Moratorium is a de facto rescission of the lease sale, they have not pointed to any authority indicating that this is the case.  Also, for the reasons the Court discussed above in response to the State's argument that the Moratorium functionally rescinded the ROD, there has not been a "functional" rescission of the lease sale.  *See* discussion *supra* Section II.B.3.a.

[298] *See* Tax Act § 20001(c)(1)(B)(ii)(II).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 71 of 74

discretion through use of the phrase "necessary to carry out this section."[299]  Thus, apart from the lease sales themselves, there are no other "discrete agency action[s]" for which Agency Defendants have an explicit deadline.[300]

Plaintiffs' briefing does not address the *TRAC* factors and instead only superficially alleges an unreasonable delay.[301]  Regardless, none of the factors weigh heavily in favor of Plaintiffs.  First, the most important factor, the "rule of reason," weighs in favor of Agency Defendants given the temporary nature of the Moratorium and their desire to address legal issues that could stymie the Program while balancing ANILCA's conservation goals.  Second, Congress has not provided any timetable for implementation of the Program beyond the requirements to conduct two lease sales within set periods of time, neither deadline of which Agency Defendants have violated.  Third, the delays have resulted only in possible economic harm, as human health and welfare are not directly impacted by the Moratorium.  Fourth, Agency Defendants delayed the Program for the

---

[299] *Id.* § 20001(c)(2).  Because Agency Defendants identified legal deficiencies in the Program's implementation, no rights-of-way or easements are necessary at this time to "carry out" Section 20001 of the Tax Act.  *Cf. W. Energy All. v. Biden*, Case No. 21-CV-13-SWS, 2022 WL 18587039, at *9 (D. Wyo. Sept. 2, 2022) (finding that, because "recent caselaw created a cloud over the sufficiency of many of the" Environmental Assessments underlying a leasing program, none of the lands subject to the program were properly "available for leasing" pursuant to the MLA and its implementing regulations).

[300] *SUWA*, 542 U.S. at 64.

[301] *See generally* Docket 60 at 39–40.  The State identifies two cases in which courts have held that agencies violated the APA by delaying agency action, but the State's filing likewise does not separately address APA § 706(1) or discuss the *TRAC* factors.  Docket 59 at 22–23.  Plaintiffs' and the State's replies do not address these factors either.  *See generally* Docket 66; Docket 67.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 72 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 72 of 74

purpose of ensuring that their NEPA review comports with the law. Indeed, Agency Defendants are attempting to balance the constraints imposed on them through multiple federal statutes: the Tax Act, ANILCA, and NEPA. There is no indication from Congress that any of these statutes should be prioritized over any other, and it cannot be said that a temporary delay in the Program's implementation represents an unreasonable prioritization of NEPA over the Tax Act or ANILCA when Agency Defendants have already begun to implement the Program and have only temporarily paused it to ensure compliance with NEPA. These efforts ultimately should further both the Tax Act and ANILCA's goals as well as NEPA's goals. Fifth, Plaintiffs have articulated some degree of prejudice from the delay, but there is no indication that, when the Moratorium ends, they will not be able to fulfill their objectives at that point. The sixth factor is largely irrelevant in this case, as there is no evidence that Agency Defendants have acted with impropriety.[302] At worst, their actions are rooted in political motivations, which are not by themselves reason to find a delay unreasonable. Accordingly, the Court finds that Agency Defendants' delay in implementing the Program is reasonable and that to date Agency Defendants have not unlawfully withheld any action.[303]

---

[302] *See TRAC*, 750 F.2d at 80 (listing six factors relevant to the question of whether an agency's delay is unreasonable).

[303] Because the Court finds that the Moratorium complies with the law, it does not reach the parties' arguments concerning the proper remedy in this case. Docket 60 at 40.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 73 of 74

**CONCLUSION**

In light of the foregoing, the State's and Plaintiffs' motions for summary judgment at Docket 59 and Docket 60, respectively, are DENIED. Defendants' responses in opposition—which the Court interprets as cross-motions for summary judgment—at Docket 63, Docket 64, and Docket 65 are GRANTED. All claims against Federal Defendants are DISMISSED with prejudice. The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 7th day of August, 2023 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 74 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 74 of 74