S. LANE TUCKER
United States Attorney

JENNIFER IVERS
SETH BEAUSANG
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Email: jennifer.ivers@usdoj.gov
      seth.beausang@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ROLANDO HERNANDEZ-ZAMORA,<br><br>    Defendant. | No. 3:21-cr-00062-MAH-MMS |

## SENTENCING MEMORANDUM

The United States recommends imposition of the following sentence:

**INCARCERATION** ................................................................................ **60 MONTHS**
**SUPERVISED RELEASE** ........................................................................ **3 YEARS**
**SPECIAL ASSESSMENT** ............................................................................. **$100**
**RESTITUTION** ................................................................................... **$2757.95**
**FINE** ................................................................................... **UNABLE TO PAY**

## INTRODUCTION

Based on the facts of this case, the sentencing guidelines, and the § 3553(a) factors, the United States respectfully asks this Court to impose the statutory maximum term of imprisonment of 60 months.

The United States does not make this recommendation lightly. Hernandez-Zamora terrorized Y.S., her daughter, her parents, her boss, and her workplace, relentlessly threatening them until they genuinely and reasonably feared for their lives. A sentence of 60 months is sufficient but not greater than necessary to reflect the seriousness of his crimes and to protect Y.S., her family, and the public from Hernandez-Zamora now and in the future.

## FACTS

For their entire relationship, defendant Rolando Hernandez-Zamora controlled Y.S.'s life. Doc. 291 at 8:19-9:2. He isolated her from her family and friends, as her "social circle kept getting smaller and smaller and smaller because [she] had to have his approval to be able to hang out with people." *Id.* at 9:9-11. He tracked her devices and location. *Id.* at 12:5-6. He followed her to work and school. *Id.* at 23:11-16, 25:1-9. Wherever she went, "[h]e just said he was watching me. So I always knew there was eyes on me or he would be around somewhere." *Id.* at 26:16-18. He was constantly watching her, monitoring her, an accusing her of cheating. *Id.* at 26:25-27:2. She had no freedom. *Id.* at 26:24-25.

Y.S. did not consent or even acquiesce to Hernandez-Zamora's power and control. Each of his behaviors was backed by risk of injury or death. He hit her, physically dragged her back to his home, and threatened her with guns. *Id.* at 12:10-15, 17:19-21, 18:12-21;

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Doc. 392 at 26:7-16. "[I]f I didn't do things the nice way, then I would have to do them the bad way." *Id.* at 26:19-20. The "bad way" meant physical force, violence, and death threats. *Id.* at 26:20-22. "I knew I was going to end up dead somehow." *Id.* at 27:10-11.

Perhaps worst of all, he convinced her that his behavior was all her fault, that she was doing something wrong and if only she "was able to read him a little better" and behave exactly how he wanted her to, then things would be fine. Doc. 391 at 33:22-34:1.

But things would never be fine, no matter what she did. "[T]here was always something he would find that would upset him." *Id.* at 20:8-9. If they saw her ex-boyfriend at a bar, she was not safe. Doc. 45-2. If she forgot her cell phone at home, she was not safe. Doc. 391 at 35:5-11. If she didn't answer his constant calls, she was not safe. *Id.* at 23:13-16; Doc. 392 at 8:14-16. If she turned her location tracking off, she was not safe. Doc. 391 at 24:16-17, 19:19-24, 34:16-17.

Y.S. grew tired of Hernandez-Zamora's jealousy and control. But whenever she tried to break up with him, he took her back by force. He threatened her with guns, even shooting a gun outside her parents' house, to force her to come back at risk of her and her family's lives. *Id.* at 15:18-24. He broke down her parents' door, physically dragged Y.S. into his car, drove her to his home, and forced her to stay there without a phone to call for help. *Id.* at 18:12-19:7.

