# Exhibit A

S. LANE TUCKER
United States Attorney

STEVEN D. CLYMER
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (315) 448-0684
Email: steven.d.clymer@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 3:21-cr-00062-MAH-MMS |
| ROLANDO HERNANDEZ-ZAMORA, | |
| Defendant. | |

**GOVERNMENT'S MOTION TO FILE DOCUMENTS UNDER SEAL**
**FILED UNDER SEAL**

The United States of America, by and through its counsel of record, the United States

Attorney for the District of Alaska, respectfully moves this Court to permit it to file certain

documents under seal. Specifically, the government seeks leave to file the following

documents under seal:

//

//

1. An unopposed motion for a protective order concerning confidential material the government proposes to disclose to defense counsel; and

2. This motion for under seal filing.

The requested under seal filing of the above-described documents (including this motion) is necessary because the government's unopposed motion for a protective order includes reference to the government's previous sealed, *ex parte*, and *in camera* filing in this matter.

RESPECTFULLY SUBMITTED August 29, 2024, at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

*/s/ Steven D. Clymer*
STEVEN D. CLYMER
Special Assistant United States Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on August 29, 2024, a true and correct copy of the foregoing was served electronically on all counsel of record.

Office of the U.S. Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ROLANDO HERNANDEZ-ZAMORA,

Defendant.

No. 3:21-cr-00062-MAH-MMS

## ORDER

FOR GOOD CAUSE SHOWN, the documents described in the "Government's Motion to File Documents Under Seal" may hereby be filed under seal and will so remain until further order of this Court.

Dated this 29 day of August, 2024.

/s/ Marco A. Hernandez
THE HONORABLE MARCO A HERNANDEZ
United States District Judge

S. LANE TUCKER
United States Attorney

STEVEN D. CLYMER
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: 315-448-0684
Email: steven.d.clymer@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 3:21-cr-00062-MAH-MMS |
| ROLANDO HERNANDEZ-ZAMORA, | |
| Defendant. | |

### UNOPPOSED MOTION FOR A PROTECTIVE ORDER
### FILED UNDER SEAL

The United States of America, by and through its counsel of record, the United

States Attorney for the District of Alaska, respectfully moves this Court for a protective

order. As the Court is aware from the government's sealed, *ex parte*, and *in camera* filing

on August 15, 2024, the government possesses confidential and personal information

arguably supportive of an argument that defendant Rolando Hernandez-Zamora makes in

connection with the judicial misconduct claim in his motion for dismissal or a new trial.

The government is aware that it has an obligation to produce to Hernandez-Zamora material information favorable to his dismissal/new trial motion. The government hopes to make such disclosure in a timely fashion in advance of the September 3, 2024, deadline for the government's response to the dismissal/new trial motion to facilitate discussion with defense counsel of a possible negotiated resolution and, in the absence of such a resolution, to enable Hernandez-Zamora to reply to the government's response to his motion.

Because of the confidential and personal nature of the information the government intends to produce, the government respectfully requests that the Court issue a protective order pursuant to Fed. R. Crim. P. 16(d)(1) prohibiting Hernandez-Zamora's counsel and Hernandez-Zamora from sharing with others not involved in case-related activities the government-disclosed material and from making any public disclosure of the same, without the government's express written permission, except permitting defense counsel to provide disclosed materials or information to those persons employed by defense counsel who are necessary to assist counsel in these proceedings. The government will designate for defense counsel the material subject to this protective order when such material is disclosed. The government further requests that anyone to whom this information is provided be subject to the terms of this protective order, and that defense counsel must advise such individuals of the restrictions on further dissemination. Further, if defense counsel refers to the content of produced materials or information in any filings, it should file them under seal or, at the minimum, redact such references from publicly-filed documents.

These restrictions should not hinder Hernandez-Zamora's ability to pursue any legal relief that he deems warranted and will protect against potential exposure and misuse of confidential and personal information. Defense counsel is free to raise any issues regarding the order during the course of litigation should this order impact counsel's representation of Hernandez-Zamora.

Government counsel has discussed this matter with defense counsel. Defense counsel does not oppose this motion.

RESPECTFULLY SUBMITTED August 30, 2024, at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

*/s/ Steven D. Clymer*
STEVEN D. CLYMER
Special Assistant United States Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on August 30, 2024 a true and correct copy of the foregoing was served electronically on all counsel of record.

Office of the U.S. Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROLANDO HERNANDEZ-ZAMORA,<br><br>Defendant. | No. 3:21-cr-00062-MAH-MMS |

## PROTECTIVE ORDER

FOR GOOD CAUSE SHOWN, THE COURT HEREBY ORDERS THAT:

Defendant Rolando Hernandez-Zamora's counsel and Hernandez-Zamora are prohibited from sharing with others not involved in case-related activities government-disclosed material relating to the government's sealed motion for this order and from making any public disclosure of the same, without the government's express written permission, except that defense counsel may provide disclosed materials or information to those persons employed by defense counsel who are necessary to assist counsel in these proceedings. The government must designate for defense counsel the material subject to this protective order when such material is disclosed. Anyone to whom this information is provided shall be subject to the terms of this protective order, and defense counsel must advise such individuals of the restrictions on further dissemination. Further, if defense counsel refers to the content of produced materials or information in any filings, it should file them under seal or, at the minimum, redact such references from publicly-filed documents.

Defense counsel is free to raise any issues regarding this protective order during the course of litigation should this order impact counsel's representation of Hernandez-Zamora.

Dated this _30_ day of August, 2024.


_____
THE HONORABLE MARCO A. HERNANDEZ
United States District Judge

Case 3:21-cr-00062-MAH Document 304 SEALED Filed 08/30/24 Page 2 of 2

S. LANE TUCKER
United States Attorney

JENNIFER IVERS
Assistant U.S. Attorney
STEVEN D. CLYMER
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (315) 373-8847
Email: jennifer.ivers@usdoj.gov
Email: steven.d.clymer@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>ROLANDO HERNANDEZ-ZAMORA,<br><br>    Defendant. | No. 3:21-cr-00062-MAH-MMS |

**GOVERNMENT'S MOTION TO FILE DOCUMENTS UNDER SEAL**
**FILED UNDER SEAL**

The United States of America, by and through its counsel of record, the United

States Attorney for the District of Alaska, respectfully moves this Court to permit it to file

certain documents under seal. Specifically, the government seeks leave to file the

following documents under seal:

Case 3:21-cr-00062-MAH Document 60-0 SEALED Filed 12/06/03/24 Page 10 of 104 2

1. An unredacted version of the government's response to defendant Rolando Hernandez-Zamora's motion for dismissal or a new trial, Docket #276.

2. Two exhibits in support of the government's unredacted response to defendant Rolando Hernandez-Zamora's motion for dismissal or a new trial; and

3. This motion for under seal filing.

The Court has ordered that the government respond to Hernandez-Zamora's motion for dismissal or a new trial, Docket #276, by today, September 3, 2024. The government intends to file <u>publicly</u> a redacted version of its response, omitting reference to personal and confidential information, and also omitted two exhibits providing the basis for that confidential and personal information. At the same time, the government seeks leave of this Court to file <u>under seal</u> an unredacted version of its response and two supporting exhibits containing confidential and personal information, both of which are redacted to omit passages not relevant to the government's response.

RESPECTFULLY SUBMITTED September 3, 2024, at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

<u>s/ Steven D. Clymer</u>
STEVEN D. CLYMER
Special Assistant United States Attorney
United States of America

<u>**CERTIFICATE OF SERVICE**</u>
I hereby certify that on September 3, 2024
a true and correct copy of the foregoing
was served electronically on all counsel of record.

<u>s/</u> Jennifer Ivers
Office of the U.S. Attorney

Case 3:21-cr-00062-MMAH Document 605 *SEALED* Filed 12/16/24 Page 11 of 104

S. LANE TUCKER
United States Attorney
JENNIFER IVERS
SETH BEAUSANG
Assistant U.S. Attorneys
STEVEN D. CLYMER
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (315) 373-8847
Email: jennifer.ivers@usdoj.gov
Email: seth.beausang@usdoj.gov
Email: steven.d.clymer@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:21-cr-00062-MAH-MMS |
| Plaintiff, | |
| | **[Unredacted; Filed Under Seal]** |
| vs. | |
| ROLANDO HERNANDEZ-ZAMORA, | |
| Defendant. | |

**RESPONSE IN OPPOSITION TO MOTION FOR DISMISSAL OF
INDICTMENT OR NEW TRIAL**

The United States respectfully opposes defendant Rolando Hernandez-Zamora's

Motion for Appropriate Relief: Dismissal of Indictment or Order of New Trial, filed at

Docket 276. Hernandez-Zamora seeks dismissal of the indictment or, in the alternative, a

new trial, and also requests an evidentiary hearing and discovery about the internal

operations of the United States Attorney's Office ["USAO"]. He alleges that the trial evidence was insufficient to convict him; that the trial judge, former District Judge Kindred,[1] committed misconduct inside and outside the courtroom and had a motive to rule against him; and that the government committed misconduct by failing to disclose a personal relationship between a senior Assistant United States Attorney ["AUSA"] and Kindred and by violating disclosure obligations imposed by *Brady v. Maryland*, 373 U.S. 83 (1963). He also alleges evidentiary error at trial. He argues that he is entitled to relief under the Due Process Clause and also that this Court should exercise its supervisory authority to grant relief.

This Court should reject all Hernandez-Zamora's claims. Hernandez-Zamora received a fair trial, and a jury convicted him on overwhelming evidence. His claim that the trial evidence was insufficient is meritless.

Hernandez-Zamora has not shown and cannot show that Judge Kindred's out-of-court judicial misconduct had an effect on his trial. Further, because the senior AUSA in the personal relationship with Judge Kindred had only minor involvement in this case—giving advice to government counsel of record and attending trial proceedings—the relationship did not require judicial recusal. Even had the undisclosed personal relationship mandated recusal, any error in Judge Kindred not doing so was harmless because Hernandez-Zamora was not prejudiced.

---

[1] When describing events that occurred during Mr. Kindred's tenure as a federal district judge, this response will refer to him as "Judge Kindred."

Case 3:21-cr-00062-MAH Document 306 *SEALED* Filed 10/03/24 Page 2 of 41

Similarly, there was no prosecutorial misconduct in not having notified defense counsel of allegations of Judge Kindred's relationship with the senior AUSA because the senior AUSA was not counsel of record and played only a minor advisory role in the case, Further there was no evidentiary error meriting a new trial, and no improper government failure to disclose evidence favorable to the defense. Accordingly, Hernandez-Zamora is not entitled to a dismissal or a new trial under Fed. R. Crim. P. 33.

Hernandez-Zamora has not made a sufficient showing to require government production of internal records or merit an evidentiary hearing.

## I.     TRIAL EVIDENCE[2]

Trial evidence proved that Hernandez-Zamora engaged in a years-long campaign of harassment and intimidation of Y.S., culminating in dozens of threats to kill her, causing Y.S. to reasonably believe her life was in danger. Despite Hernandez-Zamora's minimization of the government's evidence, it consisted of more than text messages, Y.S.'s testimony, "and a few voicemails." New Trial Motion at p. 26. Other witnesses testified

---

[2] Rule 25 of the Federal Rules of Criminal Procedure provides in relevant part that "[a]fter a verdict or finding of guilty, any judge regularly sitting in or assigned to a court may complete the court's duties if the judge who presided at trial cannot perform those duties because of absence, death, sickness, or other disability." Fed. R. Crim. P. 25(b)(1). Further, "[t]he successor judge may grant a new trial if satisfied that: (A) a judge other than the one who presided at the trial cannot perform the post-trial duties; or (B) a new trial is necessary for some other reason." *Id.* at (b)(2). Judge Kindred's resignation makes this rule applicable here.

Trial transcripts are available to assist this Court to perform post-verdict duties. Docs. 282-83, 285-87. *See United States v. Spinney*, 795 F.2d 1410, 1413 (9th Cir. 1986) (review of presentence report and sentencing memoranda sufficient based on facts of this case, but "a transcript will often be helpful, and sometimes essential"); *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012) ("Lack of sufficient familiarity with the details of that person's trial is prejudicial to him."). Upon request, the United States will provide the Court with a binder containing admitted exhibits.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

to Hernandez-Zamora's stalking behavior and death threats to Y.S. and others. In addition to witness testimony, admitted exhibits included over a dozen threatening voicemail messages, nearly a hundred photographs, including of Hernandez-Zamora's weapons and ammunition, and hundreds of text messages. *See* Doc. 261 (Gov. Exhibit List); Gov. Exhs. 1.1-16 (text message exhibits).

Y.S. described her relationship with Hernandez-Zamora, which began around 2002. Doc. 282 at 17. She testified that although Hernandez-Zamora first was charming and charismatic, he quickly became aggressive, controlling, and jealous. *Id.* at 19. This included monitoring Y.S. through the phone and Internet. For example, Y.S. testified that during their relationship, Hernandez-Zamora "had to know . . . my passwords for email, social media, phone, pretty much any kind of account that I had. . . . [H]e would just monitor it. . . . It's happened as long as I can remember." *Id.* 27. He would also stalk her, showing up at her work, spying on her, following her with his car, and unexpectedly showing up at her house. *Id.* at 25; Doc. 285 at 43.

Y.S. explained that Hernandez-Zamora had assaulted her multiple times. One time, he was convicted of assault for shooting a gun outside her window after she tried to break up with him. Doc. 282 at 82. Another time, he became so jealous after seeing Y.S.'s ex-boyfriend at a nightclub that he grabbed Y.S. by her hair and forcibly dragged her into his truck, even with Anchorage Police Department ["APD"] officers standing nearby. *Id.* at 166. He shoved Y.S. and pinned her to their bed. *Id.* at 77.

As Y.S. grew independent of Hernandez-Zamora, he tried to control her more

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

tightly. When Y.S. attended a master's degree program in psychology from 2016 to 2019, Hernandez-Zamora used a telephone app to monitor Y.S.'s location and forced Y.S. to call him the moment she left class. *Id.* at 21. If she did not, or if class went over, he would be "blowing up the phone, and getting really mad" if she didn't answer. *Id.* If Y.S.'s location did not match where Hernandez-Zamora permitted her to be, he called her persistently and forced her to contact him by FaceTime so he could see her and confirm that she was at school and not cheating on him. *Id.* at 21, 24; Doc. 285 at 22. This stalking behavior "was very distressing," causing Y.S. to stay up at night due to stress. Doc. 282 at 28-29. It made it difficult for her to focus on school, and she couldn't talk to classmates and teachers or even use the restroom after class without Hernandez-Zamora calling her. *Id.* at 25, 29. Hernandez-Zamora frequently tried to force Y.S. to stop attending school by tearing up her textbooks and breaking her laptop. *Id.* at 30. Without his disruptions, Y.S. would have finished her degree sooner. *Id.* at 33.

Because of Hernandez-Zamora's jealous, violent behavior, Y.S. attempted breaking up with him multiple times between 2016 and 2020. He responded by "constantly calling, sending threatening messages, . . . and taking [their daughter] but then not returning her." *Id.* at 39. He broke the door down and "would not take no for an answer." *Id.* One time he kidnapped her, dragging her from her parents' home, putting her in his car, and trapping her in his house. *Id.* at 40. If she tried to call police or her parents for help, he took the telephone "or sometimes [would] even break it." Doc. 285 at 23. Rather than suffer through that, Y.S. often decided "maybe it's just better to go back and do what he says." *Id.* She

was trapped. Doc. 282 at 37, 91.

Y.S. testified that, in early 2020, when she began to work at Providence Hospital, Hernandez-Zamora's controlling behavior escalated. After a FaceTime call, Hernandez-Zamora convinced himself that Y.S. was cheating on him. *Id.* at 34-37. Hernandez-Zamora – who then was working out of state– tried to forbid Y.S. from returning to work, continually calling her office telephone and telling her to leave. *Id.* at 36. Fed up with his abuse and stalking, Y.S. decided to move out. *Id.* at 36-37.

Hernandez-Zamora's violent, controlling behavior peaked when Y.S. tried to leave. He threatened to "chop [her] head off" and tear her into pieces. *Id.* at 42. Y.S. was "scared to death." *Id.* at 43. She believed he would kill her and anyone who got in his way, whether it be her parents or police. *Id.* That prompted Y.S. to get a domestic violence protective order. *Id.*; *see* Gov. Trial Exh. 42.

That did not stop Hernandez-Zamora, and he made this clear, texting her "[o]nly a bullet will stop me, not some fucking piece of shit paper." Doc. 282 at 64. Hernandez-Zamora fixated on Y.S.'s relationship with her supervisor, N.F., and accused them of having an affair. *Id.* at 50.