Y.S. was trapped, unable to leave, until early 2020 when Hernandez-Zamora moved to Washington with the expectation that Y.S. and their daughter would join him there eventually. Even from far away, Hernandez-Zamora's jealousy and control continued. As

he had done dozens of times before, Hernandez-Zamora began accusing Y.S. of cheating on him. Doc. 392 at 12:11-12. As she had before, Y.S. moved out of their shared home and into her parents' house, hoping this time she would be safe from Hernandez-Zamora as he was still in Washington. *Id.* at 31:21-32:11.

But Hernandez-Zamora returned, this time with a vengeance stronger than ever before. He began fixating on Y.S.'s male supervisor, threatening to find him and rip him to pieces. *Id.* at 39:8-25.

Because of Hernandez-Zamora's threats and knowing he was on his way back to Alaska, Y.S. sought and received a protective order prohibiting Hernandez-Zamora from contacting her or their daughter or coming within 500 feet of her workplace and her parents' residence. Trial. Exh. 42. Almost as soon as the order was issued, however, Hernandez-Zamora showed up at Y.S.'s parents' residence, slamming on the door and shouting obscenities. Doc. 392 at 48:2-25. He made it clear that the protective order would not stop him:



> Solamente una bala me va a detener no un puto papel de mierda.

> Only a bullet will stop me not a fucking piece of shit paper.

Trial Exh. 3.

He evaded police, saying he would never let them take him without a fight:

> The police haven't stopped chasing me since yesterday. Last night they were near your house, and mine; they came to knock on my door 4 times already. I don't plan to talk with them. I'm going to fight them. I don't want to live this life.

Trial Exh. 16.

He began staking out Y.S.'s home:



Trial Exh. 264.

He tried to trick someone into sharing Y.S.'s boss's home address with him:



Bates 3963-64.

//

//

//

//

//

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

He armed himself with guns and grenades:





Trial Exhs. 261-62.

He described in detail exactly how he wanted to kill Y.S. and her boss, and how much he would enjoy their deaths:



There's no one more dangerous than the person from whom everything he has fought for all his life has been taken away

So both you and he will get more bullets

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS



Trial Exhs. 8, 11, 16.

On the same day that Hernandez-Zamora asked to purchase grenades, he texted his

and Y.S.'s 11-year-old daughter to get under her bed if she heard a loud noise:

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS



Trial Exh. 13.

And no matter how much his 11-year-old daughter begged and pleaded with him, he never stopped. He doubled down on his threats and told the girl that she would never see her mother again:



> Don't never forget get under your bed cuando escuches un sonido muy fuerte.

> Don't never forget get under your bed when you hear a very loud noise.

> Love, I need to see you and hug your mommy tightly. If she goes to work, she might not come back home. She'll go forever with her boss and never come back…

Trial Exhs. 13, 16.

He left threatening voicemails for Y.S.'s boss at Providence Hospital and then went to Providence looking for the boss. As a result of Hernandez-Zamora's threats, Providence locked down the hospital for several days and hired armed paramilitary-style security guards to protect the building where Y.S. worked.

Hernandez-Zamora called Y.S. a total of 1,317 times while the protective order was in place. His stalking and threats did not stop until his arrest on May 29, 2020.

**GUIDELINES CALCULATION**

Although the United States agrees with the U.S. Probation Office's guideline calculation, this Court should depart upward because Category II substantially underrepresents Hernandez-Zamora's criminal history and risk of recidivism.

**1. The PSR Accurately Calculates Hernandez-Zamora's Guideline Range.**

The Final Presentence Report calculates a guideline range of 46-51 months based on a total offense level of 22 and a criminal history category II. The United States does not dispute this calculation.

//

//

## 2. Category II Substantially Underrepresents Hernandez-Zamora's Criminal History.

Category II substantially underrepresents Hernandez-Zamora's criminal history and the likelihood that he will commit other crimes. *See* U.S.S.G. §4A1.3(a)(1) ("If reliable information indicates that the defendant's criminal history category substantially underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted."). Reliable information supports an upward departure based on prior sentences not used in Hernandez-Zamora's computation and similar criminal conduct that did not result in criminal convictions. U.S.S.G. §4A1.3(a)(2)(A), (E).