Hernandez-Zamora's April-May 2020 text messages corroborated Y.S.'s testimony about the events of 2020, as well as the dynamic of their relationship. The following are a small portion of the messages Hernandez-Zamora sent to Y.S.:



Yesterday 11:05 PM

Y no sabes lo que voy hacer en tu trabajo con tu puto jefe...

You don't know what I'm going to do at your work with your fucking boss...

| Spanish | English |
|---|---|
| Solamente una bala me va a detener no un puto papel de mierda. | Only a bullet will stop me not some fucking piece of shit paper. |



| No hay Nadie más peligroso que aquel al que el an quitado todo por lo que peleo toda su vida<br><br>Así le caben más balas a ti y a él | There's no one more dangerous than the person from whom everything he has fought for all his life has been taken<br><br>So both you and he will get more bullets |

I swear I'll get even with you very soon, you fucking bitch

I swear I'm going to butcher your lover in front of you

| Es lógico que voy a perder la cabeza pero a él y a ti se las voy a arrancar te lo juro | It's obvious I'm going to lose my head but I swear I'm going to rip yours and his off |
| encontrarte en donde te coges con tu jefe hija de Puta allí los voy hacer pedazos estoy listo y esperando hija de Puta mayatera de mierda 🔫 | I haven't come after you, you fucking bitch, so as not to frighten my daughter, but I'm dying to find you where you fuck your boss, you fucking bitch. I'll cut you into pieces right there. I'm ready and waiting, you fucking nigger-fucking piece of shit [emoji] |
| No puedo esperar a llevarle los cajones a su amante y poder sentir como se va su vida en mis manos junto con la tuya hija de Puta.... | I can't wait to bring your knickers to your lover and be able to feel how his life ebbs away in my hands along with yours, you fucking bitch... |

Gov. Trial Exhs. 1.2, 2, 7, 14, 16.[3]

As a result of his history of abuse, when Hernandez-Zamora repeatedly threatened

---

[3] The Spanish to English translations of each of all of the text messages and voicemails were authenticated by expert witness Robert Lazaneo, who was familiar with many dialects of Spanish, including Mexican ones. Doc. 283 at 66, 69, 71-72, 75. Y.S., who is fluent in Spanish and English, agreed they were accurately translated. Doc. 285 at 31-32.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Case 3:21-cr-00062-MAH Document 306 SEALED Filed 12/03/24 Page 18 of 104

to shoot Y.S., she believed he would carry out his threats. *Id.* at 43, 58, 79-80, 153-54. Hernandez-Zamora had tools to do so. Y.S. knew Hernandez-Zamora possessed and carried firearms, including a silver revolver, a black pistol, and a rifle "like in the action movies," which Hernandez-Zamora bragged to her "could kill multiple people at once." *Id.* at 81, 158. Firearms matching those descriptions were recovered during the investigation. *See* Gov. Trial Exhs. 90-95, 105-112, 210-237.

Hernandez-Zamora's threats didn't impact only Y.S. When he learned that Y.S. was staying at her parents' residence, he called until they had to disconnect their landline telephone. Doc. 282 at 48-49. He showed up at their home several times in violation of the protective order, screaming obscenities at Y.S. *Id.* at 49. Y.S.'s parents slept in shifts, with "[o]ne of them on guard all night to make sure he didn't come, just looking out the window." *Id.* at 49, 159-60. Hernandez-Zamora threatened to kidnap his and Y.S.'s 11-year-old daughter and take her to Mexico "where nobody could find them." *Id.* at 49.

Hernandez-Zamora also shared his intentions to kill Y.S. in text messages with their daughter, despite the daughter begging him not to kill her mother, as well as in a voicemail message at Y.S.'s parents' home:



You don't need to be frightened. Your mom and your boss, yes.

She chose this end, my love.



No one can save your mom and your boss now, even if they pray all day. They destroyed my life and I'm going to finish both of their lives too.

Don't never forget get under your bed when you hear a very loud noise.

> You sons of bitches are really stupid to not let me see my daughter! You fucking dogs will pay for it, all of you! You slut, Jasmine, you have no idea what is waiting for you, fucking bitch, when you come face to face with your boss.

Gov. Trial Exhs. 12, 32. The child hoped to prove to Hernandez-Zamora that her mother was not cheating. Doc. 282 at 63. But while visiting Hernandez-Zamora, she called her mother crying because Hernandez-Zamora threatened to "take her away and never return her." *Id.* at 75. She was not able to eat or sleep and had nightmares. *Id.* at 72. Y.S. broke down in tears as she described the impact Hernandez-Zamora's conduct had on their daughter, which made Y.S. "really sad that [their daughter] was going through this." *Id.* at 119.

As soon as Hernandez-Zamora began threatening not just Y.S. but also her supervisor, Y.S. alerted her employer, Providence Hospital. *Id.* at 50. Her employer took the threats seriously, hiring armed security guards, instructing staff about active shooter scenarios, issuing a BOLO ("be on the lookout") notice, and locking down the facility multiple times. Doc. 285 at 67, 70, 74, 80-82; *see* Gov. Trial Exhs. 50-52, 53.1, 54. For her safety, Y.S. began working remotely. Doc. 282 at 51. But Y.S. felt just as trapped, afraid to leave the house at the risk of being stalked or assaulted. *Id.* at 77-78.

Hernandez-Zamora's conduct and statements to others corroborated that he intended

to carry out his threats. Not only did he share his threats with Y.S., her parents, and her daughter, but he also described them to his friend Robert Hernandez. Hernandez-Zamora told Robert that he would "blow up" the building where Y.S. worked. Doc. 285 at 109. Although Robert did not believe that threat, he did fear that Hernandez-Zamora might hurt himself or someone else and knew Hernandez-Zamora to have a short fuse. *Id.* at 114, 134. Hernandez-Zamora even asked Robert Hernandez to drive him to Y.S.'s workplace, and he nearly carried a gun when he entered. *Id.* at 111-13. A Providence Hospital employee testified that she saw Hernandez-Zamora enter the building, introduce himself as "Rolando," and ask for a supervisor. Doc. 285 at 91. When she realized that he was the person who was threatening employees, she "got really nervous." *Id.* She informed her boss of the situation, but when she returned, Hernandez-Zamora was gone. *Id.*

Eventually the APD obtained a warrant for Hernandez-Zamora, who avoided police for at least 24 hours before turning himself in. *Id.* at 120-22. When Hernandez-Zamora learned that Robert had turned over his gun, his smoke grenades, and his telephone to law enforcement officials, Hernandez-Zamora became angry and tried to tell Robert not to cooperate with police. *Id.* at 125.

Law enforcement officials attempted to extract the contents of Hernandez-Zamora's telephone but, as Federal Bureau of Investigation ["FBI"] Special Agent ["SA"] Daryl Allison explained, extraction of electronic data stored on it was impossible because it was locked with a six-digit passcode. Doc. 286 at 13. The FBI attempted to extract the data without success. *Id.* at 14. SA Allison explained that a couple of months before the trial,

new software was released allowing the FBI to use "brute force" to determine the passcode to Hernandez-Zamora's telephone, which would allow law enforcement to extract the stored data. *Id.* at 19. But that process was still ongoing during the trial. *Id.* at 21.

Hernandez-Zamora's cyberstalking had a lasting impact on Y.S. She wondered, "Am I going to die when he comes out? Is he really going to act out on this? . . . I believe that if he hasn't changed . . . I am very confident that he will carry through with his threats. And he will kill me or whoever he threatens that's around me that will get in the way, like he said. Or trying to use our daughter again – try to maybe kidnap her. I just have a lot of fears still to this date." Doc. 282 at 171-72.

## II.    PROCEDURAL HISTORY

On May 19, 2021, a federal grand jury in the District of Alaska returned a one-count indictment charging Hernandez-Zamora with cyberstalking, in violation of 18 U.S.C. §§ 2261A(2)(A), (B), and 2261(b)(6). Doc. 2. On June 1, 2021, the case was assigned to Judge Kindred. Doc. 11. On November 19, 2021, the grand jury returned a first superseding indictment charging the same underlying offense, and adding an allegation that the criminal conduct violated a protective order. Doc. 32.

Trial began before Judge Kindred on June 24, 2024. Doc. 251. The government rested on June 27, 2024, and Hernandez-Zamora rested without testifying. Doc. 256. Hernandez-Zamora moved for a judgment of acquittal under Fed. R. Crim. P. 29. Doc. 257. On June 28, 2024, the jury returned a guilty verdict on the lone count in the first superseding indictment. Doc. 259. On July 1, 2024, Judge Kindred denied the Rule 29

Case 3:21-cr-00062-MAH Document 306-SEALED Filed 12/03/24 Page 23 of 104

motion.  Doc. 266.

Judge Kindred resigned effective July 8, 2024.  This case first was reassigned to Chief Judge Gleason, Doc. 268, and then to Judge Beistline on July 15, 2024, and ultimately to this Court on August 12, 2024.  Doc. 269, Doc. 289.  On July 19, 2024, Hernandez-Zamora filed his motion to dismiss or for a new trial.  Doc. 276.

## III.  JUDICIAL MISCONDUCT PROCEEDINGS

In November 2022,  Ninth Circuit Chief Judge Mary H. Murguia directed a limited inquiry under the Rules for Judicial-Conduct and Judicial-Disability Proceedings.  *See* Order of the Judicial Council of the Ninth Circuit in *In re Complaint of Judicial Misconduct*, Ninth Circuit Case No. 22-90121 ["Judicial Council order" or "Order"]  at p. 2.   On December 27, 2022, after having determined that there was probable cause to believe that misconduct had occurred, Chief Judge Murguia identified a misconduct complaint against Judge Kindred.  *Id.* at p. 2.  The complaint alleged that Judge Kindred had created a hostile work environment for judicial employees, engaged in unwanted physical and verbal sexual conduct with a judicial clerk both during and after the clerkship, and attempted to silence those with knowledge of his misconduct.  *Id.* at pp. 2-3.

On February 3, 2023, after Judge Kindred disputed the allegations, Chief Judge Murguia appointed a Special Committee to investigate the allegations and report its findings and recommendations to the Judicial Council.  *Id.* at p. 3.  On March 4, 2024, the Special Committee issued a confidential 1,144-page report, inclusive of exhibits.  *Id.*  On April 5, 2024, after being confronted with "contemporaneous evidence," Judge Kindred

admitted "that he received nude photographs from [the] senior AUSA and that some flirtation occurred." Order at 25. After providing Judge Kindred with an opportunity to be heard and interviewing him, the Judicial Council issued its Order finding judicial misconduct on May 23, 2024. On July 8, 2024, the Ninth Circuit made this order public.

## IV. ARGUMENT

### 1. Hernandez-Zamora's Claim of Insufficient Evidence is Meritless.

This Court should deny Hernandez-Zamora's claims that he is entitled to a new trial because the trial evidence was insufficient. "Although a district court assessing a Rule 33 motion need not view the evidence in the light most favorable to the verdict and may evaluate for itself the credibility of the witnesses, courts disfavor new trial motions based on the sufficiency of the evidence." *United States v. Nelson*, No. 17-CR-00533-EMC-1, 2024 WL 1244262, at *10 (N.D. Cal. Mar. 11, 2024) (internal quotation marks, brackets, ellipse, and citation omitted). To grant a new trial on this basis, a district court must conclude that "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citations omitted). As a result, new trials are limited to "exceptional circumstances in which the evidence weighs heavily against the verdict." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012).

To prove the offense charged in the first superseding indictment, the evidence had to show that Hernandez-Zamora, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate Y.S., used an interactive

Case 3:21-cr-00062-MAH-MMS Document 306 *SEALED* Filed 12/03/24 Page 25 of 104

computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that placed Y.S. in reasonable fear of the death of or serious bodily injury to herself, or caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to Y.S. and did this in violation of a protective order. *See* 18 U.S.C. §§ 2261A(2)(A) & (B) and 2261(b)(6).

Y.S.'s testimony alone provided compelling evidence of guilt. She testified that throughout their relationship, Hernandez-Zamora monitored her phone, email, and social media accounts. Doc. 282 at 27. He often stalked her, showing up uninvited at her home, workplace, and school. *Id.* at 25; Doc. 285 at 43. He used an app to track her location and punished her if he believed she wasn't where she was supposed to be. *Id.* at 21. She explained how Hernandez-Zamora used violence and guns to control her, dragging her by the hair, pinning her down, kidnapping her, and shooting a gun outside her window. Doc. 282 at 40, 77, 82, 166. If she tried to call police or her parents for help, he would take her telephone "or sometimes even break it." Doc. 285 at 23.

When Hernandez-Zamora threatened to shoot and kill Y.S., she reasonably took his threats seriously. Doc. 282 at 42-43. She believed she was going to die. *Id.* at 43, 58, 79-80, 153-54. Even after Y.S. tried to protect herself with a restraining order, Hernandez-Zamora went to her parents' home and workplace, called her over and over, sent her hundreds of text messages, and escalated his threats of death. Y.S. could not sleep or eat, and she did not feel safe anywhere she went. *Id.* at 49, 77-78, 108, 157, 159-60. This

Case 3:21-cr-00062-MAH Document 305-4 SEALED Filed 12/03/24 Page 26 of 104

testimony was corroborated by text messages, voicemail messages, and witness testimony. The jury was entitled to convict and there was no miscarriage of justice that requires discarding its well-supported verdict.

Hernandez-Zamora's complaint that the government "chose in this case to collect only 30 days of digital evidence yet charged Rolando with over four years of misconduct," New Trial Motion at p.24, ignores that trial testimony described his conduct during the full period charged in the indictment. The text message evidence, although more limited in time than the testimony, itself satisfied multiple elements in the statute. It established that Hernandez-Zamora used an interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct to stalk his victim. The content of the text messages (some of which are set out above) powerfully demonstrated why Y.S. was reasonably in fear of the death of or serious bodily injury, and that Hernandez-Zamora caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to his victim.

2. **Hernandez-Zamora's New Trial Claims Based on Judicial Misconduct and a Failure to Recuse Are Meritless**.

a. **Judge Kindred's Out-of-Court Judicial Misconduct Does Not Provide a Basis for a New Trial.**

Hernandez-Zamora seeks a new trial based on Judge Kindred's troubling misconduct. New Trial Motion at pp. 17-19. He likens Judge Kindred's conduct to his own crime, *id.* at 18 ("The very conduct which Judge Kindred was actively under

Case 3:21-cr-00062-MAH Document 306 SEALED Filed 10/03/24 Page 27 of 104

investigation for at the time of Rolando's trial meets the legal definitions of 'cyberstalking.'"), and speculatively contends that because of this purported similarity, "perhaps Judge Kindred saw Rolando's case as one where he could 'prove' that he took sexual harassment seriously, and even that he had to prove that Rolando's conduct was worse than his own," *id.* at 19. He argues that his theory concerning Judge Kindred's motivation casts doubt on the fairness of "pre-trial motions practice, particularly motions pertaining to *Brady* and discovery issues, rulings on motions *in limine*, rulings mid-trial (to include his ruling on objections related to the Rule of Completeness and Best Evidence), and his ruling on defense's Motion of Acquittal." *Id.* at 18.

It is true that the Judicial Council's order provides a disturbing description of Judge Kindred's relationship and communications with his law clerks. Judge Kindred sent unprofessional, demeaning, and profane text messages to his law clerks; engaged in conversations that reflected poorly on his judgment and maturity; and possibly had non-consensual physical contact with a clerk after she became an AUSA. Judicial Council Order at pp. 5-8.[4] And, in an August 9, 2024, statement, the "senior AUSA" described "cordial and professional" interactions with Judge Kindred that "devolved into an abusive and manipulative relationship," and explained that Kindred described himself to her as an "extremely petty" person who "holds grudges, and had taken revenge on someone in the past" and that he was "a violent person [who] had gotten into a lot of fights." She further

---

[4] There is no allegation that this law-clerk-turned-AUSA was involved in this case. *See* Ninth Circuit News Release entitled "Judicial Conduct and Disability Complaint Number 22-90121," dated July 8, 2024 ("The former law clerk did not appear on any case before Judge Kindred while she was employed as an Assistant United States Attorney.").

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Case 3:21-cr-00062-MAH-Document 306-4 SEALED Filed 12/03/24 Page 28 of 104

described him as "sensitive and volatile, his mood swinging to an angry and scary place if I said the wrong thing," and characterized some of his messages as "aggressive." She stated that Judge Kindred "implied that he had the power, ability, and willingness to ruin everything if he did not get what he wanted" and that when he asked her to send nude photographs, she felt as if she "had no other option because he had the power to ruin not only my career, but my personal life as well." She stated that "he began to use threats against me to pressure me into sending him more [nude] pictures," but she did not describe these alleged threats.