To depart upward, this Court should consider both the seriousness of Hernandez-Zamora's criminal history and the likelihood of recidivism. *United States v. Connelly*, 156 F.3d 978, 984 (9th Cir. 1998). For the second prong, recidivism, this Court should consider the quantity of uncounted criminal conduct, the similarity of uncounted criminal conduct to the offense conduct, and whether prior sentences have had any deterrent effect. *Id.* at 985. Here, Hernandez-Zamora's uncounted criminal conduct is serious and demonstrates a high likelihood of recidivism.

First, Hernandez-Zamora's 2006 convictions for Assault in the Fourth Degree, Misconduct Involving Weapons, and Violating Conditions of Release were not counted because they fell one month outside of the 10-year window established in application note 2 of U.S.S.G. §4A1.1. Those offenses were highly serious: Hernandez-Zamora shot a gun outside Y.S.'s parents' home after Y.S. tried to break up with the defendant. PSR ¶ 38.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Page 10 of 17
Case 3:21-cr-00062-MAH    Document 396    Filed 12/02/24    Page 10 of 17

They are also very similar to this offense. Hernandez-Zamora called Y.S. and threatened to kill her, leading her to fear for her safety. *Id.* When Y.S. did not answer, Hernandez-Zamora showed up at her parents' home with a gun. *Id.*; Doc. 391 at 15:18-16:6. He fired several shots outside Y.S.'s window. PSR ¶ 38. Hernandez-Zamora further accused Y.S. of cheating on him. *Id.*

Second, Hernandez-Zamora committed at least one additional assault against Y.S. that was not charged because he prevented her from reporting it. In her trial testimony, Y.S. explained that in the summer of 2016, she tried to break up with Hernandez-Zamora and took refuge at her parents' home. Doc. 391 at 18:12-21. Hernandez-Zamora broke down the door of her parents' home and forcibly dragged Y.S. into the car and drove her back to their shared home. *Id.* Y.S. did not report that incident because Hernandez-Zamora took her phone and prevented her from making any calls or leaving the house. *Id.* at 19:3-7. That criminal conduct involved assault and kidnapping, serious offenses, and like this offense, resulted from Hernandez-Zamora's jealous, violent outbursts at the thought of Y.S. leaving him.

Finally, Hernandez-Zamora's post-indictment conduct has followed the very same pattern. In November 2021, he broke down the front door of a woman he was dating in Oregon, accusing her of being "whit another men." Doc. 45 at 16; *see* PSR ¶ 50, Doc. 45-12. Hernandez-Zamora carried a firearm around her, and after she broke up with him, he continued to harass her by contacting her via unknown numbers and WhatsApp. Doc. 45-12. Hernandez-Zamora completely disregarded the wellbeing of this woman's daughter,

who suffered severe emotional distress because of his conduct. *Id.*; PSR ¶ 50. That event resulted in Hernandez-Zamora's pretrial detention.

Taken in the aggregate, these uncounted criminal offenses are frequent and repetitive, demonstrating a pattern beginning in at least 2006 and continuing regularly until Hernandez-Zamora's current period of incarceration. But prior jail time has had no long-term deterrent effect on Hernandez-Zamora. Each time he has been released, he has picked up right where he left off, assaulting and harassing a romantic partner, whether Y.S. or another woman. Hernandez-Zamora poses a high risk of recidivism, and an upward departure to at least Category III is warranted, resulting in a guideline range of 51-63 months.

## STATUTORY CRITERIA AND RECOMMENDED SENTENCE

### 1. Nature and Circumstances of the Offense – 3553(a)(1)

The nature and circumstances of this offense, described in the Facts section above, are shocking. Y.S. believed that she would end up dead, and based on Hernandez-Zamora's statements to her and to others, his history of violence, and his actively seeking out deadly weapons to use against her, the evidence supports those fears.