Even if this Court were to accept the senior AUSA's assertions as true,[5] neither she nor the Judicial Council's Order describes Judge Kindred as having engaged in conduct similar to Hernandez-Zamora's violence and credible threats of violence targeting his victim and others. The evidence at trial included proof of physically stalking Y.S., threatening to kill her, and a prior conviction of Hernandez-Zamora for shooting a gun outside her window after she tried to break up with him. He threatened Y.S. that "only a bullet will stop me" when Y.S. obtained a domestic violence protective order. There is no evidence that Judge Kindred acted "with the intent to kill, injure, harass, intimidate, or

---

[5] Two redacted statements of the senior AUSA, one dated February 20, 2023, and the other dated August 9, 2024, are attached to this sealed version of the government's response as Exhibit A and Exhibit B, respectively. There are reasons to question the accuracy of both of the senior AUSA's statements. They are inconsistent with each other and the first statement cannot be squared with the Judicial Council's Order. The aspect of the second statement that purports to explain the senior AUSA's conduct could be interpreted as a self-serving attempt to excuse her failure to notify either the United States Attorney's Office or opposing counsel in cases before Judge Kindred of her personal relationship with him Further, both of the senior AUSA's versions of the events are uncorroborated, in large part because of her apparent decisions to delete messages from Kindred and to communicate with him through an application that automatically deletes messages.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

place under surveillance with intent to kill, injure, harass, or intimidate" anyone. He did not violently assault or kidnap anyone, threaten them with violence, discharge a firearm outside anyone's window, appear unwanted at their residences, or violate a protective order. And the only physical interaction with Judge Kindred that the senior AUSA described is that he hugged her on two occasions, once after following her to her car and asking her "where we could go to make out" (which did not occur). Although the senior AUSA claimed that Judge Kindred "threatened" her, she did not describe the threats or suggest that they involved violence.

Thus, Hernandez-Zamora's effort to liken Judge Kindred's misconduct to Hernandez-Zamora's cyber-stalking fails. But, even had their conduct in some sense been "similar," Hernandez-Zamora's further claim that Kindred's misdeeds therefore created a motive for him to treat Hernandez-Zamora unfairly in litigation makes no sense. If anything, similarity might cause Judge Kindred to minimize the severity of Hernandez-Zamora's conduct. Further, any suggestion that Judge Kindred would have treated Hernandez-Zamora harshly to impress or curry favor with the Judicial Council both ignores that Kindred had admitted to significant misconduct to the Judicial Council in April 2024, before trial began, and that the Ninth Circuit's misconduct inquiry did not concern Judge Kindred's handling of cases.

In short, Hernandez-Zamora has not articulated any plausible connection between Judge Kindred's out-of-court judicial misconduct and his rulings in Hernandez-Zamora's case. "Judicial misconduct proceedings . . . may not be used to seek reversal of a judge's

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Case 3:21-cr-00062-MAH Document 306-4 SEALED Filed 12/03/24 Page 30 of 104

decision, to obtain a new trial, or to request reassignment to a different judge." *In re Jud. Misconduct*, 86 F.4th 851, 852 (9th Cir. 2023). As described more fully below, Judge Kindred's legal rulings during trial and pretrial proceedings are supported by the law. That Judge Kindred engaged in misconduct unrelated to this case does not require a new trial.

### b. Judge Kindred's Personal Relationship with a Senior AUSA Who Did Not Represent the Government in This Case Did Not Require Recusal and Thus Does Not Provide a Basis for a New Trial.

Hernandez-Zamora also contends that the undisclosed personal relationship between Judge Kindred and a senior AUSA, as described in the Judicial Council's order, coupled with what Hernandez-Zamora describes as this senior AUSA's "supervisory and advisory capacity to the assigned AUSAs on this case," and her presence "throughout the entirety of trial in the gallery" demonstrates that Judge Kindred could not be impartial and required recusal. *Id.* at pp. 19-20. This contention is wrong.

The Judicial Council's order describes a senior AUSA with whom Judge Kindred had a "flirtatious rapport" and from whom he received nude photographs. Order at pp. 21, n.17; *see also id.* at pp. 16, 24, 25.[6] Although the order does not state when this rapport became "flirtatious" or when Judge Kindred received the photographs, it does describe Kindred initially denying these facts when questioned by the Special Committee and later admitting them to the Judicial Council on April 5, 2024. Order at pp. 11, 24. Accordingly, the rapport developed and Kindred received the photographs well before trial began in this

---

[6] The Judicial Council's order is based on a report and exhibits of the Special Committee that investigated the misconduct complaint against Judge Kindred. Order at pp. 3-4. *See* 28 U.S.C. § 360(a).

Case 3:21-cr-00062-MAH Document 306-4 SEALED Filed 12/03/24 Page 31 of 104

case.[7]

"Any . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).[8] "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988). "The test under § 455(a) is whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *F.J. Hanshaw Enterprises, Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1144 (9th Cir. 2001) (internal quotation marks and citations omitted). "Scienter is not an element of a violation of § 455(a). The judge's lack of knowledge of a disqualifying circumstance may bear on the question of remedy, but it does not eliminate the risk that 'his impartiality might reasonably be questioned' by other persons." *Liljeberg*, 486 U.S. at 859 (quoting 28 U.S.C. § 455(a)). "Disqualification under § 455(a) is necessarily fact-driven and may turn on subtleties in the particular case." *United States v. Carey*, 929 F.3d 1092, 1104 (9th Cir. 2019) (quoting *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008)).

---

[7] In her written statement of August 9, 2024, the senior AUSA acknowledged an undisclosed personal relationship with Judge Kindred and having exchanged nude photographs with him but described their relationship as "emotionally manipulative and abusive," not flirtatious.

[8] In different places, Hernandez-Zamora's motion cites 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(1) as bases for recusal. New Trial Motion at pp. 18, 19. The latter provision, 28 U.S.C. § 455(b)(1), applies only where a judge "has a personal bias or prejudice concerning a party." It has no application here where Hernandez-Zamora relies on Judge Kindred's relationship with a government attorney who was not a "party" to the litigation.

The Ninth Circuit decision in *United States v. Bosch*, 951 F.2d 1546 (9th Cir. 1991), addresses whether recusal is required under 28 U.S.C. § 455(a) because of a personal relationship between a district court judge and an attorney representing a party in litigation before that judge. The AUSA who successfully prosecuted Bosch for drug and related offenses was a former law clerk of the presiding judge, one with whom the judge "maintained a close relationship." *Id.* 1548. During trial, the judge made remarks that, according to Bosch, demonstrated that the judge was partial towards the AUSA, including the judge commenting that the AUSA was like one of his sons, and excusing the AUSA's tardy document production as "not like" something the AUSA typically would do. *Id.* at 1549. Bosch also relied on a remark during post-trial litigation, where the judge expressed a desire to "make things easier" for the AUSA. *Id.*

On appeal, Bosch sought reversal of his conviction because of the judge's failure to recuse under 28 U.S.C. § 455(a). *Id.* at 1548. Reviewing for plain error (because Bosch had not moved for recusal in the district court despite learning of the relationship), a divided Ninth Circuit panel found that Bosch had not established prejudice or satisfied the applicable "miscarriage of justice" standard. *Id.* at 1548-49.

Judge O'Scannlain dissented. After describing both the mandatory nature of the recusal statute and the remarks upon which Bosch's claim relied, he concluded that "[t]he trial judge's comments on the record in this case demonstrate that he could not ignore his close relationship with the prosecutor, and they dispel the objective impression of neutrality." *Id.* at 1556–57 (O'Scannlain, J., dissenting). The dissent argued that the plain

Case 3:21-cr-00062-MAH-MMS Document 306 *SEALED* Filed 12/03/24 Page 33 of 104

error requirements were satisfied, and the conviction should be vacated and the case remanded to the district court for a new trial before a different judge. *Id.* at 1557-58.

But here the senior AUSA did not enter an appearance in Hernandez-Zamora's case or otherwise represent the government. Taking allegations in Hernandez-Zamora's motion as true, the senior AUSA only provided advice to the two AUSAs assigned to the trial and watched court proceedings, sitting in the gallery, not at counsel table.[9] Because of this limited role, a reasonable person with knowledge of all the facts would not conclude that Judge Kindred's impartiality in Hernandez-Zamora's case might reasonably be questioned.

To the knowledge of government counsel, there are no reported decisions addressing circumstances under which recusal was required under 28 U.S.C. § 455(a) when a judge has a personal relationship with an attorney who was not counsel representing a litigant in court (like the senior AUSA here) but has some limited involvement in a case before the judge (as was true here). But a published advisory opinion interpreting a judicial ethics rule that addresses recusal and is similar to 28 U.S.C. § 455(a) is instructive.[10]

Canon 3(C)(1) of the Code of Conduct for United States Judges provides in pertinent part that:

---

[9] Hernandez-Zamora's motion asserts that the senior AUSA "served in a "supervisory role," New Trial Motion at pp. 19-20, but in her role as Acting Senior Litigation Counsel she had no supervisory authority. See Justice Manual § 3-4.534(E)(9) (providing that "[n]ot supervis[ing] any AUSAs" is a requirement for being "Senior Litigation Counsel."

[10] The Judicial Code of Conduct for United States Judges is at
https://www.uscourts.gov/sites/default/files/code_of_conduct_for_united_states_judges_effective_march_12_2019.pdf. Published Ethics Advisory Opinions are available at
https://www.uscourts.gov/sites/default/files/guide-vol02b-ch02.pdf.

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which: (d) the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is . . . (ii) acting as a lawyer in the proceeding . . . . .

Canon 3(C)(1)(d).[11]

Published Ethics Advisory Opinion 38 explains that recusal is required under this Canon "when a judge's spouse,[12] child, or other relative serves as an [AUSA]" and "has acted as an attorney in or relating to the proceeding [before the judge]," including in "cases in which the relative has done any work or given any advice, whether that advice was given or work done before or after the action was filed." *See also* Published Advisory Opinion 58 (suggesting that recusal required when a relative of a judge has "participated in the preparation or presentation of the case before the judge"). Significantly, no similar restriction applies "where one of the attorneys is a friend of long standing and is also a godfather of one of the judge's children." Published Ethics Advisory Opinion 11.

Even if the senior AUSA's personal relationship with Judge Kindred would have required recusal under the ethics rule or 28 U.S.C. § 455(a) had the senior AUSA appeared before him to represent the government, that did not occur in this case. And the senior AUSA was not Kindred's "spouse, his child, or other relative." Accordingly, her mere

---

[11] "[P]erson related . . . within the third degree of relationship" includes "parent, child, grandparent, grandchild, great grandparent, great grandchild, sister, brother, aunt, uncle, niece, and nephew, including "whole and half blood relatives and most step relatives." Canon 3(C)(3)(a).

[12] Commentary to Canon 3 provides that "[r]ecusal considerations applicable to a judge's spouse should also be considered with respect to a person other than a spouse with whom the judge maintains both a household and an intimate relationship."

presence in the court's gallery and her advice to the AUSAs who tried this case did not require Judge Kindred's recusal under Canon 3(C)(1)(d), just as recusal would not be required under Published Ethics Advisory Opinion 11 if the advice-giving attorney was a close friend of the judge and godfather to his child.

This suggests that Judge Kindred also was not required to recuse under 28 U.S.C. § 455(a). Judge Kindred had no obligation to recuse from a case in which the senior AUSA did not appear as government counsel and had only limited involvement. A low recusal threshold would encourage litigants to disqualify judges as a means of forum-shopping. *See United States v. Spangle*, 626 F.3d 488, 496 (9th Cir. 2010) (in a case involving a potential threat of physical harm to a judge and his family, explaining that "[i]t is imperative that we not allow defendants to 'manipulate the system' by 'threatening every jurist assigned on the 'wheel' until the defendant gets a judge he prefer[s].'") (quoting *Holland*, 519 F.3d at 915). To be able to compel recusal based on the judge's personal but non-familial relationship with an attorney, plus advice-giving by that attorney to counsel for a litigant, would make forum shopping easy to accomplish.[13]

There was no judicial misconduct in Judge Kindred presiding in this case despite his undisclosed personal relationship with the senior AUSA, who did not represent the government here, and instead only gave limited advice and watched the trial.

Hernandez-Zamora advances an additional contention, speculating that Judge

---

[13] Such a rule would be especially troublesome because recusal is required under 28 U.S.C. § 455(a) without regard to whether a judge is aware of facts requiring it. *See Liljeberg*, 486 U.S. at 859.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Case 3:21-cr-00062-MAH Document 306-4 SEALED Filed 12/03/24 Page 35 of 104

Kindred may have favored the government because he was fearful that the senior AUSA otherwise would have disclosed their relationship. New Trial Motion at p. 20. But, as the Judicial Council's order explains, Judge Kindred admitted both his personal relationship with the senior AUSA and his receipt of photographs to the Council in April 2024. Order at pp. 3, 4. Trial in this case began months later. And, in any event, even when a party possesses information that may suggest a threat to the presiding judge, recusal is not required. *Spangle*, 626 F.3d at 496 ("Although Spangle obviously obtained this [personal information about the presiding judge and his family], there is no evidence that he had acted on it or was planning to take action against the judge.").

### c. The Timing of the Judicial Council's Order in Relation to Hernandez-Zamora's Trial Does Not Provide a Basis for a New Trial.

Hernandez-Zamora suggests that Judge Kindred's awareness of the Special Committee's investigation and receipt of its report provided a motive to be unfair to the defense in this case to demonstrate to the Committee that he took sexual assault seriously, and also raised questions about his "focus and attention" when deciding the Rule 29 motion. New Trial Motion at p. 21. These contentions are meritless. It is fanciful to suggest that Judge Kindred believed that rulings in this case would influence the Special Committee in its investigation into misconduct in his relationship and communication with law clerks. Nothing in the Judicial Council's order suggests that the Special Committee was investigating Judge Kindred's handling of cases generally. And, in any event, on March 1, 2024, months before trial began, Judge Kindred had received a copy of the Special Committee's report, Judicial Council Order at p. 9, and well knew that nothing that he

Case 3:21-cr-00062-MAH Document 306-6 SEALED Filed 12/03/24 Page 37 of 104

would do in Hernandez-Zamora's case would undo the damning conclusions of the Order. And, even if the likely outcome of the investigation detracted from Judge Kindred's ability to focus, a fact that Hernandez-Zamora asserts but does not prove, it does not follow that distraction would impair Kindred's *impartiality* in this case or prevent him from properly performing his duties.[14]

### 3. Had There Been Error in Judge Kindred's Failure to Recuse, It Would Be Harmless Error.

Even where a defendant presents a meritorious claim that a district judge erroneously failed to recuse, relief should be denied if the error is harmless. *United States v. Arnpriester*, 37 F.3d 466, 468 (9th Cir. 1994) ("There need not be a draconian remedy for every violation of § 455(a)."). Where "there is no reasonable possibility that prejudice resulted" from a statutory violation, *United States v. Rosales-Rodriguez*, 289 F.3d 1106, 1109 (9th Cir. 2002) (citation omitted), like a failure to recuse under 28 U.S.C. § 455(a), the error is harmless.

The only rulings that Hernandez-Zamora identifies as having been infected by Judge Kindred's alleged bias were decisions to deny (a) his pretrial motion for "*Brady*" information, New Trial Motion at pp. 18, 24; (b) his "best evidence" and "rule of

---

[14] In addition, relying on Fed. R. Crim. P. 25(b)(2)—which permits a successor judge to grant a new trial if no successor can perform post-verdict duties or for other reason—Hernandez-Zamora questions the ability of this Court (or another federal judge) "to fully assume the role and duties required of [it] post-trial." New Trial Motion at p. 21. Hernandez-Zamora underestimates the Court. The post-verdict responsibilities required here—resolving a new trial motion and imposing sentence in a single defendant case, one arising from a one-count indictment resulting in a week-long trial— is well within the capability of an experienced federal judge. Accordingly, the Court also should reject this claim (which has nothing to do with Judge Kindred's impartiality).

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Case 3:21-cr-00062-MAH-MMS Document 306 *SEALED* Filed 12/03/24 Page 27 of 41

completeness" objections to the admission of text message evidence, *id.* at pp. 18, 20, 24, 26; (c) his request for a jury instruction, *id.* at p. 25; and (d) his Rule 29 motion for a judgment of acquittal, *id.* at pp. 17-18, 21, 24. Because none of these defense objections or requests were meritorious, Hernandez-Zamora cannot show that the denials were the product of bias or establish prejudice in Judge Kindred's failure to recuse.