This case stands out compared to other cyberstalking cases. The course of conduct lasted many, many years. Some of Hernandez-Zamora's most alarming threats were sent not just to Y.S. but also her 11-year-old daughter, who was deeply traumatized by his conduct. Hernandez-Zamora's course of conduct resulted in the lockdown of a building on the Providence Hospital campus. Providence is the largest and busiest hospital in Alaska. And Hernandez-Zamora called Y.S. 1,317 times in violation of a protective order.

Considering the length, scope, and seriousness of Hernandez-Zamora's criminal conduct the maximum sentence is appropriate here.

**2. History and Characteristics of the Defendant – 3553(a)(1)**

Hernandez-Zamora is obsessive, jealous, and controlling. These traits have driven his violent outbursts throughout his adult life. In 2006, after accusing Y.S. of cheating, he threatened to kill her and shot a gun outside her parents' home. PSR ¶ 38. In 2007, he dragged her by her hair out of a bar after seeing Y.S.'s ex-boyfriend. Doc. 45-2. In 2018, he exploded when Y.S. was working on a group project with a man. Trial Exh. 253. In 2020, he convinced himself Y.S. was cheating on him and decided to kill her and her boss in response. PSR ¶ 17. In 2021, while on pretrial release, he broke down a different girlfriend's door after accusing her of cheating. Doc. 45 at 16; see PSR ¶ 50, Doc. 45-12. This jealous, rageful behavior has only gotten worse over time, and Hernandez-Zamora has shown no remorse or recognition of the harm he has caused.

In addition to violating pretrial release by committing yet another domestic violence offense, Hernandez-Zamora has continually misbehaved while in custody. PSR ¶ 7. Some of those disciplinary incidents involved weapons and violence. *Id.*

Nor is Hernandez-Zamora willing to address his serious mental health problems. He did not cooperate with his initial competency evaluation, resulting in a finding that he was not competent. Doc. 116. At the restoration stage, however, Hernandez-Zamora participated minimally, continuing to deny that he had any mental health problems. PSR ¶ 63. He refused medication and will refuse any medication in the future. *Id.* at ¶ 64.

### 3. Seriousness of the Offense and Just Punishment for the Offense – 3553(a)(2)(A)

A significant sentence of imprisonment is necessary when considering the seriousness of this offense. Hernandez-Zamora worked day and night to terrorize Y.S. She could not escape Hernandez-Zamora and even obtaining a protective order did not keep her safe – he did not relent until he was arrested. Only jail stopped him from carrying out his threats.

Needless to say, stalking an intimate partner has long-term traumatic impacts on the victim. A recent Alaska study examined the physical and mental health effects on Alaska women who were the victims of intimate partner violence – defined to include, assault, stalking, controlling behaviors, and threats, the same type of harassment and violence that Hernandez-Zamora inflicted on Y.S.[1] The study showed that Alaska women who experienced intimate partner violence had sharp declines in their physical and mental health, both short and long-term.[2] Specifically, the victims of the type of harassment and violence that Hernandez-Zamora inflicted on Y.S. experienced 1.6 to 2 times more physical symptoms such as chronic pain and headaches and 4 to 10 times more mental health challenges than Alaska women who were not victimized that way.[3]

Impact statements from Y.S. and her family bear out those statistics. Y.S. suffered for more than 18 years because of Hernandez-Zamora's stalking and violence. A sentence

---

[1] Ingrid Diane Johnson, PhD & Andrew Gonzalez, BA, Relationships between Intimate Partner Violence and Alaskan Women's Health, iii (2023), available at https://scholarworks.alaska.edu/bitstream/handle/11122/14854/23-UAAJIC-001-AVS%20Health%20Report.pdf?sequence=1&isAllowed=y.
[2] Id.
[3] Id.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Page 14 of 17
Case 3:21-cr-00062-MAH     Document 396     Filed 12/02/24     Page 14 of 17

of five years of imprisonment is a necessary and just punishment for the harm he inflicted.

**4. Deterrence and Protection of the Public – 3553(a)(2)(B)**

Hernandez-Zamora's criminal history, offense conduct, and pretrial conduct, as well as recidivism rates of domestic abusers, point to one likely outcome: he will do this again.