### a. *Brady* Claim[15]

Before trial, Hernandez-Zamora moved to dismiss under *Brady*, 373 U.S. 83, based on the government's purported failure to disclose the contents of a cellular telephone seized from him when he was arrested. Doc. 175. Magistrate Judge Matthew M. Scoble recommended denying the defense claim, citing the government's explanation that "it has not successfully extracted information from the cellphone," Doc. 187 at p. 5, "because the phone is password-protected, and that the defendant has not cooperated with its unlocking," *id.* at p. 6. Magistrate Judge Scoble explained that "[i]f the phone cannot be unlocked, the government is not able to disclose what it cannot access." *Id.* Hernandez-Zamora did not dispute these facts. On May 20, 2024, Judge Kindred adopted this recommendation and denied the *Brady* motion. Doc. 221. Before trial, the government allowed defense counsel to inspect the telephone, but without the passcode, neither defense counsel nor the government was able to access its contents.[16]

It would have been reversible error to grant Hernandez-Zamora's pretrial motion to

---

[15] Hernandez-Zamora also raises a new and different *Brady* claim in his new trial motion. This claim is discussed below in Section IV(5) at pages 38-39.

[16] After trial, the government was able to unlock and extract the telephone. Hernandez-Zamora did

dismiss for an alleged *Brady* violation under these circumstances. "The proponent of a *Brady* claim—*i.e.*, the defendant—bears the initial burden of producing some evidence to support an inference that the government possessed or knew about material favorable to the defense and failed to disclose it." *United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009). When Judge Kindred adopted the recommendation, he had before him no evidence that the government "possessed" the inaccessible electronic data on Hernandez-Zamora's telephone or that the data was "favorable" to him. *See, e.g.*, *United States v. Reid*, No. 20-CR-00626 (PMH), 2024 WL 2159848, at *8 (S.D.N.Y. May 14, 2024) ("Because the contents of the Samsung were encrypted, and the Government was under no obligation to discover information not in its possession, Erskine's contentions of a *Brady* violation fail."); *United States v. Young*, No. 23-CR-208 (MJD/ECW), 2024 WL 913308, at *4 (D. Minn. Mar. 4, 2024), *report and recommendation adopted*, No. CR 23-0208 (MJD/ECW), 2024 WL 2292263 (D. Minn. May 21, 2024) (rejecting defense claim that Fed. R. Crim. P. 16(a)(1)(E) and *Brady* doctrine required production of electronic data on defendant's seized cellular telephone because "the data it contains is not in the Government's possession because the cellphone is encrypted, Young has refused to provide his passcode, and the Government has not been able to break the encryption"). Accordingly, even had Judge Kindred erroneously failed to recuse himself, his denial of the *Brady* claim does not hint at, much less demonstrate, bias. Hernandez-Zamora was not prejudiced.

---

not request an adjournment to permit completion of the process, which was expected to take 187 days. Doc. 286 at 21:7-9.
U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Case 3:21-cr-00062-MAH-Document 306 *SEALED* Filed 12/03/24 Page 40 of 41

### b. Evidentiary Claims

Hernandez-Zamora claims prejudice from Judge Kindred's rejection of his best evidence and rule of completeness objections to the government's introduction at trial of a limited number of photographic images of text messages taken from Y.S.'s cellular telephone rather than the government forensically extracting the data from the telephone. New Trial Motion at p. 4.

### i. Background

Before Y.S. testified, Hernandez-Zamora argued outside the presence of the jury that the "best evidence" of Y.S.'s text message conversations with Hernandez-Zamora "would be [Y.S.'s] phone itself." Doc. 282 at 12:10. He further raised the rule of completeness, asserting that without a full extraction of Y.S.'s phone, there was "missing evidence." *Id.* at 12:12. The Court concluded that "I don't know that the rule of completeness or best evidence applies here." *Id.* at 13:17-18. Instead, the Court invited Hernandez-Zamora to raise those issues during cross examination and jury instructions. *Id.* at 13:17-14:6.

Hernandez-Zamora did not raise his completeness or best evidence objections again, but he argued that evidence was missing throughout the trial. *See* Doc. 285 at 34 ("And you don't remember them asking to make a copy of your phone?"), 36 ("So, you talked about some things that happened in 2016, 2017, 2018, 2019; the FBI didn't look at any of those messages, correct?"); Doc. 285 at 22 ("So you were not provided a phone of the alleged victim in this case?"), 26 ("Will that data also tell you whether messages were

altered or deleted?"); Doc. 286 at 68 ("And the messages you took were just from a couple days?"), 69 ("Would you agree that pictures of the text messages provide less data than an extraction?").

He further argued that law enforcement officials acted in bad faith by collecting two months, rather than four years, of text messages from Y.S.'s phone. FBI SA Krista Lang testified that she did not extract the full contents of Y.S.'s phone to "not victimize her and also protect her," which were typical considerations in SA Lang's experience. Doc. 286 at 31. SA Lang believed she was respecting Y.S.'s wishes by not making a full copy of her phone and instead taking photographs of the text messages that FBI needed for investigative purposes. *Id.* at 67-68. SA Lang further testified that law enforcement cannot continually collect every single piece of evidence, in part because of their large caseloads. *Id.* at 75. Y.S. likewise stated that there were so many messages that "[i]t would take forever to get" back to 2016. Doc. 285 at 35-36. Despite that testimony, Hernandez-Zamora accused the government of destroying evidence by not obtaining a forensic image of Y.S.'s phone or taking photographs of images from before 2020. Doc. 286 at 84-85, 88-89.

### ii. Best Evidence Rule

The "Best Evidence Rule" is codified at Fed. R. Evid. 1002. It provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." This rule applies only when the *terms* of a writing are being established, *see e.g.*, *Mintz v. Bartelstein*, No. 2:12-CV-02554-SVW-

Case 3:21-cr-00062-MAH-MMS Document 306-4 *SEALED* Filed 12/03/24 Page 42 of 104

SS, 2012 WL 12865276, at *4 (C.D. Cal. Nov. 15, 2012), *see also Diamondstar Ent. Holdings, LLC v. THH, LLC*, 641 F. Supp. 3d 849, 862 (C.D. Cal. 2022), not where a witness, like Y.S., testifies about receipt and content of text messages, like those that Hernandez-Zamora sent threatening her.

But even assuming that Fed. R. Evid. 1002 applied, it was not violated here. The underlying text message information, including its content, was stored electronically on the hard drive of Y.S.'s cellular telephone. Under the Federal Rules of Evidence, "[f]or electronically stored information, 'original' means *any printout — or other output readable by sight —* if it accurately reflects the information." Fed. R. Evid. 1001(d) (emphasis added). Accordingly, the readable graphic image produced on the telephone screen *and* a readable graphic image of the same messages that forensic extraction software would produce, *both* are the "original." The photographs the agent took of originals—the text messages displayed on the telephone's screen—were "duplicates."[17] Under Fed. R. Evid. 1003, "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Because Hernandez-Zamora did not raise a genuine question about the authenticity of the originals and identified no circumstances that made it unfair to admit the photographs, admission of the photographs was permissible under the rules of evidence, including the best evidence rule in Fed. R. Crim. P. 1002. That an agent chose to

---

[17] "A 'duplicate' means a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." Fed. R. Evid. 1001(e).

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

photograph only images of some of the text messages stored on the telephone and only those photographs were offered into evidence has no bearing on whether the best evidence rule was satisfied. *United States v. Hock Chee Koo*, 770 F.Supp.2d 1115, 1126 (D. Oregon 2011) (rejecting best evidence objection where FBI had copied only portions of a computer hard drive).

### iii. Rule of Completeness

The "Rule of Completeness" is codified at Fed. R. Evid. 106. It provides in relevant that "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time." This rule had no application to the claim about text messages that Hernandez-Zamora raised during trial. It relates only to a party's ability to respond to an opponent's introduction of a misleading excerpt from a statement by contemporaneously admitting the remainder of the statement. Hernandez-Zamora does not dispute that the full content of all of the text messages in FBI's possession were presented to the jury. *See* Doc. 286 at 101; *United States v. Lopez*, 4 F.4th 706, 715 (9th Cir. 2021).

Neither of these evidence rules—Rule 1002 nor 106— prohibited admission of photographic images of selected text messages rather than a graphic image of a full forensic extraction of all electronic text message data from a cellular telephone. Accordingly, Hernandez-Zamora cannot show prejudice in Judge Kindred's rejection of his evidence objections.

### c. Jury Instruction Claim

Judge Kindred discussed with the parties whether a jury instruction was appropriate to remedy Hernandez-Zamora's concerns about the text messages. *Id.* at 83-98. He considered Hernandez-Zamora's request for either Ninth Circuit Pattern Instruction 3.19, Lost or Destroyed Evidence, or an alternative drafted by the defense.[18] The judge and parties discussed *United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013), the leading Ninth Circuit decision addressing destruction of evidence. Doc. 286 at 83-96. The government expressed concern about the defense proposed instruction because it was not based on any pattern instruction, statute, or caselaw. Doc. 286 at 114.

After reviewing caselaw, Judge Kindred declined to give an instruction about

---

[18] The proposed instruction read:

### DEFENSE PROPOSED JURY INSTRUCTION REGARDING EVIDENCE OF TEXT MESSAGES

The jury is instructed that the text messages presented as evidence in this case were obtained through photographs of the alleged victim's phone screen rather than by a full extraction of the phone's data. The jury should consider this when evaluating the reliability, credibility, and authenticity of the text messages.

The jury is also instructed to consider any testimony or evidence presented regarding the standard procedures for extracting data such as text messages from a cell phone and whether those procedures were used in the present case.

In evaluating the weight and credibility to give to the photos of the text messages, the jury may consider the following: any testimony regarding the method used to take the photographs, completeness of the photographs, and the possibility of alteration or tampering.

collection or destruction of evidence, concluding that there was no evidence of bad faith on the part of the government, even if he believed law enforcement should have collected more text messages. *Id.* at 113-15. He did, however, give Hernandez-Zamora "wide latitude" to argue during closing that the government engaged in bad faith by choosing not to extract Y.S.'s phone – latitude that Hernandez-Zamora used. *Id.* at 114. Of the 22 transcript pages of defense closing argument, ten focused on that issue. Doc. 287 at 45-54, 58.

Hernandez-Zamora did not establish below and does not allege in his new trial motion that there was evidence of government bad faith by the agent in photographing only some of the text messages available from Y.S.'s telephone or in the prosecutors presenting only those photographs to the jury. Judge Kindred could properly consider that the agent's action was "taken in good faith [and] with reasonable justification," Comment, Ninth Circuit Model Instruction 9.13, including to safeguard the victim's privacy. Hernandez-Zamora cannot credibly argue that the outcome of his trial would have been different had either the model instruction or his proposed instruction been given. *See United States v. Fox*, 761 F. App'x 765, 768 (9th Cir. 2019 ("Fox fails to show that any error in the instructions affected his substantial rights or the outcome of the case. Fox was still able to present his defense, which was that he did not actually know the crew members were discharging oily wastes overboard."). Accordingly, Hernandez-Zamora cannot show prejudice in the decision to not give the model instruction or the alternative that he proposed. Thus, he cannot show that he was prejudiced by instructional error because

Judge Kindred did not recuse himself.

### d. Rule 29 Claim

As described above, *see* Section IV(1) at pages 14-16, Hernandez-Zamora's claim that he is entitled to a new trial because of evidence insufficiency is meritless. Given that, Judge Kindred, who at the Rule 29 state was required to assess Hernandez-Zamora's claim under a more onerous standard—whether "[t]he evidence is sufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offenses charged beyond a reasonable doubt," *United States v. Soud*, No. 3:20-CR-00036-SLG, 2021 WL 3476606, at *1 (D. Alaska Aug. 6, 2021)—properly denied the Rule 29 motion. "It is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction." *United States v. Katakis*, 800 F.3d 1017, 1028 (9th Cir. 2015) (quoting *United States v. Dodge*, 538 F.2d 770, 783 (8th Cir.1976)). Given the strength of the prosecution evidence and the daunting standard at the Rule 29 stage, a judge would have been remiss if he failed to deny the Rule 29 motion. Hernandez-Zamora cannot show that Judge Kindred's failure to recuse prejudiced him in the Rule 29 decision.

### 4. Nondisclosure of Information About the Relationship Between Judge Kindred and AUSAs Was Not Prosecutorial Misconduct and, In Any Event, Had the Failure to Disclose Been Misconduct, It Was Harmless.

Hernandez-Zamora alleges USAO misconduct because it did not notify defense counsel of the personal relationship between Judge Kindred and the senior AUSA. He makes the same allegations against the senior AUSA. He argues that the failure to disclose

Case 3:21-cr-00062-MAH Document 306 SEALED Filed 12/03/24 Page 47 of 104

requires dismissal. New Trial Motion at pp. 22-23. In fact, there was no prosecutorial misconduct by the USAO and even had there been, it did not prejudice Hernandez-Zamora.

Any USAO obligations as to Hernandez-Zamora were contingent on Judge Kindred's recusal obligations. In other words, the USAO was required to notify Hernandez-Zamora about the personal relationship between Judge Kindred and the senior AUSA only if Judge Kindred was required to recuse himself from Hernandez-Zamora's case under 28 U.S.C. § 455(a) as a result of the senior AUSA's personal relationship with the judge and her limited involvement in the case. But, as explained above in Section IV(2)(b) at pages 20-26, under the circumstances present here, there was no recusal obligation. Accordingly, there was no notification obligation.

That said, it would have been prudent, indeed expected, for the senior AUSA to refrain from involvement in any case assigned to Judge Kindred, including this one, once their relationship became more than professional. But, for reasons explained above, because there was no recusal obligation due to the senior AUSA's limited involvement in the case, a failure to notify could not have been prosecutorial misconduct. Hernandez-Zamora offers no authority for his claims that there was a due process violation under the circumstances present there or that there is a basis for a sanction under the Court's supervisory authority.

In any event, even if the USAO had a notification obligation here, or had it been required to prohibit the senior AUSA from any participation in any case assigned to Judge

Case 3:21-cr-00062-MAH Document 306-4 SEALED Filed 12/03/24 Page 37 of 41

Kindred and from attending proceedings in his courtroom,[19] any misstep here was harmless. As explained above in Section IV(3) at pages 27-36, there is no reasonable possibility that prejudice resulted from Judge Kindred having remained on this case. Accordingly, any error was harmless.

### 5. Hernandez-Zamora's Reiteration of a Rejected Claim Regarding the Text Message Evidence and His New *Brady* Claim Are Meritless.

Hernandez-Zamora reiterates his best evidence claim, not only in a misguided effort to show that Judge Kindred was biased for denying it at trial, but as a substantive basis for a new trial. New Trial Motion at pp. 25-26. For the reasons explained above in Section IV(3)(b)(ii) at pages 31-33, this claim is meritless. The best evidence rule did not require suppression of the incriminating text messages and provide no basis for a new trial.

Hernandez-Zamora also argues that the case agent's decision to collect only some text message information from the crime victim violated both the *Brady* rule and the Due Process Clause. New Trial Motion at pp. 26-27. Trial testimony showed that FBI made a took photographs of only enough of the text messages on Y.S.'s telephone to collect sufficient evidence of Hernandez-Zamora's criminal conduct. Doc. 286 at 67-68. The agent chose not to re-victimize Y.S. by making a full copy of the personal contents of Y.S.'s phone. *Id.* at 31.

Law enforcement officials have no constitutional obligation to collect all potentially

---

[19] As the senior AUSA's statements make clear, until August 9, 2024, she had described only a professional relationship with Judge Kindred. Thus, there is no basis to conclude that the United States Attorney's Office was aware until the Judicial Council's Order became public on July 8, 2024, of the evidence described in the Order.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

useful evidence. Instead, "unless a criminal defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). And a defendant cannot merely speculate about the exculpatory value of evidence: that must be apparent to law enforcement in deciding whether to collect the evidence. *United States v. Martinez-Martinez*, 369 F.3d 1076, 1086 (9th Cir. 2004). Hernandez-Zamora acknowledges that his *Brady* claim is based on mere speculation: "it is impossible to know how much exculpatory evidence was contained on Y.S.'s phone." New Trial Motion at p. 27. The evidence that FBI did collect leads to only one reasonable conclusion: that Y.S.'s phone contained more of the same abuse and harassment by Hernandez-Zamora. Because Hernandez-Zamora cannot show a bad faith failure to preserve exculpatory evidence, he cannot establish a constitutional violation meriting dismissal or a new trial. *United States v. Avenatti*, 559 F. Supp. 3d 274, 280 (S.D.N.Y. 2021) (explaining that "the Government was under no obligation to disclose to Avenatti more than it obtained itself" from his cellular telephone).