Incarceration has not deterred him. His own 11-year-old daughter – the person that he claims to love the most – repeatedly begged him to stop threatening her mother. That did not deter him. He was arrested for state crimes in May 2020, and arraigned on federal crimes in June 2021. Even that did not deter him from committing additional violent acts against a different romantic partner and her daughter.

Hernandez-Zamora is not alone in this. Domestic violence offenders in Alaska reoffend at much higher rates than people convicted of other offenses.[4] Within eight years of release, around 75% are rearrested and convicted of new crimes, usually domestic violence crimes.[5] Hernandez-Zamora's criminal history bears out that pattern, and he has given this Court no reason to believe this will change in the future.

But even without a measurable deterrent effect, a significant sentence of imprisonment would serve the important purpose of protecting Y.S. and the public from Hernandez-Zamora. His periods of incarceration have been the only brief moments of peace for Y.S. and his other victims. Given the extraordinarily high likelihood that Hernandez-Zamora will reoffend, a sentence of 60 months is the most reasonable sentence

---

[4] Alaska Criminal Justice Commission, Domestic Violence in Alaska, 22 (2021), available at https://www.ajc.state.ak.us/acjc/docs/rr/domestic_violence_in_alaska.pdf.
[5] *Id.*

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Page 15 of 17
Case 3:21-cr-00062-MAH    Document 396    Filed 12/02/24    Page 15 of 17

to address this factor.

### 5. Rehabilitation and Treatment – 3553(a)(2)(D)

Because Hernandez-Zamora does not acknowledge his need for medication and treatment, this factor should not weigh heavily in the Court's analysis. *See* PSR ¶¶ 58-64f.

### 6. Need to Avoid Sentencing Disparities – 3553(a)(6)

A sentence of 60 months is consistent with similar cases in this district.[6] In *United States v. Louis Holger Eklund*, 3:18-cr-00035-SLG, the defendant was sentenced to 42 months on each count of Cyberstalking, consecutive, for a total of 84 months. That defendant made 152 phone calls and sent 141 emails to one of the victims, compared to the thousands involved in this case. In *United States v. Peter Lee Norris*, 3:19-cr-00078-RRB, the defendant was sentenced to 60 months on Count 1 (Cyberstalking), and 48 months on Count 2 (18 U.S.C. § 876), also consecutive. In that case, the defendant sent harassing letters to OCS workers and an FBI agent.

Here, given Hernandez-Zamora's years-long campaign of threats, violence, harassment, and stalking, a sentence of 60 months, the maximum sentence, is needed to avoid a sentencing disparity among defendants in this district who have received more prison time for arguably less severe conduct.

### 7. Restitution – 3553(a)(7)

After Hernandez-Zamora broke down her parents' door in 2016, Y.S. and her family purchased a security system for $909.95. *See* Attachment 1. And after Hernandez-

---

[6] The median sentence for the offense is 53 months, but that included only a sample size of 3 cases. PSR p. 3.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Page 16 of 17
Case 3:21-cr-00062-MAH     Document 396     Filed 12/02/24     Page 16 of 17

Zamora's 2020 threats, Y.S. and her daughter both purchased new phones with different numbers. *See* Attachments 2-3. This Court should order restitution for the total amount of $2,757.95, as well as any additional restitution as appropriate, to Y.S.

**CONCLUSION**

Y.S. tried but could not escape Hernandez-Zamora's cyberstalking. He used phones and the internet to harass, threaten, and intimidate her wherever she went and at all hours. Y.S. suffered for years with no freedom, no privacy, and no safety. A sentence of 60 months of imprisonment is needed, but not greater than necessary, to account for Hernandez-Zamora's insidious, dangerous conduct.

RESPECTFULLY SUBMITTED December 2, 2024 at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

/s/ Jennifer Ivers
JENNIFER IVERS
Assistant United States Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on December 2, 2024
a true and correct copy of the foregoing
was served electronically on all counsel
of record.

/s/ Jennifer Ivers
Office of the U.S. Attorney