### 6. Hernandez-Zamora Has Not Established a Right to Discovery or an Evidentiary Hearing.

If the Court denies Hernandez-Zamora's requests for dismissal or a new trial, he seeks discovery and an evidentiary hearing in support of his claim that recusal was required. New Trial Motion at p. 23.

To the extent that Hernandez-Zamora seeks to discover information about the internal operations of the United States Attorney's Office, he must make a preliminary showing of entitlement. "Mere speculation about materials in the government's files,"

Case 3:21-cr-00062-MAH-MMS Document 306 SEALED Filed 12/03/24 Page 50 of 104

without demonstrating the existence of favorable, material evidence, does not "require the district court to make those materials available." *United States v. Mincoff*, 574 F.3d 1186, 1200 (9th Cir. 2009); *see also United States v. Armstrong*, 517 U.S. 456, 469 (1996) (requiring a defendant seeking to discover internal government documents regarding cocaine base charging decisions in support of claim of equal protection violation "to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not"). Under the circumstances present here, Hernandez-Zamora would have to establish, at the minimum, that there is a legal basis to compel discovery from the government at this stage of the proceedings, *and* that the USAO had knowledge of facts requiring Judge Kindred's recusal and chose to refrain from disclosing it. He has made no attempt to do this, and cannot do so. As explained above, there was no recusal obligation due to the senior AUSA's limited involvement in the case.

In addition, to the extent that Hernandez-Zamora seeks "the production or disclosure of any material contained in the files of the Department [of Justice], any information relating to material contained in the files of the Department [of Justice], or any information acquired by any person while such person was an employee of the Department [of Justice] as a part of the performance of that person's official duties or because of that person's official status," 28 C.F.R. § 16.21(a), he also must comply with the "*Touhy* regulations," 28 C.F.R. § 16.21 *et seq. See generally In re Boeh*, 25 F.3d 761 (9th Cir. 1994).

Similarly, he has provided no grounds for an evidentiary hearing other than a desire to conduct a fishing expedition. *Compare Morgan v. Gonzales*, 495 F.3d 1084, 1091 (9th

Case 3:21-cr-00062-MAH Document 306-4 SEALED Filed 12/03/24 Page 51 of 104

Cir. 2007) (denying request for evidentiary hearing on immigrant's unsupported claim of government misconduct), *with United States v. Lord*, 711 F.2d 887, 891 (9th Cir. 1983) (ordering evidentiary hearing after "unrebutted prima facie showing of prosecutorial misconduct").

## V.    CONCLUSION

For the reasons started above, the government respectfully requests that the Court deny Hernandez-Zamora's motion for dismissal or a new trial and for discovery and an evidentiary hearing.

RESPECTFULLY SUBMITTED September 3, 2024 at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

*/s Jennifer Ivers*
JENNIFER IVERS
Assistant United States Attorney
United States of America

*s/ Steven D. Clymer*
STEVEN D. CLYMER
Special Assistant United States Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on September 3, 2024
a true and correct copy of the foregoing
was served electronically on all counsel of
record.
/s Jennifer Ivers

# Exhibit A

Subject to protective order in U.S. v. Hernandez-Zamora, District of Alaska Case No. 3:21-cr-00062-MAH-MMS

February 20, 2023                                                                                           *Sent via E-mail*



My name is ████████████, and I am an Assistant United States Attorney (AUSA) in the District of Alaska. I am not a supervisor. I started with the office in September 2018. Prior to that, I was a deputy public defender for Maricopa County in Phoenix, AZ. After moving from Arizona to Alaska, I worked for Alaska's public defender's office for a few months prior to my start date with the US Attorney's Office. I hold an active bar license in Alaska and an inactive bar license in Arizona. I was first barred in Arizona in January 2013.

## I. My Interactions and Professional Relationship with Judge Kindred

I met Judge Kindred, I believe, in either late February or early March 2020. Several of my colleagues previously worked with Judge Kindred at the Alaska District Attorney's Office. Those colleagues include Criminal Chief James Klugman, Deputy Criminal Chief Will Taylor, former Criminal Chief Christina Sherman, and Senior Litigation Counsel Adam Alexander. Judge Kindred was observing a hearing in another judge's courtroom. After the hearing concluded, I approached Judge Kindred, shook his hand, and introduced myself. I do not recall much of this brief interaction.

Soon after I met Judge Kindred, the COVID pandemic changed the operations of the courthouse and the US Attorneys Office. Hearings went fully remote and the US Attorney's Office implemented maximum telework. I stayed fully locked down in my home with my husband and my then-two-year-old son for about two months. Then, I started going to work in-person in the office, including returning to the federal building's gym, though there were only a few others in the US Attorney's Office who chose to return to work in the office. Several of my colleagues also utilize the gym including my direct line supervisor, Will Taylor.

I would, with some frequency, see Judge Kindred in the gym when I would go for my own workouts. I do not recall the first time, or the number of times, I saw Judge Kindred at the gym. On the occasions I did see Judge Kindred at the gym, we would sometimes speak and the conversations generally consisted of ordinary small talk, such as asking about each other weekends, vacations, or TV recommendations. My phone messages with Judge Kindred were related to coordinating meetings, although I may have sent him a message wishing him a happy Thanksgiving, but I do not remember if I actually sent it. I send many people, including people from work, messages wishing them a "Happy Thanksgiving" as well as similar sentiments on other holidays. I also may have messaged Judge Kindred, asking him if he had any advice for me regarding an opening in management. I recall running into him in the hallway after considering sending him the message, but

I cannot remember if I actually had sent the message or if I thought about sending it and happened to run into Judge Kindred while still considering whether to message him.

I recall seeing Judge Kindred in the gym on or shortly after June 17, 2021. On June 16, 2021, I argued an appeal in front of the Ninth Circuit Court of Appeals. The following day, the Federal Bar Association (FBA) held a bench bar event on the lawn of the Court of Appeals courthouse in downtown Anchorage, only a few blocks from the federal building where the district court and US Attorney's Office is located. This event occurred in the afternoon, and I had to leave early because I had a meeting scheduled to speak with a victim in a double homicide case I was prosecuting. My colleague, James Klugman, and I were discussing whether we should walk back to the office when Judge Kindred approached us, with his law clerk, Tara Lewis, who wanted to meet me. Tara Lewis was extremely complimentary about my professional work. Tara and I chatted for a few minutes, and AUSA Chris Schroeder may have also joined this conversation, before James Klugman, Chris Schroeder, and I walked back to the office for our meeting.

Sometime between June 17, 2021 and September 17, 2021, I saw Judge Kindred at the gym. I told him that I enjoyed meeting his law clerk Tara Lewis. He asked if I would be willing to meet with her to give her career advice and I agreed. I do not recall if he asked me during the same gym encounter that I told him I enjoyed meeting Tara Lewis, or if that occurred on a different day. Regardless, I met with Ms. Lewis on September 17, 2021, to provide her career advice.

During the week of November 22, 2021, I ran into Judge Kindred at the gym. He thanked me for helping Tara Lewis explore her career options, noting that the pandemic had really limited her ability to network. Tara Lewis is not from Alaska and moved here for her clerkship sometime in 2020. I also expressed frustration with the lack of networking opportunities in Alaska. When I practiced in Arizona, I was a member of the Sandra Day O'Connor Inn of Court,[1] and it was absolutely the most beneficial networking activity I have ever engaged in. When I moved to Alaska in 2018, I looked to join the local chapter, only to discover Alaska did not have an Inn of Court. Judge Kindred expressed an interest in a judge-attorney networking opportunity, which thrilled me

---

[1] Per the Inn of Court's Website: "The American Inns of Court is an association of lawyers, judges, and other legal professionals from all levels and backgrounds who share a passion for professional excellence. Through regular meetings, members are able to build and strengthen professional relationships; discuss fundamental concerns about professionalism and pressing legal issues of the day; share experiences and advice; exhort the utmost passion and dedication for the law; provide mentoring opportunities; and advance the highest levels of integrity, ethics, and civility. Our Inns have gained a national and international reputation as an organization that bridges the gap between formal law school education and legal practice by offering career-long continuing education in the Common Law tradition. This uniquely non-partisan association encourages meaningful mentoring relationships. We are one of the very few legal organizations that involve the whole spectrum of the profession: from law students to supreme court justices; every level of federal and state judges, small firms to large firms; legal educators to law students. All have the opportunity to learn and grow without limit. Membership is divided into "pupillage teams," with each team consisting of a few members from each membership category depending on the members' level of experience. Each pupillage team conducts one program for the Inn each year. Pupillage team members gather informally outside of monthly meetings in groups of two or more. This allows the less-experienced attorneys to become more effective advocates and counselors by learning from the more-experienced attorneys and judges."
https://www.innsofcourt.org/AIC/About_Us/What_Is_an_American_Inn_of_Court/AIC/AIC_About_Us/What_Is_An_American_Inn_of_Court.aspx?hkey=d3aa9ba2-459a-4bab-aee8-f8faca2bfa0f

because I had wanted to establish an Inn of Court chapter in Alaska, but did not have a judge on board, which is required to establish a chapter.

As Judge Kindred had expressed an interest in expanding networking opportunities in Alaska, I asked him if he would be interested in the Inn of Court, and if so, if I could send him some materials to review. Judge Kindred agreed. I then asked him if I should email the materials to his judicial assistant. He said to email them to him directly. I said that I did not have his email address and he responded that he would ask his clerk, Tara Lewis, to send me his contact information, since she had already been communicating with me. I told him that this was not a US Attorney official networking activity, so that he could expect to receive an email from my personal email, rather than my government email.

Several days later, I had not yet received Judge Kindred's contact information, so I messaged Ms. Lewis on November 24, 2021, explaining that I told Judge Kindred that I would send him some information about a networking group. She confirmed that Judge Kindred had asked her to do the same yesterday, but she had forgotten to send me his information. She then texted me Judge Kindred's contact information, specifying, "This is his personal cell and court email." Later that day, I sent Judge Kindred an email with two PDFs and various links related to Inn of Court.

I do not recall how soon after sending the email regarding Inn of Court that Judge Kindred and I met to discuss it further, however, I believe it was within a week or two. Judge Kindred did not immediately respond to my email, so I brought it up to him again the next time I saw him in the gym. He offered that he had time later in the afternoon. I agreed and he told me to come to chambers. Later in the afternoon, but still during normal business hours, I walked to his chambers, but could not find the buzzer for his chambers. I believe I sent him a text message from my personal phone to the phone number Tara Lewis sent me, alerting him that I was at the door, but did not know how to reach his chambers. I believe he asked which door and then told me he would come find me.

Judge Kindred walked me to chambers and we discussed the basics of Inn of Court in his office. I believe Tara Lewis and other clerks were in chambers. Judge Kindred and I sat across from each other with his office door open during the conversation. We also engaged in small talk. I do not remember how long the meeting lasted, but when it ended, it was still normal business hours and I walked back to my office.

I believe during my next conversation I had with Judge Kindred, I asked him for some career advice and the process of becoming a judge. He again invited me to speak in his chambers later that afternoon, which I did. It was during normal business hours, I believe his clerks or staff were in his chambers, we met in his office with the door open, and sat across from each other. Although I do not remember how long the conversation lasted, it was still normal business hours when I left to return to my office.

I sent a follow up email regarding Inn of Court on January 25, 2022. Judge Kindred did not respond. Periodically, when I saw Judge Kindred at the gym, I would mention that I had some additional information regarding the Inn of Court. Sometime around May 10, 2022, Judge Kindred agreed to take another meeting, which again, occurred in his chambers, and started and ended during

normal business hours. I had discovered that Alaska previously had an Inn of Court chapter, but it dissolved. Judge Kindred shared that he had talked to a few other judges about it and none of them were interested in participating. He also asked me to determine if it was possible to know why the previous chapter failed.

After this meeting, I would periodically see Judge Kindred in the gym. Sometimes I would speak with him, other times I would just wave, and sometimes I would complete my workout as if he was not there. I mentioned to Judge Kindred a few times that I had received the requested information from the Inn of Court Chapter Relations contact and suggested that we set another meeting, but he never agreed to set another meeting. I told my US Attorney, S. Lane Tucker, that I had met with Judge Kindred regarding potentially starting an Inn of Court chapter, that Judge Kindred seemed to have lost interest, but it was an idea I still wanted to execute. She suggested I reach out to the FBA and see if I could put on a CLE to gauge interest for Inn of Court in the federal legal community. I met with an executive board member with the FBA and intend to suggest her idea when the FBA contact reaches back out.

I emailed Judge Kindred on one other occasion. After my office hired a few new AUSAs, including Tara Lewis, I organized several meet-and-greets. I thought it would be advantageous for the new hires to have the opportunity to speak with the judges and receive advice. I also felt it would be helpful for me to get some face time with the judges outside of the courtroom. We met with all of the judges and one of the senior status judges. We did not meet with Judge Kindred. I had asked Judge Kindred when I saw him in the gym if he would be willing to meet with the new AUSAs. He agreed and directed me to email him for his availability. I complied; however he did not respond. Later, when I saw him at the gym, he apologized for failing to get back to me and assured me he would get something on the calendar to meet with the new hires, but he never did.

This is the full extent of my relationship with Judge Kindred. I do not now, nor have I ever had, a romantic, intimate, or close personal relationship with Judge Kindred. I have not sought such a relationship with Judge Kindred. My relationship with Judge Kindred has always been courteous, but professional. As of the receipt of this letter, my last contact with Judge Kindred occurred on either January 19 or 20, 2023. That day, I went to the gym in the federal building. Judge Kindred was using a weight machine next to the sanitizing wipes. As I reached for a sanitizing wipe for the gym mat, I said something to the effect of, "Hey, how's it going?" Judge Kindred did not respond, and I assumed he did not hear me because he was focused on his workout. I then wiped the mat and began my workout. At some point during my workout, Judge Kindred left the gym.



████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████

██████████████████████████████████████████████
███████████████████████████████████████

     I do not have any messages as my personal phone was set to delete messages automatically after a certain time period, I believe 30 days. ████████████████████████████████████████The messages I sent to Judge Kindred are described above. ███████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████

     Sincerely,

████████████████

████████████

# Exhibit B

Subject to protective order in U.S. v. Hernandez-Zamora, District of Alaska Case No. 3:21-cr-00062-MAH-MMS

August 9, 2024                                                    *Sent via E-mail*



Please accept this letter in response to ██████████████████ ██████████████ requesting additional information following the submission of my February 20, 2023 written response.[1] ██████████████████████ ██████████████████

**Question No. 1:  If you dispute that the Order is referencing you or your conduct, explain why and provide any information known to you regarding the identity of the "more senior AUSA" and explain the basis for your answer.**

I was not involved in the drafting of the Judicial Council of the Ninth Circuit's May 23, 2024 Order in *In re Complaint of Judicial Misconduct*, No. 22-90121 ("Order"). However, for the reasons forth below, I have no reason to dispute that I am the "more senior AUSA" referenced in the Order, as I was pressured by Judge Kindred to send nude photos of myself to him.

**Question No. 2:  State whether you have ever sent nude, partially clothed, inappropriate, or unprofessional photographs to then Judge Kindred, and if so, explain when, how, and why these photographs were sent. Describe in detail all photographs of any type that you sent or provided, by any means, to then Judge Kindred.**

As my February 20, 2023 initial response ██████ states, I first met Judge Kindred in or around late February or early March 2020. Although our interactions at first were cordial and professional, they devolved into an abusive and manipulative relationship. My first real interactions with Judge Kindred occurred in 2021, when I expressed an interest to Judge Kindred of beginning an Inn of Court chapter in Alaska, which, to my great happiness, Judge Kindred agreed. It was important to me to expand networking opportunities to attorneys in Alaska, as I had found networking opportunities to be lacking since I moved here in 2018.

Sometime in late November 2021, Judge Kindred and I met in his chambers to discuss establishing an Inn of Court in Alaska. The meeting was cordial and professional, his door remained open, and his law clerks were present outside of his office. After that meeting, Judge Kindred sent me a text message telling me that he had enjoyed meeting with me. I believe I sent

---

[1] This response was prepared with the assistance of my counsel, Brownell Landrigan, PLLC.

1

Judge Kindred a Happy Thanksgiving text message, to which I believe he responded in a friendly manner.

Later that weekend, Judge Kindred agreed to speak with me about the process of becoming a district court judge. Judge Kindred once again invited me to meet with him in Chambers, which I did. Once again, we met in his office with the door open, and his clerks and staff were present outside of his office. After this meeting, Judge Kindred sent me a number of text messages telling me how great he thought I was, and even sent me a photo of his confirmation hearing, telling me that that would soon be me.

Throughout these early conversations, Judge Kindred made it a habit of telling me how well-connected he was with high-profile individuals in the legal and political community. He regularly mentioned having drinks with Rob (Rob Henderson, the former Alaska Deputy Attorney General)) and Clint (Clint Campion, the former District Attorney for Anchorage), and often spoke of talking to Dan (Dan Sullivan, U.S. Senator for Alaska) and Lisa (Lisa Murkowski, U.S. Senator for Alaska). He even told me that Senator Murkowski had asked him for a list of good attorneys, and that he had told Senator Murkowski that he thought it was important that the next district judge be a woman.

Judge Kindred frequently would brag about he soon would be the only active federal judge in Alaska, as Judge Gleason intended to go on senior status within two to three years. He said she had delegated many of the Chief Judge tasks to him already. He would talk about how soon he would be the Chief Judge and how that would be the case for the rest of my career.

Judge Kindred also told me that he once had to participate in a program due to his rage problems. He did not tell me the specifics of the program or what he had done to be placed into the program. On multiple occasions, Judge Kindred told me that he is extremely petty, holds grudges, and had taken revenge on someone in the past. He also told me on several occasions that he was a violent person and had gotten into a lot of fights.

In or around December 2021, Judge Kindred began texting me with more frequency and began sending me selfies. At some point, he told me that he found me attractive. He told me that he had included my name in a list of judicial candidates to send to Senator Murkowski. As soon as he told me he had recommended me for a federal judgeship, he started asking me to send him nude photos. At first, I declined, but I agreed the next day, feeling pressured to appease Judge Kindred given his inherent position of power and authority over me as a federal judge, his ability to influence decisions in the U.S. Attorney's Office, and his influence over my future. I told Judge Kindred that I would share photos with him over Signal, and he agreed to delete everything.

If I took too long to respond to Judge Kindred's messages, he would send me aggressive messages asking if I did not like him anymore. I felt trapped and panicked when I felt like I was taking too long to respond to one of his texts, even if I was driving and it was unsafe to respond. He was sensitive and volatile, his mood swinging to an angry and scary place if I said the wrong thing. In December 2021, he asked me to guess his age. I incorrectly guessed that he was a year

2

older, which set him off. Over the course of several weeks, he told me how I needed to learn to not say stupid things and think before I speak. He implied that I needed to work off this deficit. He dropped a reference to this wrong against him in unrelated conversations.

I sent a topless photo to Judge Kindred via Signal. After receiving this photo, Judge Kindred pressured me to send him a photo of my vulva. At first, I tried to make an excuse so I would not have to send that photo, but I eventually did. I felt trapped and believed I had no choice. Then Judge Kindred suggested he could send me photos of himself. He sent a fully clothed photo and invited me to ask to see more. I agreed to accept more photos. He texted that he needed me to state explicitly that I wanted to see a picture of his penis. I tried to wriggle out of doing so, but he wouldn't let up, so I ultimately did tell him to send me explicit pictures. Judge Kindred sent me photos of his penis. He told me he had fantasies of performing oral sex on me in the locker room shower. He told me to masturbate while he sent me these text messages. I told him I was, because, again, I felt trapped and panicked, but in reality, I was not.

After I sent these first photos to Judge Kindred on Signal, I asked him if I would be on his recusal list or if my cases would be reassigned to our district's only other active judge. I told him that I trusted that he would do what needed to be done in terms of ethics. Judge Kindred responded angrily and repeatedly accused me of threatening him. After this, however, he began to use threats against me to pressure me into sending him more pictures. From then on, I would say what I thought he wanted to hear.

Judge Kindred started telling me that he wanted me to send him more photos, and would tell me what he wanted those photos to depict, including my anus, me wearing a thong, or me doing a particular yoga pose. He sent me more photos of his penis and asked me to give him compliments. If I was not descriptive enough in my compliments, he would criticize me, tell me he had low self-esteem, and that I was hurting him. On two occasions, he me made me send him text messages describing how I would perform oral sex on him. Frequently, he would send me texts detailing, in explicit detail, his fantasies of performing oral sex and anilingus on me. I would respond by trying to conform to what I thought he would want me to say. I felt pressured and as if I had no choice.

Eventually, he messaged me, and acknowledged that there was a power disparity between him and I. He told me to confirm that I was participating voluntarily. Sensitive to his volatility and fearful of how he would react otherwise, I confirmed.

One of his fantasies involved performing oral sex on me in his chambers. He repeatedly told me that he wanted me to make the first move on him, but I never initiated a physical relationship with him. He told me that he often fantasized about what kind of underwear I would be wearing. He told me that he preferred crotchless underwear and that he wanted to look up my skirt.

If we were both in the gym at the same time, Judge Kindred would sometimes sit on the machine behind my exercise mat and watch me do yoga. He would text me, either in the moment

3

or later, that he loved to look at my butt and that it was his favorite sight in the world. He also told me that he intentionally left his water bottle behind my mat, so that even when he was working out on the other side of the gym, he would have a reason to walk behind me and look at my butt. After he said that, I noticed that he would often walk behind me upwards of ten times a workout. Sometimes, after leaving the gym, Judge Kindred would text me and tell me that he could see the outline of my vulva in my yoga pants. He once told me to wear loose fitting shorts to the gym, so I would expose myself to him while doing yoga.

On one occasion, I mentioned that I was going to go out for a drink with a friend. Judge Kindred suggested that I join him, as he was getting drinks with Rob Henderson and Clint Campion and he could introduce me to them, which he said would be good for my career. While we were at the bar, Judge Kindred sent me flirty messages via Signal. He wanted to know when I was leaving, so I told him. He left at the same time I did, and wanted to know where I was parked. He followed me to my car, and wanted to know where we could go to make out. I said I could not think of any place. He stayed on the sidewalk talking to me for another few minutes before we agreed we had to leave due to childcare responsibilities. He hugged me goodbye. Once I got in my car, I checked Signal and saw that Judge Kindred had messaged me, saying that he thought he should have grabbed my butt when he hugged me. I responded in a way that I hoped would keep him happy because I was afraid of what he could do to my personal and professional life if I did not do so. Judge Kindred hugged me on one other occasion. I never kissed Judge Kindred and I never engaged in any other physical behavior with Judge Kindred.

Sometime after this interaction, Judge Kindred told me he was meeting with Senator Murkowski because she was forming her list of potential candidates for the judicial vacancy. Judge Kindred also told me that he could connect me with his friend who worked for Senator Sullivan. The next time I saw Judge Kindred at the gym, he told me that I was on Senator Murkowski's list. He said he was a gentleman, so he was not going to ask for anything in return. However, after he left the gym, he messaged me and insinuated that I should find a way to thank him. He also implied that he had the power, ability, and willingness to ruin everything if he did not get what he wanted. I asked him what he wanted. He said he wanted more photos. Feeling I had no other option because he had the power to ruin not only my career, but my personal life as well, I sent him a nude photo. I cried as soon as I had sent the photo because I felt trapped and completely powerless.

Sometime around May 2022, Judge Kindred agreed to have another meeting with me to discuss the foundation of an Inn of Court chapter in Alaska. The meeting was once again set to take place in his chambers. However, when I arrived in his chambers this time, his clerks and staff were not present. After discussing the Inn of Court, Judge Kindred invited me over to the bar he had in his chambers, but I told him that I needed to leave to pick my son up from daycare. After I left, Judge Kindred messaged me on Signal to tell me that he was upset I had not made a move on him, and that he was upset that he tried looking up my dress but could not see anything because I was wearing thick pantyhose. I apologized and responded in a way that I hoped would assuage him. I did not want to be in this abusive relationship with Judge Kindred, but could not see a way to get out.

4

After this encounter, Judge Kindred continued to communicate with me, often complaining about other attorneys in the U.S. Attorney's Office, telling me about problems in his marriage, name dropping important people with whom he was connected, complaining about important events that he needed to attend, and keeping me up to date with the judicial vacancy process.

After the list of recusals from Judge Kindred's cases came through, I messaged him and asked him why the recusals were happening. He told me he could not talk about it, but that a complaint had been filed against him, that I would be interviewed at some point, and that he was sorry for that. I did not ask for any more information. The next time I saw him at the gym, however, Judge Kindred told me that he would not screw me over if I did not screw him over. I was very intimidated by him.

On the day I was to be interviewed by the Ninth Circuit in November 2022, Judge Kindred asked me to meet him at the gym. I told him I could not. He asked why, and I said that I could not say why. Judge Kindred told me that I was making him nervous. I told him everything was fine, but I did not tell him anything else. After I received ▮▮▮▮ first letter in January 2023, I asked Judge Kindred to switch from Signal to Telegram, another messaging app. We communicated less frequently after that. I did not tell Judge Kindred that I was interviewed by the Ninth Circuit in July 2023. He asked me in the fall of 2023 if I had been interviewed, and I said I had been. He asked me what I had said. I told him what I had said regarding my relationship and communications with him, which were consistent with my initial response ▮▮▮▮ on February 20, 2023.

I deleted many of my messages with Judge Kindred right away because I was ashamed and did not want to see any of the messages ever again, as the sight of them was incredibly emotionally painful. I also have a 30-day deletion setting on my phone, and a 7-day deletion setting on Signal, so even if I had not deleted the messages out of shame, I would no longer have access to any of the messages described above anyway.

Judge Kindred used his position of authority as a federal Judge to force me into an emotionally manipulative and abusive relationship. I did not seek out anything but a cordial, professional relationship with Judge Kindred. Judge Kindred, on the other hand, used the power and authority he wielded over my professional livelihood to pressure me into sending him nude, demeaning photos and messages and into becoming an unwilling recipient of his sexual fantasies and sexually explicit photos. If I did not respond in the way that he wanted, Judge Kindred made it clear that he had the power to ruin my life. He had made a point of telling me on several occasions he had rage issues and that he was someone who held grudges and took revenge. I could not see a way out and felt like I had no choice but to acquiesce to Judge Kindred's demands.

▮▮▮▮▮▮ I had no reason to believe that Judge Kindred's abuse would end any differently. I am seeking therapy to try to understand how and why I was abused and victimized by Judge Kindred. Regardless of the vulnerability arising from my prior abuse, Judge Kindred was not an ordinary abuser. He was a federal Judge who held a position of power over me. It is shocking to

5

me that these awful personality traits—manipulation, abuse, anger, threats, etc.—were not detected before Judge Kindred's name was submitted to the U.S. Congress, but, perhaps even more concerningly, that they were not detected during Judge Kindred's confirmation process.

**Question No. 3:** **State whether you have ever had flirtatious, inappropriate, or unprofessional interactions with then Judge Kindred, and if so, explain when, how, and why these interactions occurred.**

Please see my response to Question No. 2, above. My relationship with Judge Kindred was emotionally manipulative and abusive. I did not willingly engage in the interactions detailed above with Judge Kindred. Judge Kindred made very clear to me that he had power and influence in Alaska's legal and political circles (reaching as high as being on a first-name basis with Senators Murkowski and Sullivan), that he had rage issues, and that he was a person who held grudges and took revenge against those who he felt had wronged him. When I asked him if I would be on his recusal list, he accused me of threatening him and then turned around and used threats against his professional life to pressure me into sending him more nude, demeaning photos. Throughout my interactions with Judge Kindred, I felt ashamed and terrified that he would ruin my life if I did not do what he wanted.

**Question No. 4:** **State whether you ever communicated with then Judge Kindred via Signal, and if so, describe the communications and state when and why they occurred via Signal.**

Please see my response to Question No. 2, above. When Judge Kindred first pressured me to send him nude photos, I told him that I would send them through Signal. Judge Kindred agreed to delete everything I sent him. I felt ashamed of being pressured into sending these photos, and I never wanted to see them again. I never wanted to see the messages Judge Kindred sent me again either. I felt that if I did not send Judge Kindred these photos, he would have lashed out against me. As stated above, he made it clear to me that he had rage issues, that he held grudges, and that he took revenge against people who he felt had wronged them. Throughout my interactions with Judge Kindred, I felt ashamed and terrified that he would ruin my life if I did not do what I wanted.

**Question No. 5:** **State whether you would like to revise any portion of your written response** ▮▮▮▮**, particularly with respect to any communications sent to or interactions with then Judge Kindred not previously described, and if so, provide your revisions and explain in detail why any new or different information contained in your revisions was not included in your initial written response** ▮▮▮▮**.**

I would like to revise my original February 20, 2023 response ▮▮▮▮ with the information set forth in this letter. I am providing this information under the time constraints provided ▮▮▮▮. If given more time, I may want to revise my original response further, but the information included herein is the information I am able to provide within ▮▮▮s one-week time limit.

6

I did not disclose the information included in this letter in my original February 20, 2023 response because I was afraid of what Judge Kindred would do if he found out. Moreover, I did not consider our relationship to be intimate, romantic or close. I felt like a victim in an abusive relationship. Judge Kindred used his position of authority as a federal Judge to force me into an emotionally manipulative and abusive relationship. He made it clear that he could ruin my life and that he had rage issues. During the Ninth Circuit's investigation, he went so far as to tell me that he would not screw me over if I did not screw him over. Even though he is no longer a federal Judge, I am still terrified of what he will do to me if he finds out that I disclosed this information. He remains personally and professionally well-connected in a state where I have almost no such connections. As a result of all of these factors, the threats made by Judge Kindred, and the power and authority he held over me, I omitted the details set forth herein.

Sincerely,

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 3:21-cr-00062-MAH-MMS |
| ROLANDO HERNANDEZ-ZAMORA, | |
| Defendant. | |

## ORDER

FOR GOOD CAUSE SHOWN, the documents described in the "Government's Motion to File Documents Under Seal," filed today, may hereby be filed under seal and will so remain until further order of this Court.

Dated this 3rd day of September, 2024.

/s/ Marco A. Hernandez
THE HONORABLE MARCO A HERNANDEZ
United States District Judge

S. LANE TUCKER
United States Attorney

JENNIFER IVERS
SETH BEAUSANG
Assistant U.S. Attorneys
STEVEN D. CLYMER
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Email: jennifer.ivers@usdoj.gov
       seth.beausang@usdoj.gov
       steven.d.clymer@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 3:21-cr-00062-MAH-MMS |
| ROLANDO HERNANDEZ-ZAMORA, | |
| Defendant. | |

**MOTION TO FILE UNDER SEAL**
**FILED UNDER SEAL**

The United States of America, by and through its counsel of record, the United

States Attorney for the District of Alaska, respectfully moves this Court to permit it to file

the following documents under seal:

1. The government's response in opposition to defendant Rolando Hernandez-Zamora's motion to amend protective orders, Docket #313; and

2. This motion for under seal filing.

The Court has ordered that the government respond to Hernandez-Zamora's motion to amend protective orders by today, September 24, 2024. The government's response refers to documents, their contents, and their attachments that this Court already has ordered sealed for good cause shown. Accordingly, the above-described documents also should be sealed.

RESPECTFULLY SUBMITTED September 24, 2024, at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

*/s/ Steven D. Clymer*
STEVEN D. CLYMER
Special Assistant United States Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on September 24, 2024, a true and correct copy of the foregoing was served electronically on all counsel of record.

Office of the U.S. Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ROLANDO HERNANDEZ-ZAMORA,

Defendant.

No. 3:21-cr-00062-MAH-MMS

## SEALING ORDER

FOR GOOD CAUSE SHOWN, the documents described in the "Government's Motion to File Documents Under Seal," filed today, may hereby be filed under seal and will so remain until further order of this Court.

Dated this 24th day of September, 2024.

_____
THE HONORABLE MARCO A. HERNANDEZ
United States District Judge

S. LANE TUCKER
United States Attorney

JENNIFER IVERS
SETH BEAUSANG
Assistant U.S. Attorneys
STEVEN D. CLYMER
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Email: jennifer.ivers@usdoj.gov
        seth.beausang@usdoj.gov
        steven.d.clymer@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>ROLANDO HERNANDEZ-ZAMORA,<br><br>                    Defendant. | No. 3:21-cr-00062-MAH-MMS |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO AMEND
PROTECTIVE ORDER [DOCKET #313]
FILED UNDER SEAL**

The United States of America, by and through its counsel of record, the United

States Attorney for the District of Alaska, respectfully responds to and opposes defendant

Rolando Hernandez-Zamora's Motion to Amend Protective Order, filed at Docket #313.

Although Hernandez-Zamora's requests are not entirely clear, he apparently asks this Court to (1) amend or lift its sealing order at Docket #308 and unseal the government's response to his motion to dismiss or for a new trial ["post-verdict motion"], including attachments to the response[1]; (2) amend or lift its protective order at Docket #304 and "publish" one or more of his motions "on the public docket"[2]; and (3) order the government to publicly file unredacted copies of two letters attached as exhibits to the government's response. As explained below, Hernandez-Zamora does not provide good reason for these requests. Accordingly, his motion should be denied.

## 1. Background

On July 19, 2024, Hernandez-Zamora moved post-verdict for an order vacating his conviction and either dismissing the indictment against him or granting him a new trial.

---

[1] Hernandez-Zamora's motion challenges "the stipulated protective orders at Sealed Dockets 304 and 305." Docket #313 at p. 1. In fact, Docket #305 is a government *motion* for an order to seal both its response to Hernandez-Zamora's post-verdict motion and the accompanying exhibit. This government sealing motion resulted in the sealing order located at Docket #308. Accordingly, the government interprets Hernandez-Zamora to be moving to amend or lift the Court's sealing order at Docket #308, as well as the protective order at Docket #304.

Hernandez-Zamora also requests unsealing of "the Government's *motions* and exhibits so they may be made part of the public record." Docket #313 at p. 2; *see also id.* at pp. 9, 13 (referring to "the Government's sealed motions and exhibits"). In fact, the government filed a sealed *response*, with exhibits, to Hernandez-Zamora's post-verdict motion. Docket #306. (It also filed a redacted version of this response publicly. Docket #307.) The government interprets Hernandez-Zamora's present motion to seek unsealing of the government's sealed *response* and exhibits.

[2] Hernandez-Zamora's motion states: "after this Court's consideration of this and Rolando's concurrently filed reply and related motions, defense counsel asks this Court to unseal this motion and publish it on the public docket." Docket #313 at p. 2. Read literally, this passage seeks unsealing of only the defense motion at Docket #313, which moves to lift the Court's sealing and protective orders. It is unclear whether Hernandez-Zamora also seeks unsealing of his reply, filed at Docket #315, and/or other unspecified motions.

Docket #276.  Among other things, he claimed that he is entitled to a new trial because former United States District Judge Joshua Kindred, who presided over his trial, erred by failing to recuse under 18 U.S.C. § 455.  *Id.* at pp. 16-22.  Hernandez-Zamora argued that Kindred was not impartial for three reasons, each requiring recusal: (a) Kindred's own misconduct was similar to that for which Hernandez-Zamora was convicted; (b) a senior AUSA who had a personal relationship with Kindred both attended the trial and gave advice to the government attorneys who tried the case; and (c) the trial took place around the same time as a judicial investigation into Kindred's misconduct.  *Id.*

On July 29, 2024, the Court granted a government motion to extend to its filing deadline to obtain trial transcripts.  Docket #280, #281.  On August 15, 2024, the government sought further extension for reasons explained in an *ex parte*, *in camera*, and under seal filing.  Docket #294.  In support of that motion, the government described two letters signed by the senior AUSA, dated February 20, 2023, and August 9, 2024.  It explained that information contained in these letters was "confidential and highly personal" but that "[s]ome information in the senior AUSA's second statement . . . arguably is supportive of an argument that Hernandez-Zamora makes in connection with the judicial misconduct claim in his new trial motion," and noted that "Hernandez-Zamora argues as one basis for relief that Judge Kindred was unable to be fair and impartial to the defense at trial because his own conduct was similar to the cyber-stalking offense charged against Hernandez-Zamora."  Docket #293-1 (*ex parte* and sealed).  It further explained that "[t]he government is aware that it has an obligation to produce to Hernandez-Zamora material

Case 3:21-cr-00062-MAH Document 326-4 *SEALED* Filed 12/10/24 Page 3 of 12

information favorable to the new trial motion, but the information in the only recently received senior AUSA's second statement . . . is incomplete, vague, and conclusory." *Id.*[3] Accordingly, the government requested additional time for "further investigation to assess its disclosure obligations." *Id.* On August 19, 2024, this Court granted the government's second extension request. Docket #299.

On or around August 30, 2024, Hernandez-Zamora, through counsel, orally agreed to not oppose a protective order pertaining to documents the government planned to produce.[4] Later that day, the Court granted the government's unopposed motion for a protective order. Docket #304. The order applies to government-designated documents produced to defense counsel. *Id.* It does not limit Hernandez-Zamora's use in this litigation of such designated documents and permits him to provide or disclose such documents (and information they contain) "to those persons employed by defense counsel who are necessary to assist counsel in these proceedings." *Id.* It requires that pleadings

---

[3] The government's *ex parte* and sealed filing also explained that the government planned to hand-deliver an unredacted copy of the August 9, 2024 statement to the Court rather than file it electronically "because of its confidential and highly personal nature." *Id.* The government later did so.

[4] Hernandez-Zamora asserts that government counsel conditioned the government's production on a defense agreement to not oppose a motion for a protective order. Docket #313 at p. 4 ("asserting that government counsel "would disclose those items only if she agreed to a protective order"). Government counsel has a different recollection. The government planned to produce redacted copies of the senior AUSA's two letters after a protective order was in place *or* it had an opportunity to move for one, without regard to whether the motion was successful. In a brief telephone conversation with defense counsel, government counsel explained that the government had materials to produce but would move for a protective order before doing so. Government counsel asked whether defense counsel would agree to not oppose the motion. Defense counsel agreed. Government counsel did not state that the government's production of the materials was contingent on defense non-opposition to the government motion for a protective order.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Case 3:21-cr-00062-MAH Document 326-7 *SEALED* Filed 12/10/24 Page 84 of 104

referring to the contents of government-designated documents be filed under seal or, at the minimum, be redacted from publicly filed documents to remove references to material in them. *Id.* Hernandez-Zamora now challenges this protective order.

On August 30, 2024, government counsel produced to defense counsel redacted versions of the two letters, along with the protective order. The government designated these letters as materials to which the protective order applies. The letters are redacted as follows:

Redactions to February 20, 2023 letter:
- Recipient information, subject line, salutation, and first sentence describing the genesis of the letter; and
- Portion from the bottom of page 5 until the last paragraph of page 15 and portions of the last paragraph, all addressing matters other than the senior AUSA's relationship or communications with Kindred.

Redactions to August 9, 2024 letter:
- Recipient information, subject line, salutation, and portions of first paragraph describing the genesis of the letter;
- Recipient information in paragraph on page 1 beginning "As my February 20, 2023 initial response";
- Recipient information in paragraph on page 5 beginning "On the day I was";
- Personal and confidential information unrelated to Kindred at the bottom of page 5; and
- Recipient information in last two paragraphs on page 6.

On September 3, 2024, the Court granted the government's motion to file its response to Hernandez-Zamora's post-verdict motion under seal. Docket #308. Later that same day, the government filed a sealed unredacted response to Hernandez-Zamora's post-verdict motion. Docket #306. Copies of the two redacted letters it had provided to defense counsel were attached as an exhibit and also sealed. Docket #306-1. At the same time, the government filed a public version of its response in which discussion of information from

the two letters was redacted.  Docket #307.  The redacted letters were not attached to this publicly filed version of the response.  *Id.*  The government served both versions of its response on defense counsel.  Hernandez-Zamora now apparently[5] challenges the order sealing the government's response and attached letters, as well as redactions to the letters.

### 2. Governing Law

A court can properly order the sealing of judicial records, including dispositive pleadings and documents attached to such pleadings, when there are "compelling reasons" to do so.  *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (explaining that "'compelling reasons' must be shown to seal judicial records attached to a dispositive motion").  "The 'compelling reasons' standard is invoked even if the dispositive motion, or its attachments, were previously filed under seal or protective order."  *Id.*

"[T]he right to inspect and copy judicial records is not absolute," and should not "become a vehicle for improper purposes."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).  "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets."  *Kamakana*, 447 F.3d at 1179 (quoting *Nixon*, 435 U.S. at 598).  Courts have recognized that there are compelling reasons to seal matters of a "very private nature."  *Martinez v. Cnty. of Los Angeles*, No. 2:22-CV-6589-DSF-AFMX, 2024 WL 2947273, at *1 (C.D. Cal. Apr. 5,

---

[5] See footnote 1, *supra*.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

2024) (sexting communications and related investigatory materials); *L.W. through Doe v. Snap Inc.*, 675 F. Supp. 3d 1087, 1102 (S.D. Cal. 2023) (ordering sealing of screen names based on "respectable concerns relating to user privacy and safety"); *Henry v. Municipality of Anchorage*, No. 3:15-CV-00187-RRB, 2018 WL 11417375, at *4 (D. Alaska Sept. 25, 2018) (approving redactions and previously-imposed sealing "to protect victims, informants, and other sensitive information").

Sealing in criminal cases is not uncommon. The Ninth Circuit has recognized that transcripts of grand jury testimony and warrant materials are "not subject to the right of public access at all because the records have traditionally been kept secret for important policy reasons." *Kamakana*, 447 F.3d at 1178. Further, the District of Alaska requires the sealing of certain judicial documents in criminal cases. *See* District of Alaska Local Criminal Rules 11.1(e) (plea agreement addendum), 32.1 (sentencing memorandum addendum). Significantly, these local rules also contemplate that motions addressing other matters, as well as documents related to such motions, can properly be sealed, and provide a process by which litigants can seek judicial approval for doing so. *See* Alaska Local Criminal Rule 47.1(f), (j).

### 3. Argument

#### a. This Court Properly Issued the Challenged Sealing and Protective Orders.

"Compelling reasons" supported this Court's decisions to order sealing and issue a protective order. The sealing order and protective order are necessary to safeguard confidential and highly personal information about an Assistant United States Attorney and

Case 3:21-cr-00062-MAH Document 26-4 *SEALED* Filed 12/10/24 Page 87 of 104

member of the Alaska Bar. Disclosure of the sealed and protected materials, which certainly would be reported in the national new media, would publicize an official identification of the senior AUSA by name, which has not occurred, and also would make public the senior AUSA's description of salacious details of her relationship with Kindred that have not appeared in news accounts. As this Court undoubtedly recognized when it issued the sealing and protective orders, public disclosure of the letters, even in redacted form, or the information contained in them would cause significant and irreparable professional, financial, personal, and emotional harm to the senior AUSA.

Significantly, this is not a situation in which the government both introduces information in its possession to support its own litigation position and, at the same time, urges a district court to deny public access to the information. Here, by contrast, the government made disclosure (without the senior AUSA's consent) not to enhance its own position but instead to ensure that Hernandez-Zamora was aware of information arguably favorable to his motion.

**b. Hernandez-Zamora Has Offered No Sound Reason for Lifting the Sealing Order or Protective Order.**

Hernandez-Zamora has not offered a cogent reason to make the sealed and protected material public. He repeatedly expresses displeasure that the government, despite information in the senior AUSA's letters, refuses to agree with him that Kindred's misconduct was akin to own his cyberstalking of the woman whom he victimized. Docket #313 at pp. 7 (complaining that the government's response "wholly ignores the contents of the sealed AUSA 1 letters"); *id.* (asserting that "Government counsel wholly dismisses

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Case 3:21-cr-00062-AMAH Document 326-07 SEALED Filed 12/10/24 Page 8 of 12

the idea that former Judge Kindred's conduct was similar to the conduct that was alleged to Rolando"); *id.* at p. 9 ("For the Government to state that former Judge Kindred's conduct as described by AUSA 1 does not mirror the alleged behavior of Rolando is to bury one's head in the sand.").  But whether subjective concerns described in the senior AUSA's second letter—about Kindred's possible withdrawal of support for her candidacy for a federal judgeship and undefined damage to her legal career—are anything like Hernandez-Zamora's four-year-long campaign of violence and explicit threats of violence against his own victim is an argument on the merits, not one that supports lifting this Court's sealing and protective orders.  Hernandez-Zamora *asserts* that he is prejudiced by the "dilemma" of having to either file his reply under seal (which he has done, *see* Docket #315) or refrain from relying on the protected materials, Docket #313 at p. 9, but never *explains* how this harms his ability to litigate his claims.  And, as his reply demonstrates, he was fully able to present arguments to this Court based on the protected materials, simply by filing them under seal.

Ultimately, the *only* reason Hernandez-Zamora provides for lifting the protective and sealing orders has nothing to do with his ability to effectively press his claims in court. Instead, he argues that he is entitled to publicize the personal and confidential protected materials and is prejudiced *before the public* by judicial restrictions on his ability to do so. Explaining his belief that the government's public [and thus redacted] response to his substantive motion is at odds with the sealed letters of the senior AUSA, *id.* at p. 8 ("AUSA 1's own words belie the Government's argument."),  Hernandez-Zamora

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

contends that both he and the public are prejudiced by his inability to fully reply *in public*. He argues that "[t]his dilemma disserves Rolando and the public: Rolando should not be required to *appear* as though he lacks a substantive response to the Government's publicly filed opposition." *Id.* at p. 9 (emphasis added).

These contentions are meritless. Hernandez-Zamora does not have standing to assert the public's right of access. *See, e.g.*, *United States v. Hickey*, 185 F.3d 1064, 1066 (9th Cir. 1999) (holding that the government "lacks third-party standing to assert this right [of access] on behalf of the public in this case"); *Doe v. Pub. Citizen*, 749 F.3d 246, 261 (4th Cir. 2014) (describing *Hickey* as "rejecting the proposition that a named party has standing to vindicate the public's right of access"); *Eaglin v. McCall*, No. CV 0:14-4003-PJG, 2017 WL 3498877, at *3 (D.S.C. Aug. 16, 2017) (explaining that party to lawsuit "has not established how he has standing to assert a right to access on behalf of any other person").

Further, Hernandez-Zamora has not shown that his desire to litigate his claim in the media requires disclosure of personal and damaging information about the senior AUSA. Indeed, Hernandez-Zamora's own merits argument undercuts his motion to lift the protective and sealing orders. On one hand he asks this Court to find that Kindred's conduct is analogous to his own, arguing that "in the small legal community that is Alaska, and the even smaller community that is the federal judiciary in Alaska, [Kindred's] threat to withdraw his support of [the senior AUSA] would be the equivalent of firing a gun in the backyard of her career." *Id.* at p. 9. On the other, after analogizing the senior AUSA

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

to his own crime victim, Hernandez-Zamora insists on further victimizing the senior AUSA by disclosing information that can only cause her significant professional and personal harm.

Hernandez-Zamora's motion asks this Court to disclose prurient details about this matter that can serve only to "promote public scandal" and permit this Court's files "to serve as reservoirs of libelous statements for press consumption," *Nixon*, 435 U.S. at 598, neither of which is a proper basis for dissolving previously (and correctly) issued sealing and protective orders.[6]

### c. The Redactions to the Letters Are Appropriate and Should Remain.

The government's redactions to the two letters, which are described above, do not deny Hernandez-Zamora access to any information supportive of his post-verdict motion.[7] Further, public filing of either redacted or unredacted versions of these letters would cause the harm described above. Accordingly, Hernandez-Zamora's challenge to the redactions and his request that this Court order the government to publicly file unredacted is meritless and should be denied.

---

[6] Sealing need not be permanent. When compelling reasons for sealing no longer exist, documents can be unsealed. *In re Copley Press, Inc.*, 518 F.3d 1022, 1028 (9th Cir. 2008).

[7] The government has provided the Court with an unredacted copy of only the August 9, 2024 letter. If the Court requests an unredacted copy of the February 23, 2023 letter, the government will hand-deliver a copy to chambers.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

**4. Conclusion**

For the reasons stated above, the government respectfully requests that the Court

deny in its entirety Hernandez-Zamora's motion to amend the protective and sealing orders.

RESPECTFULLY SUBMITTED September 24, 2024, at Anchorage, Alaska.

<div style="margin-left:40%">

S. LANE TUCKER
United States Attorney

/s/ *Steven D. Clymer*
STEVEN D. CLYMER
Assistant United States Attorney
United States of America

</div>

**CERTIFICATE OF SERVICE**
I hereby certify that on September 24, 2024, a true and correct copy of the foregoing was served electronically on all counsel of record.

Office of the U.S. Attorney

S. LANE TUCKER
United States Attorney

JENNIFER IVERS
SETH BEAUSANG
Assistant U.S. Attorneys
STEVEN D. CLYMER
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Email: jennifer.ivers@usdoj.gov
        seth.beausang@usdoj.gov
        steven.d.clymer@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>ROLANDO HERNANDEZ-ZAMORA,<br><br>　　　　　Defendant. | No. 3:21-cr-00062-MAH-MMS |

## RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO AMEND PROTECTIVE ORDER [DOCKET #313] FILED UNDER SEAL

The United States of America, by and through its counsel of record, the United

States Attorney for the District of Alaska, respectfully responds to and opposes defendant

Rolando Hernandez-Zamora's Motion to Amend Protective Order, filed at Docket #313.

Although Hernandez-Zamora's requests are not entirely clear, he apparently asks this Court to (1) amend or lift its sealing order at Docket #308 and unseal the government's response to his motion to dismiss or for a new trial ["post-verdict motion"], including attachments to the response[1]; (2) amend or lift its protective order at Docket #304 and "publish" one or more of his motions "on the public docket"[2]; and (3) order the government to publicly file unredacted copies of two letters attached as exhibits to the government's response. As explained below, Hernandez-Zamora does not provide good reason for these requests. Accordingly, his motion should be denied.

## 1. Background

On July 19, 2024, Hernandez-Zamora moved post-verdict for an order vacating his conviction and either dismissing the indictment against him or granting him a new trial.

---

[1] Hernandez-Zamora's motion challenges "the stipulated protective orders at Sealed Dockets 304 and 305." Docket #313 at p. 1. In fact, Docket #305 is a government *motion* for an order to seal both its response to Hernandez-Zamora's post-verdict motion and the accompanying exhibit. This government sealing motion resulted in the sealing order located at Docket #308. Accordingly, the government interprets Hernandez-Zamora to be moving to amend or lift the Court's sealing order at Docket #308, as well as the protective order at Docket #304.

Hernandez-Zamora also requests unsealing of "the Government's *motions* and exhibits so they may be made part of the public record." Docket #313 at p. 2; *see also id.* at pp. 9, 13 (referring to "the Government's sealed motions and exhibits"). In fact, the government filed a sealed *response*, with exhibits, to Hernandez-Zamora's post-verdict motion. Docket #306. (It also filed a redacted version of this response publicly. Docket #307.) The government interprets Hernandez-Zamora's present motion to seek unsealing of the government's sealed *response* and exhibits.

[2] Hernandez-Zamora's motion states: "after this Court's consideration of this and Rolando's concurrently filed reply and related motions, defense counsel asks this Court to unseal this motion and publish it on the public docket." Docket #313 at p. 2. Read literally, this passage seeks unsealing of only the defense motion at Docket #313, which moves to lift the Court's sealing and protective orders. It is unclear whether Hernandez-Zamora also seeks unsealing of his reply, filed at Docket #315, and/or other unspecified motions.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Docket #276. Among other things, he claimed that he is entitled to a new trial because former United States District Judge Joshua Kindred, who presided over his trial, erred by failing to recuse under 18 U.S.C. § 455. *Id.* at pp. 16-22. Hernandez-Zamora argued that Kindred was not impartial for three reasons, each requiring recusal: (a) Kindred's own misconduct was similar to that for which Hernandez-Zamora was convicted; (b) a senior AUSA who had a personal relationship with Kindred both attended the trial and gave advice to the government attorneys who tried the case; and (c) the trial took place around the same time as a judicial investigation into Kindred's misconduct. *Id.*

On July 29, 2024, the Court granted a government motion to extend to its filing deadline to obtain trial transcripts. Docket #280, #281. On August 15, 2024, the government sought further extension for reasons explained in an *ex parte*, *in camera*, and under seal filing. Docket #294. In support of that motion, the government described two letters signed by the senior AUSA, dated February 20, 2023, and August 9, 2024. It explained that information contained in these letters was "confidential and highly personal" but that "[s]ome information in the senior AUSA's second statement . . . arguably is supportive of an argument that Hernandez-Zamora makes in connection with the judicial misconduct claim in his new trial motion," and noted that "Hernandez-Zamora argues as one basis for relief that Judge Kindred was unable to be fair and impartial to the defense at trial because his own conduct was similar to the cyber-stalking offense charged against Hernandez-Zamora." Docket #293-1 (*ex parte* and sealed). It further explained that "[t]he government is aware that it has an obligation to produce to Hernandez-Zamora material

information favorable to the new trial motion, but the information in the only recently received senior AUSA's second statement . . . is incomplete, vague, and conclusory." *Id.*[3] Accordingly, the government requested additional time for "further investigation to assess its disclosure obligations." *Id.* On August 19, 2024, this Court granted the government's second extension request. Docket #299.

On or around August 30, 2024, Hernandez-Zamora, through counsel, orally agreed to not oppose a protective order pertaining to documents the government planned to produce.[4] Later that day, the Court granted the government's unopposed motion for a protective order. Docket #304. The order applies to government-designated documents produced to defense counsel. *Id.* It does not limit Hernandez-Zamora's use in this litigation of such designated documents and permits him to provide or disclose such documents (and information they contain) "to those persons employed by defense counsel who are necessary to assist counsel in these proceedings." *Id.* It requires that pleadings

---

[3] The government's *ex parte* and sealed filing also explained that the government planned to hand-deliver an unredacted copy of the August 9, 2024 statement to the Court rather than file it electronically "because of its confidential and highly personal nature." *Id.* The government later did so.

[4] Hernandez-Zamora asserts that government counsel conditioned the government's production on a defense agreement to not oppose a motion for a protective order. Docket #313 at p. 4 ("asserting that government counsel "would disclose those items only if she agreed to a protective order"). Government counsel has a different recollection. The government planned to produce redacted copies of the senior AUSA's two letters after a protective order was in place *or* it had an opportunity to move for one, without regard to whether the motion was successful. In a brief telephone conversation with defense counsel, government counsel explained that the government had materials to produce but would move for a protective order before doing so. Government counsel asked whether defense counsel would agree to not oppose the motion. Defense counsel agreed. Government counsel did not state that the government's production of the materials was contingent on defense non-opposition to the government motion for a protective order.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

referring to the contents of government-designated documents be filed under seal or, at the minimum, be redacted from publicly filed documents to remove references to material in them. *Id.* Hernandez-Zamora now challenges this protective order.

On August 30, 2024, government counsel produced to defense counsel redacted versions of the two letters, along with the protective order. The government designated these letters as materials to which the protective order applies. The letters are redacted as follows:

Redactions to February 20, 2023 letter:
- Recipient information, subject line, salutation, and first sentence describing the genesis of the letter; and
- Portion from the bottom of page 5 until the last paragraph of page 15 and portions of the last paragraph, all addressing matters other than the senior AUSA's relationship or communications with Kindred.

Redactions to August 9, 2024 letter:
- Recipient information, subject line, salutation, and portions of first paragraph describing the genesis of the letter;
- Recipient information in paragraph on page 1 beginning "As my February 20, 2023 initial response";
- Recipient information in paragraph on page 5 beginning "On the day I was";
- Personal and confidential information unrelated to Kindred at the bottom of page 5; and
- Recipient information in last two paragraphs on page 6.

On September 3, 2024, the Court granted the government's motion to file its response to Hernandez-Zamora's post-verdict motion under seal. Docket #308. Later that same day, the government filed a sealed unredacted response to Hernandez-Zamora's post-verdict motion. Docket #306. Copies of the two redacted letters it had provided to defense counsel were attached as an exhibit and also sealed. Docket #306-1. At the same time, the government filed a public version of its response in which discussion of information from

the two letters was redacted. Docket #307. The redacted letters were not attached to this publicly filed version of the response. *Id.* The government served both versions of its response on defense counsel. Hernandez-Zamora now apparently[5] challenges the order sealing the government's response and attached letters, as well as redactions to the letters.

## 2. Governing Law

A court can properly order the sealing of judicial records, including dispositive pleadings and documents attached to such pleadings, when there are "compelling reasons" to do so. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (explaining that "'compelling reasons' must be shown to seal judicial records attached to a dispositive motion"). "The 'compelling reasons' standard is invoked even if the dispositive motion, or its attachments, were previously filed under seal or protective order." *Id.*

"[T]he right to inspect and copy judicial records is not absolute," and should not "become a vehicle for improper purposes." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447 F.3d at 1179 (quoting *Nixon*, 435 U.S. at 598). Courts have recognized that there are compelling reasons to seal matters of a "very private nature." *Martinez v. Cnty. of Los Angeles*, No. 2:22-CV-6589-DSF-AFMX, 2024 WL 2947273, at *1 (C.D. Cal. Apr. 5,

2024) (sexting communications and related investigatory materials); *L.W. through Doe v. Snap Inc.*, 675 F. Supp. 3d 1087, 1102 (S.D. Cal. 2023) (ordering sealing of screen names based on "respectable concerns relating to user privacy and safety"); *Henry v. Municipality of Anchorage*, No. 3:15-CV-00187-RRB, 2018 WL 11417375, at *4 (D. Alaska Sept. 25, 2018) (approving redactions and previously-imposed sealing "to protect victims, informants, and other sensitive information").

Sealing in criminal cases is not uncommon. The Ninth Circuit has recognized that transcripts of grand jury testimony and warrant materials are "not subject to the right of public access at all because the records have traditionally been kept secret for important policy reasons." *Kamakana*, 447 F.3d at 1178. Further, the District of Alaska requires the sealing of certain judicial documents in criminal cases. *See* District of Alaska Local Criminal Rules 11.1(e) (plea agreement addendum), 32.1 (sentencing memorandum addendum). Significantly, these local rules also contemplate that motions addressing other matters, as well as documents related to such motions, can properly be sealed, and provide a process by which litigants can seek judicial approval for doing so. *See* Alaska Local Criminal Rule 47.1(f), (j).

### 3. Argument

#### a. This Court Properly Issued the Challenged Sealing and Protective Orders.

"Compelling reasons" supported this Court's decisions to order sealing and issue a protective order. The sealing order and protective order are necessary to safeguard confidential and highly personal information about an Assistant United States Attorney and

member of the Alaska Bar. Disclosure of the sealed and protected materials, which certainly would be reported in the national new media, would publicize an official identification of the senior AUSA by name, which has not occurred, and also would make public the senior AUSA's description of salacious details of her relationship with Kindred that have not appeared in news accounts. As this Court undoubtedly recognized when it issued the sealing and protective orders, public disclosure of the letters, even in redacted form, or the information contained in them would cause significant and irreparable professional, financial, personal, and emotional harm to the senior AUSA.

Significantly, this is not a situation in which the government both introduces information in its possession to support its own litigation position and, at the same time, urges a district court to deny public access to the information. Here, by contrast, the government made disclosure (without the senior AUSA's consent) not to enhance its own position but instead to ensure that Hernandez-Zamora was aware of information arguably favorable to his motion.

### b. Hernandez-Zamora Has Offered No Sound Reason for Lifting the Sealing Order or Protective Order.

Hernandez-Zamora has not offered a cogent reason to make the sealed and protected material public. He repeatedly expresses displeasure that the government, despite information in the senior AUSA's letters, refuses to agree with him that Kindred's misconduct was akin to own his cyberstalking of the woman whom he victimized. Docket #313 at pp. 7 (complaining that the government's response "wholly ignores the contents of the sealed AUSA 1 letters"); *id.* (asserting that "Government counsel wholly dismisses

Case 3:21-cr-00062-MAH Document 320 SEALED Filed 12/10/24 Page 100 of 104

the idea that former Judge Kindred's conduct was similar to the conduct that was alleged to Rolando"); *id.* at p. 9 ("For the Government to state that former Judge Kindred's conduct as described by AUSA 1 does not mirror the alleged behavior of Rolando is to bury one's head in the sand."). But whether subjective concerns described in the senior AUSA's second letter—about Kindred's possible withdrawal of support for her candidacy for a federal judgeship and undefined damage to her legal career—are anything like Hernandez-Zamora's four-year-long campaign of violence and explicit threats of violence against his own victim is an argument on the merits, not one that supports lifting this Court's sealing and protective orders. Hernandez-Zamora *asserts* that he is prejudiced by the "dilemma" of having to either file his reply under seal (which he has done, *see* Docket #315) or refrain from relying on the protected materials, Docket #313 at p. 9, but never *explains* how this harms his ability to litigate his claims. And, as his reply demonstrates, he was fully able to present arguments to this Court based on the protected materials, simply by filing them under seal.

Ultimately, the *only* reason Hernandez-Zamora provides for lifting the protective and sealing orders has nothing to do with his ability to effectively press his claims in court. Instead, he argues that he is entitled to publicize the personal and confidential protected materials and is prejudiced *before the public* by judicial restrictions on his ability to do so. Explaining his belief that the government's public [and thus redacted] response to his substantive motion is at odds with the sealed letters of the senior AUSA, *id.* at p. 8 ("AUSA 1's own words belie the Government's argument."), Hernandez-Zamora

Case 3:21-cr-00062-MAH Document 307-SEALED Filed 12/09/24 Page 101 of 104

contends that both he and the public are prejudiced by his inability to fully reply *in public*. He argues that "[t]his dilemma disserves Rolando and the public: Rolando should not be required to *appear* as though he lacks a substantive response to the Government's publicly filed opposition." *Id.* at p. 9 (emphasis added).

These contentions are meritless. Hernandez-Zamora does not have standing to assert the public's right of access. *See, e.g.*, *United States v. Hickey*, 185 F.3d 1064, 1066 (9th Cir. 1999) (holding that the government "lacks third-party standing to assert this right [of access] on behalf of the public in this case"); *Doe v. Pub. Citizen*, 749 F.3d 246, 261 (4th Cir. 2014) (describing *Hickey* as "rejecting the proposition that a named party has standing to vindicate the public's right of access"); *Eaglin v. McCall*, No. CV 0:14-4003-PJG, 2017 WL 3498877, at *3 (D.S.C. Aug. 16, 2017) (explaining that party to lawsuit "has not established how he has standing to assert a right to access on behalf of any other person").

Further, Hernandez-Zamora has not shown that his desire to litigate his claim in the media requires disclosure of personal and damaging information about the senior AUSA. Indeed, Hernandez-Zamora's own merits argument undercuts his motion to lift the protective and sealing orders. On one hand he asks this Court to find that Kindred's conduct is analogous to his own, arguing that "in the small legal community that is Alaska, and the even smaller community that is the federal judiciary in Alaska, [Kindred's] threat to withdraw his support of [the senior AUSA] would be the equivalent of firing a gun in the backyard of her career." *Id.* at p. 9. On the other, after analogizing the senior AUSA

Case 3:21-cr-00062-MAH Document 284-3 SEALED Filed 11/09/24 Page 102 of 104

to his own crime victim, Hernandez-Zamora insists on further victimizing the senior AUSA by disclosing information that can only cause her significant professional and personal harm.

Hernandez-Zamora's motion asks this Court to disclose prurient details about this matter that can serve only to "promote public scandal" and permit this Court's files "to serve as reservoirs of libelous statements for press consumption," *Nixon*, 435 U.S. at 598, neither of which is a proper basis for dissolving previously (and correctly) issued sealing and protective orders.[6]

### c. The Redactions to the Letters Are Appropriate and Should Remain.

The government's redactions to the two letters, which are described above, do not deny Hernandez-Zamora access to any information supportive of his post-verdict motion.[7] Further, public filing of either redacted or unredacted versions of these letters would cause the harm described above. Accordingly, Hernandez-Zamora's challenge to the redactions and his request that this Court order the government to publicly file unredacted is meritless and should be denied.

---

[6] Sealing need not be permanent. When compelling reasons for sealing no longer exist, documents can be unsealed. *In re Copley Press, Inc.*, 518 F.3d 1022, 1028 (9th Cir. 2008).

[7] The government has provided the Court with an unredacted copy of only the August 9, 2024 letter. If the Court requests an unredacted copy of the February 23, 2023 letter, the government will hand-deliver a copy to chambers.

U.S. v. Hernandez-Zamora
3:21-cr-00062-MAH-MMS

Case 3:21-cr-00062-MAH Document 324-3 *SEALED* Filed 11/09/24 Page 103 of 104

### 4. Conclusion

For the reasons stated above, the government respectfully requests that the Court

deny in its entirety Hernandez-Zamora's motion to amend the protective and sealing orders.

RESPECTFULLY SUBMITTED September 24, 2024, at Anchorage, Alaska.

<div align="right">

S. LANE TUCKER
United States Attorney

/s/ *Steven D. Clymer*
STEVEN D. CLYMER
Assistant United States Attorney
United States of America

</div>

**CERTIFICATE OF SERVICE**
I hereby certify that on September 24, 2024, a true and correct copy of the foregoing was served electronically on all counsel of record.

Office of the U.S. Attorney